Charles Donald **BELCHER**, Plaintiff,

v.

**BIRMINGHAM TRUST NATIONAL BANK**, a corporation, et al., Defendants.

Civ. A. No. 64–168.

United States District Court,
N. D. Alabama, S. D.

May 1, 1968.

Charles E. Clark, of Silberman, Silberman, Clark & Loeb, Birmingham, Ala.; Baker & Baker, Clearwater, Fla., for plaintiff.

Robert B. Donworth, Jr., and Harry R. Teel, of Bradley, Arant, Rose & White, Birmingham, Ala., for Birmingham Trust National Bank.

Ralph B. Tate, John P. Ansley of Spain, Gillon, Riley, Tate & Ansley, Birmingham, Ala., for Robena B. Davis and Fred H. Davis.

Erle Pettus, Jr., and Edgar M. Elliott, III, and W. Eugene Rutledge of Rives, Peterson, Pettus & Conway, Birmingham, Ala., for corporation, partnership, and individual defendants other than Robena B. Davis and Fred H. Davis. McLean Pitts, of Pitts & Pitts, Selma, Ala., associated counsel.

## OPINION IN LIEU OF FORMAL FINDINGS UNDER RULE 52 F.R.CIV.P.*

GROOMS, District Judge.

After sundry preliminary hearings, the trial of this action began on May 17, 1965, and was concluded on July 27, 1966. Sixty days were devoted to the taking of evidence, the transcript of which, excluding exhibits, covers 9662 pages. Depositions received in evidence cover 6012 pages, not including exhibits. Over 1600 exhibits were tendered and most of them admitted in evidence. The Court files, six in number, contain 1450 pages. The briefs extend to a total of 1850 pages. Certain of the defendants and cross-defendants have provided the Court with proposed Findings and Conclusions of 288 pages. The Court's penciled notes made during the course of the trial are 152 pages in length. These statistics are recited neither for the discouragement nor the enlightenment of those who must read them, nor for the elicitation of sympathy for the Court from the sheer size of the undertaking which has devolved upon it, but to account for the length of the opinion which follows, the time required for its preparation, and the resulting delay in its issuance.

In the hope that perhaps the areas of decision, both as to facts and law, may be more succinctly detailed, the Court has chosen to state the facts chronologically and narratively, with the law applicable thereto, rather than in the usual numerical sequence common to Rule 52 findings and conclusions.

To avoid repetition, the facts found as to any issue are to be taken and considered as found as to any other issue to which they may be applicable.

In formulating its opinion, the Court has given careful consideration to the evidence and exhibits, the oral arguments, the excellent briefs, the entire proceedings, and issues submitted to it. The results speak for themselves.

## HISTORY OF THE BELCHER ENTERPRISES TRUSTS AND ESTATES

The *W. E. Belcher Lumber Company* was founded by W. E. Belcher, Sr. during the early part of the century and was operated as a sole proprietorship until 1941. The Lumber Company (herein referred to as the Corporation) was incorporated in 1941 as the W. E. Belcher Lumber Company, Inc. The incorporators, who were also the original directors and stockholders, were issued 1,000 shares of stock of a par value of $50.00 per share, and were as follows:

| | |
|---|---|
| W. E. Belcher | 996 shares |
| Brady Belcher | 1 share |
| H. H. Maxwell | 1 share |
| A. Roland Belcher | 1 share |
| W. E. Belcher, Jr. | 1 share |

W. E. Belcher was president, Brady Belcher—vice-president, and Roland Belcher—secretary. Upon the death of W. E. Belcher in 1945, Brady Belcher became president and has continued to serve as such. The original directors, other than W. E. Belcher, Sr., have continued to serve in that capacity, with the exception of Roland Belcher who retired from participation in the company business in 1949. Mrs. Robena Davis and

---

* See Belcher v. Birmingham Trust National Bank, as Trustee, 5 Cir., 395 F.2d 685. Belcher v. Grooms, 5 Cir., 406 F.2d 14.

Mrs. H. H. Maxwell have served as directors since that year.

Mr. Belcher, Sr. was survived by five children and his widow, Mrs. Ella Belcher. These children in order of birth are: Brady, Mrs. Ruby Maxwell, A. Roland, W. E., Jr., and Mrs. Robena Davis.

Prior to 1949 all of the 996 shares of stock in the Corporation was transferred to the children of W. E. Belcher—the government accepting an estate valuation of $650.00 per share on the transfers. In 1949 the stock was held as follows:

| | |
|---|---|
| Brady Belcher | 201 shares |
| Mrs. H. H. Maxwell | 199 shares |
| Mr. H. H. Maxwell | 1 share |
| A. Roland Belcher | 200 shares |
| W. E. Belcher, Jr. | 200 shares |
| Mrs. Robena Davis | 199 shares |
| Total ........ | 1,000 shares |

The business of the Corporation had flourished by the time of the death of Mr. Belcher in 1945. Some 80,000 acres of timber land had been acquired, and the operation had grown from a small sawmill to an extensive plant at Centreville, Alabama, manufacturing various lumber products.

On July 1, 1949, Roland conveyed 40 shares of his stock to the Corporation subject to an option to repurchase within ten years. On July 16, 1951, he conveyed to it 30 additional shares subject to a like option to repurchase. Neither option was exercised. The facts as to these options will appear in detail when the specific questions involving them are reached.

On July 16, 1951, Roland by deed of trust conveyed his remaining 130 shares to the Birmingham Trust National Bank, as Trustee, under an *inter vivos* trust. The options to repurchase, together with certain other property, were also set over to said trust.

On May 23, 1963, the Birmingham Trust sold 30 shares of the stock held by it in the trust to Fred H. Davis, the husband of Robena. The Corporation thereafter refused to transfer the owner-

ship of this 30 shares upon its books. Title to this 30 shares is in dispute in this litigation. The facts as to the sale of the 30 shares will likewise appear later in these findings. Since the sale to Davis, W. E. Belcher, Jr. has transferred one share of his stock to his son W. E. Belcher, III. Mrs. Maxwell has transferred one of her shares to her daughter, Mrs. Fred Hallman. The 30 shares involved on the second sale by Roland were acquired upon the expiration of the option by the Belcher Lumber Sales Co., Ltd.

The *Belcher Lumber Sales Co.* was formed in 1944 as a general partnership. This partnership entered into an "output" agreement with the Corporation, by which it was to act as a sales agency to the Corporation. The purchase price of lumber payable to the Corporation was 8% less than the sales price with a credit period of 15 days to the Sales Company. The partners contributed capital to the Sales Company in the amount of $100,000.00 in the following percentages:

| | |
|---|---|
| Brady Belcher | 34 % |
| Mrs. H. H. Maxwell | 16.5% |
| A. Roland Belcher | 16.5% |
| W. E. Belcher, Jr. | 16.5% |
| Mrs. Robena Roby (Davis) | 16.5% |
| | 100 % |

The general partnership continued until July 16, 1951, when, with the consent of all the partners, Roland's interest was conveyed to the Birmingham Trust. On July 23, 1961, the *Belcher Lumber Sales Company, Ltd.*, a limited partnership under the laws of Alabama, was established and assumed the business of the existing general partnership. The Birmingham Trust became a special or limited partner. The percentages of ownership remained the same, but the capital was reduced by one-half, and the other one-half plus an earned surplus account of approximately $24,000.00 were set up in a paid surplus account. On January 1, 1952, all accounts were merged into a single partner's account.

On November 13, 1956, the *Belcher Wood Products, Ltd.* was formed for the purpose of purchasing non-merchantable timber products from the Corporation for conversion to wood chips for sale to paper manufacturers. The partners contributed $50,000.00 to the capital in the following percentages:

| | |
|---|---|
| Brady Belcher | 20% |
| Mrs. H. H. Maxwell | 10% |
| Mrs. Fred Hallman | 5% |
| Mrs. Ruby Maxwell Palmer | 5% |
| W. E. Belcher, Jr. | 20% |
| Mrs. Robena Davis | 20% |
| Birmingham Trust | 20% |

Mrs. Palmer, not heretofore identified, is the daughter of Mrs. Maxwell. Birmingham Trust was and is a special partner.

In 1959 Brady, W. E., Jr., Mrs. Maxwell and Mrs. Davis organized a corporation known as *Engineered Structures, Inc.* Each of the stockholders owns 25% of the stock. This corporation was organized to use the Corporation products in the manufacture of wooden structural members, principally roof trusses. The corporation did not intend to pay dividends, and the Birmingham Trust declined an invitation to become a partner.

In the 1940's Brady Belcher, his wife Beulah, and his brother-in-law George Phillip White, an attorney, formed *Brady Belcher Interests, Inc.* This company owned a sawmill known as *Silas Lumber Company.* These parties were also the incorporators of the *Belcher Motor Company* and the *Centreville Oil Company.* The *Belcher Investment Company* is a partnership or joint venture organized in 1954 by Brady with a two-thirds interest and by W. E., Jr. with a one-third interest. *Southern Pine Homes, Inc.* was organized in 1954 by Brady, W. E., Jr., Lester Harris and Earl Furlong, with control resting equally in Brady and W. E., Jr. It was organized to engage in the house building business. All of the corporations referred to are Alabama corporations with their principal places of business in Centreville, Alabama.

*J. L. Bell Company, Inc.* and *Norris Furniture Corporation* are Florida corporations, with their principal offices in Quincy, Florida, engaged in the manufacture and sale of furniture, respectively. The capital stock of these corporations was acquired in the name of Brady and W. E., Jr., who claim that the acquisition was as agents of the Sales Company. The Sales Company to a large extent, and the Corporation to a lesser, have financed these two corporations with alarming if not with disastrous results, and much of this controversy stems from this action. Those opposed to Brady and W. E., Jr. claim that they acted wholly without authority; that all of the transactions respecting said corporations were in fact the private undertaking of Brady and W. E., Jr. and not that of the Sales Company or Corporation.

After the institution of this litigation Brady Belcher caused a *Costa Rica Company* to be organized for the exploitation of a timber contract with the government of Costa Rica. The stockholders appear to be the nominees of Brady who purportedly hold the stock for the W. E. Belcher Lumber Company. It is charged that this endeavor was undertaken without authority of the Board of Directors of the Corporation.

In 1965 *Forest Industries, Inc.* was incorporated in Iowa with its principal place of business in Moline, Illinois, for the purpose of manufacturing boxes and crates. Brady and W. E., Jr. subscribed to 51% of the capital stock in the name of the Sales Company and again it is claimed without any notice to the other partners of the Sales Company. The Sales Company at the instance of Brady and W. E., Jr. has extended very substantial credit to this company, which is averred to be insolvent.

At the time A. Roland Belcher established the trust referred to, which is known as Trust B, he also established another trust, known as Trust A. Plaintiff, Charles Donald Belcher, the only son of Roland and Charles' mother, Mary Rogers Belcher, was the income benefi-

ciary of Trust A. Trust A was to terminate and be paid over to Charles at age 25. He was granted power to invade the corpus with the consent of his mother. There remains only $1.00 in Trust A.

In 1953 Trust B was amended to delay vesting in Charles until he attained the age of 25 as to one-half of the corpus, and until he attained the age of 30 as to the remainder. Roland reserved the income during his life. Thereafter the income was payable to Charles. Roland died February 7, 1959. The Birmingham Trust became his executor. Except for certain personal items, the testamentary estate poured over into Trust B. There were substantial debts of his estate, including estate taxes, since Trust B was included in the estate for estate tax purposes.

Brady, W. E., Jr. and H. H. Maxwell are the trustees of the *Estate of W. E. Belcher, Sr.* Income from the trust was payable quarterly to the five children of W. E. Belcher, Sr. and his widow Ella Belcher. After Roland's death his share was payable to the plaintiff. Except for a small distribution right after Mr. Belcher's death, no distribution of income has been made from the trust. This has accumulated and now amounts to a very substantial sum. Failure to distribute this income has become a point of controversy in this action as well as in a separate action in the state court.

## HISTORY OF THE LITIGATION AND PARTIES

This litigation was instituted by Charles Donald Belcher, a citizen of Florida, on March 31, 1964, against Birmingham Trust National Bank, a corporation. By amendment of June 14, 1964, the following were added as parties defendant:

Brady Belcher, W. E. Belcher, Jr., Ruby B. Maxwell, H. H. Maxwell, Ruby M. Palmer, Julia M. Hallman, Robena B. Davis, W. E. Belcher Lumber Company, Inc., a corporation; Belcher Lumber Sales Company, Ltd., a limited partnership, whose general partners are Brady Belcher, W. E. Belcher, Jr.,

Ruby B. Maxwell and Robena B. Davis; Belcher Wood Products, Ltd., a limited partnership whose general partners are the same as those in the Sales Company with the addition of Julia M. Hallman and Ruby M. Palmer.

On August 6, 1964, the defendant Birmingham Trust National Bank, as Trustee, filed a cross-claim against all the parties defendant added by the amendment of June 18, except the two partnerships, and added as other cross-defendants: Beulah White Belcher, Clara Dukes Belcher, Fred H. Davis, W. E. Belcher, III, Belcher Investment Company, Belcher Motor Company, Inc., Brady Belcher Interests, Inc., Southern Pine Homes, Inc., Centreville Oil Company, Inc., and Ella Belcher.

On August 20, 1964, Mrs. Robena B. Davis filed a cross-claim against all the cross-defendants named in the Trustee's cross-claim, including Mr. Davis, except her mother Ella Belcher. By amendment of the same date Birmingham Trust National Bank was made a cross-defendant to Mrs. Davis' cross-claim.

On October 7, 1964, cross-defendant Fred H. Davis filed a cross-claim against all the cross-defendants named by Mrs. Davis, including Mrs. Davis, but not including Beulah White Belcher, Clara Dukes Belcher, the Investment Company, the Motor Company, Southern Pine, or Centreville Oil.

On May 13, 1965, Mary Rogers Belcher, plaintiff's mother, a citizen of Florida, intervened in the case as a party plaintiff adopting the allegations of the complaint of the plaintiff.

## PLEADINGS AND RELIEF SOUGHT

The pleadings in this case are voluminous. The relief sought, except such as shown by the amplification encompassed by the order of April 13, 1965, and except such as sought by amendment since the pretrial order of May 14, 1965, is set out in the pretrial order.

Plaintiff in his original complaint seeks an equitable accounting and related relief as to the Trustee, Birmingham Trust. He charges breach of duty by

the Trustee Bank as follows: (1) failure to collect income; (2) failure to preserve the trust property; (3) failure to control assets; and (4) breach of duty of care in the administration of the estate. As to the other defendants plaintiff seeks an accounting for alleged damage done to the plaintiff's interest in the trust estate.

By its cross-claim, as amended to date of the pretrial order, Birmingham Trust seeks the following relief: (1) a dissolution of the corporation, the Lumber Company; (2) a dissolution of the Sales Company and Wood Products partnership; (3) an accounting—(a) for sums owing to the Lumber Company in nine particulars, (b) upon dissolution for sums owing the two partnerships in twelve particulars, and (c) of funds of the estate and testamentary trust of W. E. Belcher, Sr.; (4) a declaration removing any cloud upon the Trustee's title to any stock owned by it in the Corporation and the right to alienate same without limitation of the right of purchase by the Corporation; and (5) an indemnity or exoneration from the cross-defendants if it be held liable to the plaintiff.

By an amendment of June 21, 1966, to its cross-claim, identified as the "Florida Lands amendment," the Bank challenges the legality of the action of Brady Belcher, the Corporation, W. E. Belcher, Jr. and Ruby Maxwell (the latter two concurring with Brady), respecting the two sales of stock by Roland Belcher, and the subsequent acquisition of the shares by the Corporation and the Sales Company, as well as their action which culminated in the sale to Fred Davis of 30 shares in 1963. The challenge includes an alleged violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b). The Court reserved a ruling on the objections to the allowance of that aspect of the amendment relating to the Securities Exchange Act.

By a further amendment of June 29, 1966, the Bank seeks to establish a constructive trust on behalf of the Corporation in the Florida lands acquired by Brady Belcher allegedly with its corporate funds. It also seeks damages claimed to have been sustained on the sale of the 30 shares of stock to Fred Davis.

Mrs. Davis by her amended cross-claim seeks the same relief sought by the Trustee in (1), (2), (3), (4) and (5), except she does not seek relief as to salary and small loan business income paid to her mother Mrs. Ella Belcher. As to an accounting on the dissolution of the partnerships she seeks the same relief as the Bank respecting loss or damage suffered by reason of a breach of the general partners' failure to disclose the true state of facts of the financial condition of the partnerships, denying any dereliction on her part as a general partner.

By a further amendment to her cross-claim filed June 30, 1966, Mrs. Davis seeks also to establish for the Corporation a constructive trust on the Florida lands.

By his cross-claim Fred H. Davis seeks: (1) to require the Corporation to transfer the 30 shares of stock, which he purchased from the Bank as Trustee, and a removal of any cloud to his title thereto or his right to alienate same; and (2) a dissolution of the Corporation.

The Court heard evidence on Forest Industries, Inc. and the Costa Rica Company, and acquisitions by that company and the claims respecting same are in issue.

The defendants, other than Birmingham Trust and Mrs. Davis, enter a general denial of the right of the plaintiff to any relief. They also assert among other defenses that the plaintiff is without right to maintain this action without a joinder of the Bank, as Trustee, an indispensable party plaintiff, and that there should be a realignment of the Trustee with the plaintiff, and that when the parties are thus realigned the Court is without jurisdiction since the Trustee and the defendants are citizens of Alabama. Such defendants also charge that there is collusion between the Trustee and plaintiff beneficiary.

For answer to the complaint and to the cross-complaint of the Birmingham Trust National Bank, the defendant Robena B. Davis pleads (1) the general issue; (2) the statute of limitations; (3) laches; (4) waiver and estoppel; and (5) contributory fault on the part of the plaintiff and the intervenor.

For answer to the complaint the Birmingham Trust National Bank pleads (1) the general issue, except as otherwise admitted in its written answer; (2) the statute of limitations; (3) laches; (4) waiver and estoppel; (5) as to any lack of diligence on its part, which it denies, it pleads the contributory fault on the part of the beneficiaries and each of them; (6) ratification by the conduct of the Trust settlor, A. Roland Belcher, during his lifetime; and (7) to the extent that the plaintiff fails to sustain his claim against the defendants, it would not be liable to the plaintiff.

For answer to the cross-claim of the Birmingham Trust National Bank with respect to the dissolution of the Corporation and the partnerships, the cross-defendants, other than Robena B. Davis and Fred H. Davis, say that such relief is not within the scope of Rule 13(g) of the Federal Rules of Civil Procedure and that the cross-claimant is not entitled to any relief upon said claims, and in the alternative the defendants say that if cross-plaintiff is entitled to any such relief it should be realigned with the plaintiff in this action, thereby defeating diversity jurisdiction. The defendants also plead: (1) lack of jurisdiction of the cross-claim under Rule 13(g) due to improper alignment; (2) failure to comply with the conditions of Rule 23(b); (3) the general issue; (4) statute of limitations; (5) laches; (6) waiver and estoppel; (7) ratification; and (8) contributory fault on the part of the plaintiff, intervenor and cross-complainants.

The cross-defendants assert: (1) that said cross-claim of Fred H. Davis is not a legal cross-claim under Rule 13(g); and (2) when the claim is properly aligned the Court will be deprived of jurisdiction of the said claim insofar as dissolution of the Corporation is sought. For the remaining answers, the defendants adopted all of the answers asserted to the counterclaim of the Birmingham Trust National Bank.

At the outset the Court is met with the jurisdictional question above referred to both with respect to the claims asserted by the plaintiff to the plaintiff's cause of action as well as to the claims laid in the cross-complaints.

## JURISDICTION

Brady Belcher and those arrayed with him as defendants and cross-defendants filed motions to dismiss both the original suit and the cross-claims challenging, *inter alia,* the diversity jurisdiction of the Court. They insist that the defendant Birmingham Trust should be realigned with the plaintiff and that such realignment would place residents of Alabama on opposite sides in the litigation thereby destroying diversity. By orders of July 23 and September 21, 1964, the Court overruled the motions assailing jurisdiction. In initially disposing of the jurisdictional question on the motions the Court followed the five–four majority opinion in Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205, which held that the trial court should determine the issue of antagonism, between a party and the party sought to be realigned with him, "by the pleadings and the nature of the dispute." The Court does not construe Smith v. Sperling as holding that if it be determined in the course of the trial on the merits that in fact there is no diversity its lack is proscribed by the Court's initial ruling on the motion holding the presence of diversity from the pleadings and the nature of the controversy. In view of this construction the Court permitted the filing of answers both as to the original and cross-claims asserting the issue of jurisdiction. The parties have briefed the question at length.

Plaintiff contends that Section 95 of Title 7 of the Code of Alabama, 1940, has conferred upon him substantive

rights as beneficiary to maintain this action against his Trustee, Birmingham Trust. This section provides that:

"A remainderman or reversioner of personalty may maintain an action against a wrongdoer for any injury going to destroy the existence or ultimate value of the property. In such cases the tenant in possession, and remainderman or reversioner, may sue jointly for the injury to the entire estate, the recovery being held under like limitations."

This section was applied in Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550, where it was held that beneficiaries of trust shares of a corporation's common stock had a right as contingent remaindermen to sue for cancellation of a consent decree, authorizing the issuance of preferred stock to another common stockholder in satisfaction of the latter's money judgment against the corporation, where there was want of a valid consideration for the judgment.

■ Where a trustee commits a breach of duty, third parties who benefit thereby or who participate therein and who are cognizant of such breach become trustees *in invitum*, and the beneficiary may hold them accountable separately or along with the trustee. Leach v. Gray, 201 Ala. 47, 77 So. 341; Saunders v. McDonough, 218 Ala. 207, 118 So. 389. This common law principle as to such third party liability finds lodgement in Title 58, Section 44, Code of Alabama, which provides:

"All persons aiding and assisting trustees of any character, with a knowledge of their misconduct, in misapplying assets, are directly accountable to the persons injured."

Rule 18(a), Federal Rules of Civil Procedure, provides:

"A party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third-party claim, may join, either as independent or as alternate claims, as many claims, legal, equitable, or maritime, as he has against an opposing party."

Rule 20(a) provides in pertinent part as follows:

"All persons . . . may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action. A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities."

Rule 13(g) provides that:

"A pleading may state as a cross-claim any claim by one party against a co-party arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or relating to any property that is the subject matter of the original action. Such cross-claim may include a claim that the party against whom it is asserted is or may be liable to the cross-claimant for all or part of a claim asserted in the action against the cross-claimant."

■ Based upon the averments of his pleadings and under the Alabama statutes and decisions plaintiff has a substantive right of action against the Bank and the other defendants, and may pursue his right in accordance with the procedures provided for in the above quoted rules, subject, of course, to the jurisdictional limitations upon this Court.

The Court will not attempt to analyze the cases pro and con on the issue of jurisdiction and alignment. Limited by the sweep of certain general principles, each case must be posited at least upon its own pleadings and the nature of the controversy, if not upon the actual facts relating to jurisdiction.

■■ After reading and understanding the voluminous charges made by the plaintiff against the Bank, the briefs respecting the same, and after hearing the contentions of the parties, the Court concludes that the controversy between the plaintiff and the Bank is not feigned or collusive, but is actual and substantial, real and apparent. It is clearly apparent that if Brady Belcher and those arrayed with him had not been sued herein, the Bank could not seriously contend that there was no jurisdiction as between it and the plaintiff. It is equally clear that the controversy, so vigorously asserted, did not vanish with the appearance of the other defendants in the case.

■ It is also contended that plaintiff must obtain relief against the Bank before he can pursue his claim against the other defendants. This contention overlooks the fact that plaintiff has the right to pursue the Bank and the other defendants jointly as well as separately. It also appears to ignore Rule 18(b) which in material part provides that "whenever a claim is one heretofore cognizable only after another claim has been prosecuted to a conclusion, the two claims may be joined in a single action; but the court shall grant relief in that action only in accordance with the relative substantive rights of the parties."

Plaintiff falls within the statutes and rules referred to. He could have maintained this action against the Trustee Bank, a citizen of Alabama, as sole defendant. He could have maintained it against the defendants added by the amendment of June 18, 1964, all citizens of Alabama, without joining the Trustee Bank. It follows that he can join them all in one action as here undertaken.

■ Jurisdiction does not fail nor is realignment required because some of the cross-claims of the Trustee Bank are related to the wrongful transactions and occurrences upon which plaintiff relies in asserting that wrongs were committed to the trust estate and property by one or more of the individual defendants added by the amendment of June 18. Also in the picture is the fact that the Trustee Bank seeks relief by its cross-bill not sought by the plaintiff, as for example, the dissolution of the Corporation, on the ground among others that the Corporation was the agency through which the wrongs were committed by Brady and W. E., Jr., and one or more of the other defendants aligned with them.

■ Although jurisdiction is not affected by the desirability of avoiding a multiplicity of actions, the fact that a joinder of claims as here undertaken will have that result attests the wisdom of the rules and principles of law permitting such joinder.

The hearing on the merits confirmed the rightness of the Court's ruling on the motions to dismiss respecting jurisdiction. Consequently, the Court finds in favor of jurisdiction both on the motions and the merits. It follows that having sustained the jurisdiction as between the plaintiff and the defendants, the jurisdiction on the cross-claims is likewise sustained since the cross-claims do not depend upon diversity. Childress v. Cook, 5 Cir., 245 F.2d 798.

The Court has not overlooked Dryden v. Dryden, 8 Cir., 265 F.2d 870. That case under its facts does not in the Court's opinion rule this case as a whole or the cross-claims seeking the establishment of constructive trusts and other relief.

## FLORIDA LANDS

Although the oldest of the transactions involved in this litigation, the Florida lands were the last upon which evidence was taken. This was due to the fact that no other stockholder or officer of the Corporation knew that Corporation funds had been used by Brady Belcher to purchase such lands, until 1966. The claims of the Bank and Mrs. Davis based on the Florida lands were filed in June 1966. They seek to establish on behalf of the Corporation a constructive trust on these lands, and an accounting of profits derived therefrom.

By deed dated May 2, 1950, and recorded in Okaloosa County, Florida, on

July 17, 1950, and in Walton County, Florida, on July 19, 1950, Brady Belcher acquired title to 18,880 acres of land lying in those counties. .Of this land 200 to 250 acres have been sold. Title to the remainder is in Brady.

The chronology of and the facts relating to the acquisition of the title to these lands are as follows:

On July 11, 1950, two sight drafts were drawn on Brady Belcher—one by Ewell N. Clark in the amount of $5,000.-00, and one by the trustees of the Britton Lumber Company, the seller of the lands, for $65,830.00, or a total of $70,-830.00. Each of these drafts was payable "to the order of the Bank of Florala, Florala, Ala."

The draft drawn by Clark was signed "as Trustee for Brady Belcher and the Trustees of Britton Lumber Co." The draft drawn on behalf of the Trustees was signed by E. P. Rodwell, Jr. "as Trustee for Britton Lumber Company." Clark was the attorney for Brady Belcher. Rodwell in addition to being a Trustee was also an officer of the Bank of Florala. The occasion for handling the matter in this manner is explained in Mr. Clark's letter of July 6, 1950, to Brady Belcher as follows:

". . . Mr. E. P. Rodwell, Jr., acting for the Trustees of Britton Lumber Company has authorized me to submit the following arrangement to you for consideration and acceptance:

"(1.) Instead of the one draft on you in the amount of $70,830.00 now placed with the deed held by the Birmingham bank, Mr. Rodwell will forward two drafts to the said bank, one drawn by him for the Trustees of Britton Lumber Company for $65,-830.00 and one by me as trustee for you and said Trustees for $5,000.00, with instructions to said bank to deliver the deed to you upon payment of both drafts;

"(2) I will hold the $5,000.00 in a separate trust account with the Bank of Florala until the marketability of the title can be reasonably determined by me; . . . ."

On July 12, the First National Bank of Birmingham wrote Brady that it had received from the Bank of Florala and then held these two drafts which were to be substituted for a draft for $70,-830.00 *"with a deed attached* which we received for collection about 60 days ago."

On July 14, Brady, who was the president and a director of the Corporation, W. E. Belcher Lumber Company, drew a check for $48,750.00 on the Corporation's account at the Peoples Bank of Centreville payable to that Bank. This check on its back bears the notation, "B'ham. draft." The proceeds of this check were used to purchase a draft in the amount of $48,750.00 on the Peoples Bank's account with the First National Bank of Birmingham payable to the latter Bank. This draft bears a "paid" stamp of July 15, 1950, and a notation that it was used to pay an item held for collection, and was not a bank asset of the First National. On the same day the amount of the draft was charged by the First National to the Peoples Bank account with it.

On July 14, the Bank of Florala wired the First National to reduce the larger of the two drafts to $64,019.73 and to release the deed upon payment of the drafts. This reduced the collection item to $69,019.73. On July 15 the deed was released to Brady Belcher, and the Bank of Florala's account with the First National was credited with the latter sum. The purchase price of the land was $69,-019.73.

The Corporation's disbursement journal shows a debit to the local ledger and a credit to Peoples Bank in the amount of $48,750.00. The Corporation's disbursement journal does not otherwise identify the person, corporation or account charged with the $48,750.00 disbursement. The local ledger is in fact a group of independent cards or sheets, and the testimony given by Brady and Furlong was to the effect that some of those local

ledger cards were missing, and that the cards or sheets relating to the period preceding October 30, 1950, are missing, and that the cards or sheets pertaining to Brady's personal participation in the local ledger are missing and cannot be found. Under present procedures if the Corporation was paying its own debt there would not be a charge to the local ledger. There is no evidence that the procedures have ever been different. The only debt owed by the Corporation to the Peoples Bank in July 1950, was the sum of $39.47, and an official of the First National was unable to locate any records which reflected an indebtedness of the Corporation to the First National as of July 15, 1950. The Corporation's records do not reveal that the $48,750.00 check was applied to any corporate purpose.

In answer to plaintiff's interrogatories given on February 10, 1966, Brady stated that he had paid $70,793.93 for the lands in Florida and that he did not recall obtaining funds from the Corporation for use in their acquisition, and that no records were found to indicate such to be the case. He made no mention of missing records. Upon further answers made pursuant to an order of the Court he answered that records had been located which indicated that at the date of the payment for the lands he was not indebted to the Corporation. Later when ordered to produce the records he failed to do so, claiming that those records were missing and could not be found. The evidence upon trial firmly established the fact that Brady was indebted to the Corporation on October 31, 1950, in the sum of $34,684.29, which, by entry made near the end of the Corporation's fiscal year ending on that date was reflected as "cash on hand $34,684.29." Others in the Corporation knew nothing of this indebtedness. The sum was paid on April 16, 1951, by a loan from the First National Bank of Birmingham. Brady was unable to state whether this sum constituted any part of the $48,-500.00, or for what purpose the latter sum was drawn from the Corporation.

Finally Brady testified that he did not know where the money came from to buy the Florida lands, or whether or not he used Corporation funds for that purpose; and that he did not keep $70,-000.00 in cash lying around. There was no explanation of the source of the balance of the purchase price of $20,269.73. Brady had no recollection of paying any sums in connection with these lands other than the two drafts. These drafts were finally produced from Brady's personal files. They bear the "paid" stamp of the First National Bank of Birmingham. The memorandum of Furlong, chief accountant of the Corporation, of November 12, 1958, made in connection with a Revenue Agent's investigation confirms the fact that the deed to these lands was acquired by the payment of the two drafts.

The credit files of the First National Bank of Mobile of July 12, 1950, reveal that that Bank refused Brady a loan for $50,000.00 to purchase the Florida lands.

Although the records of the First National Bank show a credit on its account with the Bank of Florala on July 15 of the sum of $69,019.73, there is no like debit during the month of July 1950. There are no records of the Bank of Florala in evidence to show the transmittal of any funds from that Bank to the seller of the lands by debiting its account with the First National, nor are there any records showing disbursement from other accounts of the Bank of Florala.

Considering the large amount of funds involved in the purchase of the Florida lands and in his indebtedness to the Corporation, Brady's testimony as to the same reflects so much more adversely on his veracity than on the dimness of his memory that the Court cannot accept his testimony in those particulars.

As initially stated, none of the other stockholders or officers of the Corporation knew that any of its money had been used by Brady to purchase the Florida lands. None of these individuals had any knowledge of the issuance of the Corporation's check for $48,750.00.

■■ Although not technically trustees, the duties of officers and directors are analogous to those of trustees. They are required to act with fidelity and in good faith, subordinating their personal interests to the interests of the corporation. Holcomb v. Forsyth, 216 Ala. 486, 490, 113 So. 516. See statutory declaration, Title 10, § 21(97), Alabama Code. They occupy a *quasi fiduciary relation* to the corporation and its stockholders. Holcomb v. Forsyth; Ingalls Iron Works Co. v. Ingalls Foundation, 266 Ala. 656, 98 So.2d 30. The defense of laches and the statute of limitations must be weighed in the light of these relationships.

Section 20 of Title 7 of the Code of Alabama, 1940, provides that "actions for the recovery of lands, tenements, or hereditaments, or the possession thereof, *except as herein otherwise provided,*" must be commenced within ten years. (Emphasis supplied)

Section 42 of Title 7 provides that:

"In actions seeking relief on the ground of fraud where the statute has created a bar, the cause of action must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his suit."

■ The statute of limitations of ten years, Section 20, governs actions to establish resulting and constructive trusts. Haavik v. Farnell, 264 Ala. 326, 87 So. 2d 629.

■ Section 20 like other sections is subject to the additional period allowed by Section 42. *Haavik* does not hold to the contrary. In *Haavik* there was no occasion for applying Section 42 since the claim was within Section 20. Section 42 was applied in Averett v. Averett, 243 Ala. 357, 10 So.2d 16, where a bill for the cancellation of a deed was filed eleven years after the transaction, but within one year of the acquisition of knowledge of respondents' claim. There the court said:

"Treating the bill as one seeking relief upon the ground of fraud, these averments bring complainants within the one year limitation after discovery of the fraud. Code of 1940, Title 7, § 42. Parties so demeaning themselves as to keep those far from the scene of action in the dark cannot set up lack of diligence, such as non-examination of records disclosing respondents' claim of title derived as here alleged."

In Northwestern Land Association v. Grady, 137 Ala. 219, 224, 33 So. 874, 875, the court said:

"The nature and purpose of this proceeding is to enforce a constructive trust in lands. In such a case, it has been held by this court that the statutes of limitations of three and six years as a defense, are not applicable, though the statute of ten years would be, *if the case was not excepted from its operation by fraudulent concealment of the facts,* or some other saving clause of the statute. Stoutz, Adm'r, v. Huger, 107 Ala. 253, 18 South. 126." (Emphasis supplied)

■ A corporate officer charged with wrongdoing of which the other directors and officers know nothing and whom he knows to be ignorant of the wrongdoing "cannot escape liability under the shelter of the statute of limitations." Coxe v. Huntsville Gas Light Co., 106 Ala. 373, 17 So. 626; Greenleaf v. Profile Cotton Mills, 235 Ala. 530, 180 So. 582.

In Hart v. The First National Bank of Birmingham, 373 F.2d 202, decided by the Fifth Circuit on February 20, 1967, there was involved a question of the ten year statute of limitations as applicable to a constructive trust. The court concluded its opinion by saying:

"Finally, if the plaintiffs did not discover the sale to Ellinor because the banks fraudulently concealed the sale, Alabama Code, Title 7, § 42 (Recomp. 1958) extends the statute of limitations when there has been fraudulent concealment of any right of action. The period for suit in such instances

of concealment is extended to run for one year from and after the date of notice or discovery of the fraudulent concealment. Mere ignorance of the cause of action is not sufficient to invoke this provision. Peters Mineral Land Co. v. Hooper, 1922, 208 Ala. 324, 94 So.2d 606; Fletcher v. First National Bank of Opelika, 1943, 244 Ala. 98, 11 So.2d 854; Hudson v. Moore, 1940, 239 Ala. 130, 194 So. 147."

In the cited *Fletcher* case the court said:

"As was said in Tillison v. Ewing, 91 Ala. 467, 8 So. 404: 'The ignorance must be superinduced by the fraud of defendant. *In the absence of a fiduciary relation between the parties, imposing the moral and legal duty to disclose,* there must be some act or conduct calculated to mislead or deceive, or to lull inquiry. Porter v. Smith, 65 Ala. 169; Holt v. Wilson, 75 Ala. 58.'" (Emphasis supplied)

And in *Moore,* where the doctor denied that he had knowledge that he had left a sponge in the abdomen, it was stated:

*"Where confidential relations exist, as between physician and patient, the duty to disclose may render silence fraudulent,* but knowledge of the facts is a necessary element of fraudulent concealment." (Emphasis supplied)

■ No entry was made on the corporate books that would charge other stockholders and directors with knowledge that Brady had advanced himself $48,750.00 from corporate funds. The financial statements for 1950 do not show that Brady had advanced himself $48,750.00 by way of loan or otherwise. The fact of the use of the $48,750.00 was concealed from other stockholders and directors. The only means that they had of acquiring knowledge of the source of the funds was through Brady. The fact that the conveyance was recorded would give constructive notice that record title was in Brady, but these records did not disclose the source of the funds employed in making the purchase. As stated in the brief of the attorneys for Brady: "This [the funds used] be-

came an issue for the first time in June 1966, after the records of the Belcher Companies, and of Brady Belcher personally, had been subjected to the most extensive and repetitive discovery examination by opposing lawyers and the accountants of Arthur Andersen & Company." The basic facts rested in Brady's personal files and in the files of third parties, none of which were available short of discovery in a court proceeding. The other stockholders and officers had a right to rely in good faith upon the books of accounts or reports made to the Corporation by its president. Section 21(31), Title 10, Code of Alabama, 1940.

■ The defense of laches is not available to a director of a corporation when called upon to account for his wrongdoing not approved or acquiesced in by the corporation. Jacksonville Public Service Corp. v. Profile Cotton Mills, 236 Ala. 4, 180 So. 583.

In *Greenleaf, supra,* the court said:

"True, the bill does not expressly negative knowledge of the misconduct at the time of each and all of the infractions, but the facts averred show that its means of acquiring the knowledge were through the respondent who is charged with the wrongs and derelictions. In other words, limitations or laches could not be charged to this complainant so long as the respondent's relation with it existed and which was not terminated until 1934."

In McKinstry v. Thomas, 258 Ala. 690, 700, 64 So.2d 808, 815, the court held:

"Ignorance by complainants of their rights, and the existence of confidential relations qualify the consequences of what might otherwise be laches. Fowler v. Alabama Iron & Steel Co., 164 Ala. 414, 51 So. 393. Laches is founded upon acquiescence in the assertion of an adverse right for an unreasonable period of delay on the part of one who would assert it to the prejudice of the adverse party, and does not operate against a complainant on the averments of his bill which show that he had no previous

knowledge of such right now sought to be enforced."

While in Hagood v. Knight, 257 Ala. 64, 57 So.2d 616, the court held:

"Acquiescence involves actual or imputable knowledge. A person cannot be said to be guilty of laches until he has knowledge of the facts which entitles him to relief and thereafter manifests a want of diligence in asserting his rights."

Under these and other authorities the action as to the Florida lands is not barred by either laches or limitations.

A review of the authorities in both Alabama and Florida reveals that the law with respect to the establishment of constructive trusts is substantially the same in both states. See Costell v. First National Bank of Mobile, 274 Ala. 606, 150 So.2d 683; Wadlington v. Edwards, 92 So.2d 629 (Fla.); and Doing v. Riley, 5 Cir., 176 F.2d 449, 457, where the court states the general rule with citation of Florida cases. The rule as stated in Costell is as follows:

"It is a general rule in most jurisdictions that if the funds of one person are wrongfully used by another in the purchase of real estate in his own name, or in the improvement of his real estate, a constructive trust in the property purchased or improved will arise in favor of the one whose money was wrongfully used, whether the relation at the time of the misuse or misapplication of the funds was a fiduciary one, or that of employer and employee, or whether they stood to each other as strangers; . . ."

The rule applies as well to officers of a corporation. See 89 C.J.S. Trusts § 151, at 1066, 1067, where it was said:

"Such principle has been applied with respect to impressing a constructive trust on profits derived from the conduct of a competitive business, the securing of a lease, or the purchase of property for the officer's own account, especially where the officer wrongfully used corporate funds to purchase the property, . . ."

There is no evidence that the monies used were subsequently repaid to the Corporation. Even so, this would appear to make no difference, nor would a constructive trust depend upon the general state of accounts between the officer and the corporation where the money has been used without the knowledge of the other directors. Shearer v. Barnes, 118 Minn. 179, 136 N.W. 861; Milner v. Rucker, 112 Ala. 360, 20 So. 510. Nor would the fact that the officer used his own or other funds as a part of the purchase price prevent the attachment of the trust to that proportion of the property and its profits measured by the amount of corporate funds so used in relation to the total purchase price, provided there is no doubt as to the proportion of funds actually invested. Shearer v. Barnes, supra.

Whatever funds that were employed by the trustee must be traced into the property purchased. It must be shown that the funds can be located in some particular fund or property. Holloway v. Osteograf Co., 240 Ala. 507, 200 So. 197.

The relation between the seller of the lands and the First National Bank of Birmingham, which held the drafts for collection with deed attached, was that of principal and agent. Hutchinson v. National Bank of Commerce, 145 Ala. 196, 41 So. 143.

By virtue of Section 33 of Title 47 of the Code of Alabama livery of seizin as at common law is dispensed with "and the property and possession of the grantor pass as fully by his conveyance as if seizin had been formally delivered." The delivery of the deed by the First National as agent of the seller upon the payment of the drafts to the First National was just as legally effective as if delivered directly by the seller.

As already seen the two drafts were payable to the Bank of Florala, and they were so paid by the First National Bank

by crediting the former's account with the latter in the amount of $69,019.73, the total purchase price of the property.

■■ Once the funds were traced to the First National, which held the deed, as agent of the seller and delivered it when the purchase price was paid by the payment of the drafts to the Bank of Florala as directed by the seller, the funds of the Corporation need not be further traced to satisfy the principle of tracing. To hold that it is necessary to trace these funds out of the Bank of Florala's account at the First National into the hands of the seller, would be to go even beyond the "ear-marked" theory, which was long ago repudiated. Hanover National Bank v. Thomas, 217 Ala. 494, 498, 117 So. 42. Conjecture could be, but will not be, made as to how the Bank of Florala settled with the seller. The law is clear that when a vendor delivers a deed to his agent, it is the agent's duty to deliver the deed in exchange for the purchase price. The agent's receipt of the purchase price constitutes payment to the principal. 30 A.L.R.2d 805, 820.

■ The chronological sequence and the juxtaposition of events coupled with the certain fact that $48,750.00 of the Corporation's funds on deposit with the Peoples Bank of Centreville moved out of its account with that Bank to the First National Bank of Birmingham at the instance of Brady Belcher and was received by the latter Bank as a part of a larger sum in exchange for a deed to the Florida lands, which was delivered to Brady Belcher, leads but to a single conclusion that Corporation funds in that amount were used to acquire those lands. This conclusion is buttressed by the testimony as to the absence of any record or evidence of debt due from the Corporation to the First National Bank or use of the money for any corporate purpose. Brady could not, without the knowledge or authority of the other directors, thus satisfy any debt due him. Milner v. Rucker, *supra*. The testimony reveals the absence of any record or evidence of debt due Brady. In fact Brady owed the Corporation $34,684.29 at that time.

■ As already noted, the Florida lands transaction came into this lawsuit in the later stages of the trial. This was at a time when the lines had become sharply and firmly drawn between the contending parties, and to have required the Bank as Trustee and Mrs. Davis to make demand upon W. E. Belcher, Jr. and Mrs. Maxwell and Mr. Maxwell to join with them in an action against Brady to establish a trust upon the lands, as a condition to the assertion of this claim, would mock reality.

In Ellis v. Vandergrift, 173 Ala. 142, 152, 55 So. 781, 784, the court said:

"No demand or request of the corporate authorities is required to be made, as a condition to suit by the stockholder, where it can be inferred with reasonable certainty that it would be refused, actually or virtually, or where, being the wrongdoers, a majority of the governing body would control the litigation so requested or demanded."

■ The Bank, as Trustee, and Mrs. Davis are entitled to have established on behalf of the Corporation a constructive trust upon the Florida lands to the extent of 48.750/69.019.73 of the interest and title of Brady Belcher and Brady Belcher Interests, Incorporated therein, and are entitled to an accounting as to any waste committed by them with respect to such land and of the net profits derived from the sale of said land, rents and income, and income otherwise received therefrom in the same proportion.

Where an accounting is required the duty and manner of an accounting is clearly stated in Bynum v. Baggett Transportation Co., 5 Cir., 228 F.2d 566, at 573, as follows:

"[H]aving the obligation to account, one whose accounts are demonstrated to be defective and inadequate must shoulder a substantial obligation diligently to make a correct account.

"To account is to do just that. The one obliged to account does not fulfill

his duty by supplying only that which the beneficiary requests, that which is conveniently accessible, or remaining silent in the face of the beneficiary's inevitable difficulty in trying to construct or reconstruct accounts which ought to have been kept and available."

At the time of the hearing the latest accounting available on the Florida lands established income of $156,568.48 and expenses of $79,986.50 for the years 1950 through 1965.

■■■ Brady executed a mortgage on the lands to the City National Bank of Tuscaloosa as security for money loaned him by that Bank. The exact balance due thereon is not shown, but as between Brady and the Corporation, the latter is entitled to be exonerated therefrom and relieved from all payments required to be made thereon, and upon a sale, or sales, thereof is entitled to have the proceeds due it freed from the lien of said mortgage and charged against the interest of Brady derived from said sale, or sales.

Brady and his wife, Mrs. Brady Belcher, and Brady Belcher Interests, Incorporated will be required to execute and deliver to the Corporation a good and sufficient deed conveying to the Corporation an undivided 48.750/69.019.-73 interest in and to said lands not heretofore conveyed by them, all as more particularly described in the exhibits to the decree filed herewith.

The master to be appointed by separate decree will receive evidence as to whether the Florida lands can be equitably divided between or among the owners to the end that the Court may determine whether a division or a sale may be required to afford complete relief to the Corporation.

## RAMSAY LANDS

The Birmingham Trust, as Trustee, and Mrs. Davis seek, to the extent of one-fifth interest each, to establish a constructive trust on the Ramsay lands and an accounting of profits in like amount.

In the early part of 1954, the First National Bank of Birmingham, as executor and trustee of the estate of Erskine Ramsay, received bids on its offer of sale of about 7500 acres of land in fee simple and mineral rights to 2200 acres adjacent thereto located in Jefferson County, Alabama. The land was unimproved acreage with timber growing thereon. There were coal deposits on part of the land. The coal was of low grade and had not been subject to commercial development for many years.

On January 12, 1954, the Sales Company at the instance of Brady Belcher made a bid of $201,666.66 for the Ramsay lands. This was the highest bid received by the Bank, and the Sales Company became the successful bidder.

In July or August 1954, there was a "Saturday meeting," consisting of the adult members of the Belcher family, who were general partners of the Sales Company and stockholders of the Corporation. At this meeting Brady informed those present that the Sales Company was the successful bidder for the Ramsay lands. He also gave them certain general information about the lands. H. H. Maxwell, husband of Ruby, was present at the meeting and stated in effect that neither his wife nor Mrs. Davis wished the Sales Company to participate in the purchase. Brady, who had made the bid for the Sales Company without the knowledge of the other partners except perhaps W. E., Jr., stated that having made the bid he did not feel that he could back out and that he would personally go through with the transaction, but that he would require the loan of some money from the Belcher companies for the down payment.

Mrs. Davis denied any recollection of the Saturday meeting. However, prior to that meeting she was consulted as to whether she was interested in the purchase of the Ramsay lands. She discussed the matter with Mr. Maxwell, and admits she authorized him to advise Brady and W. E., Jr. that she wasn't interested in going into the house building business.

It appears that it was a part of the plans of Brady to develop part of the Ramsay land for homes. To carry out this development and to construct such homes it would require that the participants put up some additional money for the capital of a development corporation. Southern Pine Homes, Inc., with control in Brady and W. E., Jr., was subsequently organized as a development corporation, but has not functioned in that respect.

After the Saturday meeting, Brady offered W. E., Jr. a third interest in the Ramsay lands. W. E., Jr. agreed to this participation, to be handled through a partnership known as the Belcher Investment Company.

Following the Saturday meeting and on August 23, 1954, the Sales Company borrowed $130,000.00 from the Corporation. A distribution of $80,000.00 of this money was made to the partners of the Sales Company, with the limited partner, Birmingham Trust, receiving its pro rata share of 16½%, or $13,200.00. The balance of the $50,000.00 of the money so borrowed was loaned by the Sales Company to Brady and W. E., Jr. and used by them as down payment on the land. There was nothing said as to interest, if any, to be paid on this loan.

On August 24, 1954, the First National Bank, as executor and trustee, conveyed by a single deed a one-third and a two-thirds interest in the Ramsay lands to W. E., Jr. and Brady, respectively, except 40 acres thereof which was conveyed directly to Southern Pine Homes, Inc. This deed was promptly recorded. The sale was closed by a total down payment of $53,666.66, and a purchase money mortgage of $148,000.00.

By contract dated in December 1954, Brady and W. E., Jr. sold the timber on the Ramsay lands to Belcher Land and Timber Company, which was owned by the W. A. Belcher family of Birmingham, for $150,000.00, consisting of cash of $50,000.00 evidenced by check of December 30, 1954, and two notes of $50,-000.00 each dated March 1, 1955, and payable to the Belcher Investment Company. In the latter part of February or early March 1955, the two notes were purportedly transferred to the Corporation by Brady and W. E., Jr. On December 3, 1955, the mortgagor paid the two notes with interest at 4½%. The checks paying same were payable to Brady and W. E., Jr. and endorsed by them to the Corporation. The $50,000.-00 loan made by Brady and W. E., Jr. was repaid by the Belcher Investment Company to the Sales Company on January 28, 1955, without interest. At that time the Sales Company was paying interest on money which it had borrowed at the rate of 5%.

On September 29, 1956, W. E., Jr. caused a check to be drawn on the Sales Company account at the First National Bank of Mobile to the order of the Belcher Investment Company. The proceeds of this check were also used to effectuate payment on the purchase mortgage debt. It was repaid on September 5, 1958. The check was for $1,400.00.

The January 31, 1957, statement of the Sales Company lists the item of $1,-400.00 under "Notes Receivable" as "Belcher Investment Company $1,400.-00."

The October 31, 1955, statement of the Corporation lists the item of $100,000.00 under "Notes Receivable—W. A. Belcher Lbr. Co.—$100,000.00."

Through December 31, 1963, Brady and W. E., Jr. had realized a net gain from sales of timber and land of $207,-892.50. Since the date mentioned they have sold 437 acres to Southern Pine Homes, Inc. for $137,500.00, and it in turn sold the same land to T. C. McCarter for $151,000.00. There were certain other smaller sales.

On December 2, 1953, Pomeroy and McGowin, forest managers, gave the First National Bank a written report on the amount of timber on the Ramsay lands and estimated the value of timber and surface rights at $288,531.40. On March 11, 1953, Arthur J. Blair, geologist, gave the Bank a written report estimating the value of the minerals at $70,000.00. These reports were made

available to Brady Belcher, and the former report to Lester Harris, the Corporation's chief forester, before the bid was submitted on behalf of the Sales Company. A tax and valuation study made by Furlong and Wilson, the Corporation auditor, indicated that a fair value of the entire property was $820,000.00.

Following a telephone dicussion between Furlong and B. A. Monaghan, Birmingham attorney, and on August 16, 1954, Furlong made a memorandum stating:

"Present proposition. Land to be purchased by Sales Company, timber to be sold immediately. Then land and mineral rights, and mortgage, transferred to W. E. Belcher, Jr. at the remaining values. *This is to be done at request of other partners.* Proposition. Could land be sold directly to Brady and W. E., the Sales Co. endorse the mortgage (if necessary), advance down payment ($50,000.00) to W. E. and Brady. Questions: (1) The sale of the timber, immediately, will be no more than a reduction of the value of the land and timber in the hands of W. E. & Brady." (Emphasis supplied)

Following the telephone conversation Furlong visited Monaghan and on his return wrote a memorandum making substantially the same recitation as that quoted above under "present proposition." There was then a conversation by him with Brady as to which he noted:

"1. Take title to property in name of Brady and W. E. Advantages: 1. Six *months* holding period.

2. No shadow is cast on tax returns of other partners.

3. The Sales Company books are not confused with the transaction.

"2. Borrow down payment from Sales Company on a note. Interest of 4% could be paid at a cost of $2,000.00 per year; however, loan shouldn't last that long. Anyway, 50½% of this will be returned to you and W. E. Jr."

On July 19, 1954, M. G. Borland, Corporation auditor, wrote Brady Belcher as to the new contemplated development corporation stating:

"In discussing this proposed Corporation and its purposes with Mr. Turner Rice, he told me that he did not believe the Birmingham Trust as Trustee for Roland, would be permitted to participate in the Corporation as it is an untried venture and as you are well aware when a bank acts as Trustee they are restricted to the investment of trust funds only in iron clad securities. Therefore Roland would of necessity be left out of this venture. However, he would reap his share of the certain profits from the sale of both lumber and land to this Corporation. Mr. Rice later called me and stated that the matter of their participating for Roland was brought up in a meeting of the bank and was definitely ruled out."

Mr. Borland further suggested that forty acres of the land be deeded direct to the new corporation and "the balance of the land to be deeded to Belcher Lumber Sales Company, *or very much preferably to a Trustee for Belcher Lumber Sales Company,* who would in turn sell to the new corporation such land as they would require from time to time." He also suggested that the stock be owned one-fourth by each of the general partners, and that five thousand each be contributed by them by a regular drawing from the Sales Company, and fifteen thousand be loaned to the corporation to be formed.

In a memo of July 21, 1954, entitled "Survey of Building Corporation plans for development of Ramsay Estate Land," Furlong refers to and summarizes Mr. Borland's letter of the 19th and asks a question: "1. Has an attempt been made to get the feelings of Mrs. Maxwell, Mrs. Davis and W. E. Jr. about buying the stock?"

It is obvious that the Saturday meeting was held subsequent to that date, and that there was a changing of method for the consummation of the transaction between the dates of the memo of August 16 and the memo of the conver-

sation of Furlong with Brady. The latter memo is not dated, but could well have immediately followed the Saturday meeting, since title was taken as indicated and money was borrowed from the Sales Company to make the down payment. This memo is consistent with what the witnesses (other than Mrs. Davis) said took place at the Saturday meeting, and also consistent with the alternative suggested under the second "proposition," set out in the August 16 memo. It would meet the objection of the dissenting partners against becoming involved in the transaction through a purchase direct by the Sales Company.

It is charged by the Trustee Bank and Mrs. Davis that Brady failed to disclose all the facts about the value of the Ramsay lands as those facts were disclosed to him by the Pomeroy and McGowin, and the Blair reports, and as revealed by the study of Furlong and Harris. Also that the matter was presented to them as a purchase for housing development through a new corporation and not as a purchase of timber lands.

No one knows exactly what was said at the Saturday meeting, which took place more than ten years ago. Memories fade, and the facts become jumbled and distorted in the focus of hindsight. There is a possible construction of the evidence that tends to support a failure to disclose all the facts about the value of the land and the object to which it was to be devoted.

 The relation of partners with each other is one of trust, and as stated by the court in Goldsmith v. Eichold Bros. & Weiss, 94 Ala. 116, 119, 10 So. 80, 81:

"All its [partnership] effects are held in trust, and each partner is, in one sense, a trustee; a trustee for the newly-created entity,—the partnership,—and for each member of the firm, who thus becomes a beneficiary under the trust. He is more; he is a trustee and a *cestui que trust*.—A trustee, so far as his own duties bind him; a *cestui que trust*, so far as duties rest on his copartners."

See also Moore v. Moore, *infra*, this section.

In Kimberly v. Arms, 129 U.S. 512, 9 S.Ct. 355, 32 L.Ed. 764, it was stated:

"The law exacts good faith and fair dealing between partners, to the exclusion of all arrangements which could possibly affect injuriously the profits of the concern. Arms was not merely a partner of Kimberly; he was the agent of the firm for the transaction of its business, and as such was allowed a salary beyond the interest coming to him as partner. He therefore stood, in his relation to Kimberly, clothed in some respects with a double trust, both of which imposed upon him the utmost good faith in his dealings, so that he might never sink the interest of the firm into that of himself alone."

As to the burden of proof where a confidential relationship is established, the court in Kyle v. Perdue, 95 Ala. 579, 10 So. 103, said:

"When such a [confidential] relationship is shown to exist if the one who was in a position to exert the influence claims the benefit of a contract with the person bestowing the confidence, the burden is cast upon the former to show affirmatively that the influence of his position was not unduly exerted; that the utmost good faith was exercised; and that all was fair, open, voluntary, and well understood. This rule as to the burden of proof is of familiar application to contracts by which benefits are conferred by a *cestui que trust* upon his trustee, by a ward upon his guardian, by a child upon his parent, by a client upon his attorney, by a patient upon his physician, or by any one upon his priest or spiritual adviser. . . . It is not essential that any formal or technical relationship of a fiduciary character has been established between the parties."

"[I]f it appear[s] that any advantage has come to the trustee in dealing with his cestui que trust, the burden will be thrown upon him to show that con-

fidence was not in fact abused." Western Grain Company Cases, 264 Ala. 145, 85 So.2d 395, quoting with approval Colton v. Stanford, 82 Cal. 351, 23 P. 16, 19.

■ This is not simply a case of a partner selling to himself or loaning money to himself, divorced wholly from all knowledge of and absent any understanding or agreement of the other partners. The venture was a speculative undertaking. The partners were all competent. The law does not absolutely forbid every transaction between a partner and his firm, 68 C.J.S. Partnership § 100 p. 539, but places upon the partner, as a fiduciary, the duty of utmost frankness and fair play. Bogert on Trusts, Section 593.

Fraud is never presumed. In Henderson v. Gilliland, 187 Ala. 268, 65 So. 793, the court said:

"Fraud is never presumed; and to be accepted as the basis of judicial action 'must be proved by clear and satisfactory evidence; and when a transaction is susceptible fairly of two constructions, the one which will support and free it from the imputation of impurity of intention will be adopted.'— Allen v. Riddle, 141 Ala. 621, 37 So. 680."

■ Considering all the evidence, its tendencies, and the reasonable inferences to be drawn therefrom, the Court concludes that, (1) Brady and W. E., Jr. have freed themselves from any lack of frankness or fair play in the handling of the Ramsay land transactions, and (2) that the Trustee Bank and Mrs. Davis are not entitled to establish a constructive trust on the Ramsay lands and to an accounting of profits on sales of parts of the land.

The weight of the evidence convinces the Court that Mrs. Maxwell and Mrs. Davis declined to enter into the transaction, that there was an understanding by at least a majority of the general partners that money would be loaned to Brady to effectuate the purchase by him.

The Bank in the course of time heard rumors that Sales Company money had been used in making the purchase of the Ramsay lands, but had no actual knowledge of the fact.

As noted in the memorandum of the conversation between Furlong and Brady, there was consideration given to the payment of 4% on the loan to be made by the Sales Company for the down payment. However, nothing was said in the Saturday meeting or at any other time about interest on the loan.

■■ It is the general rule that a party is entitled to interest on an amount which he lends to another, although nothing was said about interest at the time of the transaction. 47 C.J.S. Interest § 10. It is also the general rule that where the contract is silent as to interest an extinguishment of the debt extinguishes the right to claim interest. 100 A.L.R. 105. However, by virtue of Section 62 of Title 9, of the Alabama Code of 1940, "all contracts, express or implied, for the payment of money, . . bear interest from the day such money, . . . should have been paid." . . . . "In Charles R. Shepherd, Inc. v. United States for Use and Ben. of Sullivan, Long & Hagerty, Inc.,[1] 5 Cir., 292 F.2d 146, the court said:

"No case cited by Shepherd holds that a claim for interest based on a statute, which claim has not been clearly waived, is extinguished by the acceptance of payment of the principal amount. In such a case, there is no conceptual difficulty in saying that the debt for interest exists independently of the principal obligation."

■■ Also, the Court cannot lose sight of the relationship of Brady and W. E., Jr. to the partnership in dealing with themselves both in receiving and in repaying the amount borrowed. There was a duty on them to fully account to the partnership for the principal as well as interest, the fruit of the loan. Members of a partnership, no more than officers of a corporation, can

---

1. Construing the Alabama law in the light of Section 62.

give away, or appropriate property, funds or credit to their own use, Textile Mills v. Colpack, 264 Ala. 669, 89 So.2d 187, nor profit personally from partnership transactions, or use partnership property for their own advantage. 68 C.J.S. Partnerships § 99, at 539.

The right to claim interest was not lost by laches or limitations. In Moore v. Moore, 255 Ala. 393, 51 So.2d 683, the court declared the rule of limitations and laches as between partners to be as follows:

"The relation of partners with each other with respect to the assets and liabilities and the profits and losses of the firm is a confidential one. Each is in a measure a trustee so long as the business continues and the partnership relation obtains. The statute of limitations does not run in favor of one or against the other."

In support of this statement the court relied on Haynes v. Short, 88 Ala. 562, 7 So. 157, where it was held that a bill by one partner to recover $3500.00 advanced to the partnership fifteen years before dissolution was timely where filed within six years of actual dissolution.

The court further relied on Ellis v. Stickney, 253 Ala. 86, 42 So.2d 779, 787, where it was said:

"Mere delay which has resulted in no disadvantage to another or that has not operated to bring about changes in conditions or circumstances, in consequence of which 'there can be no longer a safe determination of the controversy,' will not [amount to laches so as] to bar complainant's right or remedy."

The Bank, as Trustee, and Mrs. Davis are entitled to an accounting from Brady and W. E., Jr. on behalf of the Sales Company of the unpaid interest on the $50,000.00 loan from August 24, 1954, to January 28, 1955, at the rate of 5% computed to the latter date, and at 6% on the sum of such interest until paid, and of the unpaid interest on the $1,400.00 loan from September 29, 1956, until September 5, 1958, at a like rate computed to the latter date, and at 6% on the sum of such interest until paid.

On August 23, 1954, Southern Pine Homes, Inc. was incorporated. Two hundred and forty-nine (249) shares each were issued to Brady and W. E., Jr. and one share each to N. E. Furlong and L. L. Harris. Each incorporator became a director. Brady was elected president and treasurer, W. E., Jr. vice-president and Furlong secretary.

On August 13, 1954, Brady without the knowledge of the other partners caused a check for $15,000.00 to be drawn on the Sales Company's account at the First National Bank of Birmingham. This check was deposited in Brady's account in the First National Bank of Mobile. He then drew a check on the latter account in the amount of $2,500.00 payable to Southern Pine Homes, Inc. for his subscription to the capital stock of Southern Pine Homes. This $2,500.00 together with a like sum representing the subscription by W. E., Jr. to the capital stock of Southern Pine Homes, together with $3,500.00 borrowed from W. E., Jr., covered the $8,000.00 purchase price of the 40 acres of Ramsay land conveyed by the First National Bank of Birmingham, as Trustee, to Southern Pine Homes. The payment was evidenced by check of August 24, 1954, drawn to the order of the First National Bank of Birmingham, as Trustee, by Southern Pine Homes on its account with the First National of Mobile. The item of $15,000.00 appears on the books of the Sales Company as a loan to Brady Belcher. The books show a credit against the loan of like amount on August 24, 1954.

Since the exact date of the Saturday meeting is not established, it is not known whether the $15,000.00 borrowed by Brady from the Sales Company on August 13 was obtained before or after the loan authorization. Consequently, it cannot be said that the $2,500.00 of said sum used by Brady to pay for his stock subscription in Southern Pine Homes was or was not within the scope of the authorization granted at the Saturday

**92**

meeting. However, the $8,000.00 paid by Southern Pine Homes to the First National Bank, as Trustee, for the 40 acres was not an additional sum but a part of the total purchase price of the Ramsay lands. Although the Court does not put its seal of approval on the borrowing of Sales Company funds without authorization, it would appear to have been for the better interest of the Sales Company that Brady make use of some of the funds already borrowed, if such was the case, rather than to borrow new funds altogether, thereby increasing his debt to the Sales Company.

A loan of Sales Company funds having been authorized by at least a majority of the partners, it would make no difference as respects the relief here sought whether Brady substituted funds already borrowed from the Sales Company, if such was the case, for funds which he had authority to borrow, and used the same as a part of the purchase price, or whether he procured the entire proceeds of the loan out of subsequent borrowing.

■ A constructive trust will not be declared to exist on Brady's interest in Southern Pine Homes or on the land purchased by it. Nor will an accounting be required of profits made on sales by it.

The amount of unpaid interest on the $2,500.00 for the ten-day period is negligible and a discussion or finding concerning same is pretermitted.

### J. L. BELL COMPANY, INC.
### AND
### NORRIS FURNITURE CORPORATION

Brady Belcher first came in contact with J. L. Bell, principal owner of the J. L. Bell Company, in 1960. This contact related to a contract that Bell had for the purchase of South American logs. Bell was in financial difficulty and later in that year Brady borrowed $61,-064.17 in the Sales Company's name from the First National Bank of Mobile and advanced this money for the benefit of Bell so that Bell could obtain a bill of lading covering a shipment of such logs. Beginning about that time Brady also caused moneys to be advanced directly by the Sales Company to the Bell Company.

In June 1961, Charles Arendall, an attorney of Mobile, at the request of Brady and W. E., Jr. prepared an option contract whereby the Sales Company was to obtain a 60% interest in the Bell Company. This contract was abandoned when it was learned that the Bell Company could not qualify for a Small Business Administration loan with such a large interest lodged in the Sales Company, since the latter was "big business," within the meaning of the Small Business Loan Act.

After Brady's unsuccessful attempt to interest Arendall and his brother in coming into the Bell Company, and after the abandonment of the contract referred to, Brady and W. E., Jr. on August 4, 1961, caused an application by the Bell Company to be made to the Small Business Administration for a determination as to the eligibility of the Bell Company to obtain a loan from that agency. This application recited that Arendall and his brother together with Brady and W. E., Jr., *as stockholders*, had a combined interest in the Bell Company of 60%. Arendall, who had nothing to do with the application and knew nothing about the representations contained therein, was advised, as was Brady, by the S.B.A. that the application could not be accepted since Brady and W. E., Jr. were "big business," and could not own together more than 49% of the stock of the applicant. Following this declination of the loan, the Bell Company reissued 24.5% of its capital stock to Brady and a like amount to W. E., Jr. A certificate for 11% was issued to Bell, together with another certificate for 40%. The latter certificate was left with Richard Gardner, the attorney of the Bell Company who resided in Quincy, Florida.

In September 1961, the Bell Company again applied for an S.B.A. loan. Both Brady and W. E., Jr. signed the application *as owners of 24.5% each* of the Bell Company stock. This application was rejected in the following March. By that

time the Bell Company's financial condition had progressively, if not precipitously, worsened, and the Sales Company's advances had increased proportionately. Brady had personally endorsed the Bell Company's note at the First National Bank of Mobile. Bankruptcy for the Bell Company was considered. Brady *personally* borrowed money from the City National Bank of Tuscaloosa and lent it to the Bell Company, taking back a mortgage from the Bell Company in the amount of $230,000.00. The proceeds of this loan were used by the Bell Company to pay its note at the Mobile bank, which Brady had personally endorsed, and the balance was applied to other pressing obligations. At the same time the Bell Company transferred to the Sales Company by warehouse receipts certain completed furniture in purported settlement of $80,255.88 of its debt to the Sales Company. At about the time of these transactions and on July 5, 1962, the Norris Furniture Corporation was formed. Brady and W. E., Jr. became owners of 60% of its stock. Brady's personal and financial statements listed stock issued to him as an asset of his. The stock was paid for with a check drawn on his personal bank account.

The Norris Furniture Corporation entered into an "output" agreement with the Bell Company, whereby it agreed to purchase Bell's production of furniture at a discount of 18% off the wholesale sales price. .

The Mobile bank on Brady's personal endorsement continued to advance money to these companies, both of which were insolvent.

Brady caused the Sales Company to ship lumber to the Bell Company, and also arranged for local shipments which were paid for by the Sales Company and listed on the Sales Company's accounts receivable ledger as though they had been shipments from the Sales Company.

The January 31, 1962, year-end statement of the Sales Company made no mention of any attempted acquisition of the Bell Company stock. The January 31, 1963, year-end statement of the Sales Company with footnotes attached indicated for the first time that the Sales Company had acquired an interest in the Bell and Norris Companies and that the Sales Company was contingently liable on the mortgage to Brady and W. E. Jr. This information first came to Turner Rice, the agent of the Trustee, in May 1963, following his invitation to bid on certain shares of the Corporation, when Arendall approached him as attorney for Brady and W. E., Jr. respecting the purchase of all of the Trustee's stock holdings in the Corporation. At that time it was explained by Arendall that the Bell and Norris transactions might result in great loss to the Sales Company. So they have.

In the meantime and in February 1963, Bell assigned his certificate of stock for 11% in the Bell Company to Brady and W. E., Jr. At the same time he granted Brady and W. E., Jr. an option to buy his 40% stock interest in the Norris Corporation for $1,200.00. On March 20, 1963, Brady in the name of the J. L. Bell Company gave notice to Mr. Bell of the exercise of the option, and on the same day Brady caused the Sales Company to issue its check to J. L. Bell for the purchase price. Bell endorsed the certificate in blank. Brady caused the stock to be entered in the books of the Sales Company as an asset of the Sales Company.

For the year ending January 31, 1962, upon authorization of Brady Belcher, the Sales Company had extended credit to the Bell Company in the total amount of $82,064.16. $61,064.17 of this sum was reflected on the books of the Sales Company as of the date mentioned as "inventory."

On January 30, 1962, the day before the Sales Company's books were closed for the year there was a pay-down on the Bell Company's account with the Sales Company in the amount of $75,510.00. These funds were made available to the Bell Company by loans from the Mobile and Brent banks evidenced by notes endorsed by Brady personally.

Exhibit 1030 dated July 3, 1962, purports to be a guarantee by the Sales Company of a note of the same date in the amount of $230,000.00 payable to Brady and W. E., Jr. and executed for J. L. Bell Company and J. L. Bell. This $230,000.00 was the proceeds of the loan obtained from the Tuscaloosa bank.

Exhibits 1032 and 1033, dated September 28, 1961, purport to be assignments by Brady and W. E., Jr. of 499.555 shares of stock each of the Bell Company to the Sales Company, and 1031, dated February 25, 1963, purports to be an assignment by Brady and W. E., Jr. of 224.29 shares in the Bell Company to the Sales Company.

After the four exhibits above referred to were made available by state court order Brady, W. E., Jr. and Furlong each claimed on his deposition and at the trial that he did not know whether they were prepared for signature or signed in 1961, 1962, or 1963. Furlong also claimed on his deposition that he did not know whether all of them were dictated on the same day or on different days. He claims to have written them and had them typed by his secretary, Mrs. Coburn—Mrs. Coburn was not employed by the Company or Corporation until September 1962. He further testified that he had no idea when they were prepared or executed. He finally conceded that the four documents were prepared with the intention that, in any accounting with the Trustee Bank, such documents should be accepted by and deemed to be effective against the Trustee Bank as if the documents had in fact been signed on the respective dates they bore, and that he could not "rule out the possibility that all four of them were dictated, typed and signed during a recess in Brady's deposition in the state court in 1963." When asked at the trial if he had seen either of the exhibits before that deposition, W. E., Jr. answered that he didn't know. On deposition in 1965, Brady stated that he didn't remember when they were signed. Neither Brady nor W. E., Jr. claimed to have any memory whether they were all signed at one or at different times.

The typing and spacing of all four exhibits are the same. The Court finds that all these exhibits were prepared and signed on the same day for the purpose of being used against the Trustee Bank in any accounting with the latter. Any testimony to the contrary is unworthy of credit.

In the September 29, 1961, application to the S.B.A. for an additional loan of $164,884.59, representations were made over the signatures of Brady and W. E., Jr. that they were then *owners* of 24½% each of the stock of the Bell Company, and they *personally guaranteed* the payment of $80,793.45 of the loan until the principal was reduced to $110,000.00.

Brady and W. E., Jr. did not ask for or receive any advice from Arendall respecting their statement of ownership of stock in the Bell Company contained in the application to S.B.A. It was not until May 1963, that Arendall learned that the partners of the Sales Company, other than Brady and W. E., Jr., had not been informed of the facts concerning the Sales Company's "investment" in the Bell and Norris enterprises; and at no time was he requested to give an opinion as to the authority of the Sales Company to invest in the stock of Bell and Norris.

Mr. Gardner, who handled the legal services for the Bell Company in its dealings with Brady and W. E., Jr., and who had conferences with them, and Furlong and Bell, was not informed by anyone that Brady and W. E., Jr. held anything less than total beneficial ownership of the shares in the Bell Company.

On September 6, 1961, $4,000.00 of the then outstanding debt of the Bell Company was due to one of the salesmen, W. F. McInturff, for services rendered by him prior to the time the Belchers became involved in the Bell Company. To evidence that debt, the Bell Company executed and delivered a note to McInturff bearing an endorsement reading

"Belcher Lumber Sales Company, Ltd. by Brady Belcher, General Partner." On September 19, 1961, another note for $2,153.51 was executed by the Bell Company to Gregory Myrick, Inc. for a prior indebtedness of the Bell Company with a like endorsement. In the November following McInturff attempted to negotiate the note payable to him at a bank in Orlando, Florida. The bank inquired of Furlong of the authority of Brady to bind the Sales Company on the note. The legal question was referred to George White, attorney for the Sales Company, who wrote an opinion, expressing the view that one partner had no authority to endorse the note for the partnership without the consent of the other partners, except where there had been a ratification by implication from past conduct. According to information obtained by him such ratification by implication from past conduct did not exist. He advised the Sales Company that it would be the safest course to obtain written authority from the partners.

On December 5, 1961, the S.B.A. declined to make the loan as requested in the September 29, 1961, application for reasons including "lack of assurance of way to repay the loan; and disproportion of loan requested to tangible worth." This action was taken notwithstanding the fact that $80,793.45 of the loan was personally guaranteed by Brady and W. E., Jr., and the entire amount of the additional loan was to be further secured by a mortgage on the plant, equipment and machinery of the Bell Company. Nevertheless, in spite of this refusal based as indicated, Brady and W. E., Jr. continued to assist the Bell Company by making funds of the Corporation and the Sales Company available to it, by permitting it to buy merchandise on open account from the Sales Company, by giving it the benefit of services of salesmen, whose salaries and expenses were paid by the Sales Company, and by permitting it to purchase goods from other concerns with a guarantee of payment by the Sales Company.

The Bell Company's income tax return for the year 1961 prepared by Furlong and filed on March 14, 1962, recited that Brady and W. E., Jr. each owned 24½% of the stock of the Bell Company.

On March 27, 1962, Brady and W. E., Jr. caused a revised application for a loan to be submitted to the S.B.A. They again affirmed over their respective signatures that each of them owned 24½% stock interest in the Bell Company. On May 29, 1962, S.B.A. again declined to make the loan applied for in the revised application for the reasons quoted with respect to the denial of the September 29, 1961, application. After the date of this further denial Brady and W. E., Jr. continued to assist the Bell Company with its finances, so that by mid 1962 the Bell Company was indebted to both the Sales Company and the Corporation for large sums, and was on the verge of bankruptcy, as heretofore noted. It was at this juncture that the Norris Corporation was organized. One of its purposes was to minimize the exposure of those financing the Bell Company in the event of the latter's bankruptcy.

The Norris Corporation has never operated at a profit. Its operating loss was $42,142.66 in 1963, $28,888.58 in 1964, and $51,286.13 in 1965. The Sales Company was the principal source of funds for the Norris Corporation. Brady knew it to be insolvent. Even so, the Sales Company's funds continued to be loaned to the Norris Corporation by Brady without consulting the general partners other than W. E., Jr.

The J. L. Bell Company has had an operating loss every year since 1957, the year of its organization. For 1958 it lost $69,570.67, for 1959 $28,072.18, for 1960 $112,653.94, for 1961 $79,120.06, for 1962 $128,406.56, for 1963 $130,226.25 and for 1964 $170,276.04. Its estimated loss for 1965 was at least $100,000.00. Its operating deficit through 1964 was $718,-365.15, and its net worth deficit was $514,467.47.

Brady paid for his subscription to the capital stock of the Norris Corporation out of his personal funds. His personal general ledger recorded the stock as his personal asset, until it was removed by an entry of December 31, 1963. Furlong finally conceded that the entry was not in fact prepared until June 1964. Brady's financial statement of December 31, 1962, furnished to banks as credit information recorded the 180 shares of Norris stock issued to him as a personal asset.

Funds loaned by Brady to the Norris and Bell Companies were recorded on his personal ledger as receivables due him. Brady filed his personal tax returns on an accrual basis and took interest on funds borrowed from the First National Bank of Mobile and the City National Bank of Tuscaloosa as a personal deduction, and reported as personal income accrued interest on the $230,000.00 loan to the Bell Company. His 1962 balance sheet lists this loan as a personal asset under "Note Receivable"—"J. L. Bell Company, $211,500." He also listed in his personal ledger under "liabilities," the loans due those banks.

On August 24, 1962, Brady agreed to personally guarantee certain debts of the Norris Corporation to induce the Trust Company of Georgia to factor receivables of that corporation.

In the summer of 1962, Brady and W. E., Jr. caused the Sales Company to give the Bell Company credit for $80,-225.88 for furniture transferred to the Sales Company. They then caused substantially all of this furniture to be commingled with like furniture belonging to the Norris Corporation and placed in a warehouse under negotiable warehouse receipts issued in the name of the Norris Corporation. These warehouse receipts were then pledged to the City National Bank of Tuscaloosa to secure a loan to the Norris Corporation evidenced by its note, which was endorsed by "Brady Belcher."

In September 1962, Brady on behalf of the Sales Company guaranteed a $5,000.-00 loan by the Brent Banking Company to Mr. Bell. The proceeds of this personal loan were used by Bell to repay a $5,000.00 personal loan which Brady had caused the Norris Corporation to make to Bell on July 5, 1962. Neither Mrs. Davis, Mrs. Maxwell, nor the Trustee authorized the guarantee to the bank.

Brady admitted on deposition that the January 31, 1962, financial statement of the Sales Company, which was ultimately placed in the hands of the other partners, did not fairly and truthfully represent the indebtedness of the Bell Company to the Sales Company.

On January 31, 1966, the contingent liability of the Sales Company for indebtedness of the Bell Company was $425,000.00, and for the Norris Corporation $309,407.97. On that date the Bell Company owed the Sales Company $288,-636.78, and the Norris Corporation owed it $31,134.62. The two were indebted to the Corporation for $6,838.58. The total that the Sales Company had at risk by virtue of the transactions of Brady and W. E., Jr. with the Bell and Norris Companies was $1,054,179.37[1a]. They have attempted to further commit the Sales Company to many more thousands of dollars of contingent liability.

There was almost a total lack of effort on the part of Brady and W. E., Jr. to ascertain the true situation with respect to the earning potential of the Bell Company. They apparently made no effort to verify the accuracy of Lewis Bell's projection concerning its anticipated profits.

Brady and W. E., Jr. contend that the transactions by them with respect to Bell and Norris were as agents of the Sales Company. Those opposed to them in this litigation charge that Brady and W. E., Jr. were acting in their own behalf in initiating the transactions and continued to so act until they concluded that they could not make a go of these insolvent companies whereupon they decided to un-

[1a]. By virtue of Title 43, Section 31, the other partners will be held to have a lien upon the shares of Brady and W. E., Jr. for the purpose of discharging these debts.

load onto the Sales Company, thus requiring their partners to share with them the losses actual and potential.

▮ Except for the abortive 1961 option agreement prepared by Arendall, and the 1962 discussions had by Brady with him as to what would happen as respected Brady's personal endorsements on the Bell Company obligations in the event of the latter's failure, and the response by Brady in effect that the Sales Company would reimburse him in such event, the series of events and the affirmative representations made by Brady and W. E., Jr. prior to the early months of 1963 and catalogued herein do not sustain their contention that they were acting as agents of the Sales Company, but establish those to the contrary. Until May 1963, none of the other partners were advised that the Sales Company had an interest in the Bell and Norris Companies. Such information was withheld from the S.B.A. in the applications for the loans. The affirmations there contained show ownership of the stock in Brady and W. E., Jr. The tax returns negate the fact of ownership in the Sales Company. The several banks from which substantial funds were borrowed by Brady and W. E., Jr. were not informed of any ownership in the Sales Company.

The Sales Company partnership agreement defines the business the partnership was organized to conduct as "a general wholesale lumber business, *buying and selling* lumber, lumber products, veneer, boxes, crates and products of mills producing lumber and by-products thereof." (Emphasis supplied)

Paragraph FIFTH of the agreement provides that:

"The authority for the management of the business, in all respects and details, shall be vested in the general partners. The special partner shall have no managerial or other such rights in connection with the conduct of the partnership business, except those which are specifically allowed by law."

By virtue of Section 8 of Title 43 of the Alabama Code, 1940, governing limited partnerships it is provided that: "The general partners alone are authorized to transact business, sign for the partnership, and to bind the same."

Sections 21 and 22 are respectively as follows:

"The general partners are liable to account to each other, and to the special partners, for their management of the partnership, both in law and equity, as other partners.

"Every partner who is guilty of any fraud in the affairs of the partnership is liable, civilly, to the party injured, to the extent of the damage."

Section 1 included under "General Provisions" of the title, "Partnership," provides that:

"Every general partner is agent for the partnership in the transaction of its business, and has authority to do whatever is necessary to carry on such business in the ordinary manner, and for this purpose may bind his co-partners by an agreement in writing."

And Section 2, setting out what a partner may not do, provides under subsection (7) that he may not "do any other act not within the scope of the preceding section."

▮ From an early date it has been held that a partner cannot bind the partnership in a transaction which is beyond the scope of the partnership. See Abraham v. Hall, 59 Ala. 386 (1877).

▮ It is a general rule that one partner has no implied authority to bind his firm by subscribing for the stock of a corporation, even though the existence of such corporation will incidentally benefit the firm. 68 C.J.S. Partnership § 153.

Illustrative of the cases sustaining this principle is that of Barry v. Mattocks, 156 Miss. 424, 125 So. 554, where the lower court was reversed because it had sustained such a subscription on the ground that the objecting partner had entrusted the subscribing partner with

98

full control and management. The court said:

"It is assigned as error that the chancellor held that Wingfield bound the partnership in the purchase of the Humphry-Coker Seed Company stock for a price of $1,250, and that the purchase of this stock by Wingfield was his individual transaction, and that Barry should not be charged with one-half of it, for the reason that the purchase of stock was not within the scope of the planting and mercantile partnership. . . . The appellee undertakes to sustain the action of the chancellor in this behalf, because W. S. Wingfield, in the handling of the partnership, had full control and management, and had been allowed by Mr. Barry during the many years of the partnership to conduct it as he pleased, and because during the war period Wingfield bought government bonds and Barry accepted his portion thereof. It is quite well settled that the act of a single partner in subscribing to stock of a corporation, where the ownership of such stock does not appear to be within the scope of the firm business, or where there was no special authority to make such subscription, does not bind the partnership. See Wright Bros. v. Merchants' & Planters' Packet Co., 104 Miss. 507, 61 So. 550, Ann. Cas. 1915C, 1111. We think it clearly appears that the purchase of this stock was not within the scope of the partnership, and that the partners did not consult together with reference to the purchase of the stock."

■ Losses occasioned by the acts of partners which are beyond the scope of the firm business and not assented to or ratified by the other partners, must be borne by them alone. 68 C.J.S. Partnership § 97.

■ Generally in the absence of express authority a partner has only authority to bind his partnership on negotiable paper by a signature in the partnership name. *Id.* § 161b at 605, f at 611–612.

In Lewis v. Isbell National Bank, 198 Ala. 484, 73 So. 655, where a partner had endorsed the name of the partnership for the benefit of a third person, the court declared the law to be as follows:

"(1, 2) While it is the well-recognized rule that one partner, without the consent of the others, has no authority to indorse a note in the partnership name for the benefit of third persons, and that such an indorsement imposes no liability on the firm, as is disclosed by the above-cited authorities, yet it does not seem to be denied that if such a transaction comes within the knowledge of his copartners and is assented to by them, then it will be obligatory upon the firm. McNeill v. Reynolds, 9 Ala. 313; 30 Cyc. 515, 516."

Neither Mrs. Davis, nor Mrs. Maxwell or the Trustee had any knowledge of the several transactions whereby Brady and W. E., Jr. sought to bind the Sales Company by their signature, whether by them individually or in the name of the Sales Company. Certainly neither Mrs. Davis nor the Trustee has ratified such transactions or assented thereto.

■ The relationship of partnership is fiduciary in character. This relationship imposes on each partner the obligation of the utmost good faith in their dealings one with another with respect to partnership affairs. 68 C.J.S. Partnership § 76, at 516–517.

■ Each partner has a right to know all that the others know regarding the partnership affairs. *Id.* at 518. And as declared in Smith v. Rosson, 233 Ala. 219, 171 So. 375:

"Partners stand in confidential relations in all matters pertaining to the partnership business. This relation imposed on each the obligation of entire good faith in disclosing facts known to the one and not the other. As a corollary, *the one may, without being chargeable with a want of diligence, fully accept the statements of the other in their dealings.*" (Emphasis supplied)

The obligation imposed by the fiduciary relationship is especially stringent upon a partner who is managing the business. 68 C.J.S. Partnership § 76, at 517.

█ █ The Sales Company was not organized to conduct a furniture manufacturing or furniture selling business. It was without express authority to do so, and it lacked implied authority in that respect. It was without authority to subscribe to the stock of a corporation which was, or was to be, so engaged, or to organize a corporation for that purpose. The scope of the partnership business could not be so expanded to cover such an operation without the consent of the limited as well as the general partners.

In Kentucky Distilleries & Warehouse Co. v. Louisville Public Warehouse Co., 6 Cir., 19 F.2d 866, it was held:

"While a majority of partners has implied power to bind the minority in matters within the scope of the business, yet this implication cannot prevail when it is inconsistent with limitations which are created by the partnership agreement; and those limitations may be express, or may be implied from an exclusive enumeration of granted powers."

And in the early case of Taylor v. Rasch, 23 Fed. Cases No. 13,800, it was said:

"No departure by the general partners, no matter how common or long continued, if not consented to or known and acquiesced in by the special partner, could have the effect to change or enlarge the scope of the business as specified in the articles. To hold the contrary would be to disregard plain provisions of law for the protection of special partners and the public, and would make a limited partnership one of extreme hazard to the special partner."

█ Brady and W. E., Jr. were without authority to bind the Sales Company in respect to the Bell and Norris Companies by endorsement, assumption or guarantee of obligations or liabilities for or on their behalf. Their actions in becoming financially involved with insolvent and deficit producing foreign corporations should not and cannot be visited upon their partners without their prior knowledge, authority, consent, acquiescence or ratification. This record does not disclose such, except ratification by Mrs. Maxwell.

█ The acquisitions of Brady and W. E., Jr. of the capital stock of the Bell and Norris Companies were in the light of this record their own and not those of the Sales Company.

The facts are so glaringly apparent as to cause one to wonder why the insolvent Bell Company was chosen as the vehicle for the foray into the untried field of furniture manufacturing, why the other partners were not made acquainted with the venture, and why after the failure to breathe financial life into the moribund undertaking, efforts at resuscitation were so long continued.

█ It would be an exercise in wishful thinking to expect Brady and W. E., Jr. and Mrs. Maxwell, constituting a majority of the partners, to proceed against Brady and W. E., Jr. for relief on behalf of the Sales Company. Consequently, the relief to which the Sales Company is entitled is available to it through the intervention of Mrs. Davis and the Trustee as cross-claimants herein.

Brady and W. E. Belcher, Jr. are required to: (1) account to the Sales Company for its funds used by them for or on behalf of the Bell and Norris Companies; (2) save the Sales Company harmless from any and every loss incurred by it on behalf of said companies; and (3) indemnify the Sales Company against contingent liabilities and obligations purportedly incurred by it on behalf of said companies.

The relief granted on behalf of the Sales Company will extend to and encompass an accounting for the equivalent of any funds of the Corporation or the Wood Products Company that may have been, or may be, used to pay or reduce the indebtedness due the Sales Company,

or to discharge the obligations of the Sales Company, made or incurred by Brady and W. E., Jr. on behalf of the Bell and Norris Companies.

## MILLARD REYNOLDS

Millard Reynolds has for years conducted a pulpwood and timber business. The Corporation is a purchaser of lumber from Reynolds and over a period of many years it has lent or advanced large amounts of cash to Reynolds to finance his operations. Occasionally its cash was used by Reynolds for his own purely personal purposes. The aggregate amount of money involved in transactions between the Corporation and Reynolds since July 23, 1951, exceeds $3,000,-000.00, and as of July 31, 1964, Reynolds owed the Corporation $124,070.22 plus interest of $64,120.46, or a total of $188,190.68. The amount of interest has long been in dispute. The loans or advances were authorized by Brady Belcher. W. E. Belcher, Jr. knew of them. Other stockholders, directors and officers had knowledge to some extent of their existence. The Trustee bank appears not to have been directly informed of these loans and their purpose, although there is evidence that by the exercise of reasonable diligence it should have known the material facts in connection with the transactions between the Corporation and Reynolds.

Except for $50,000.00 life insurance on the life of Reynolds, the Corporation has not been able to obtain security from Reynolds for the sums due it.

Some part of the Corporation's account with Reynolds existed perhaps as far back as 1950 and certainly as early as January 30, 1954. From time to time the sums advanced to Reynolds were entered on the Corporation's books under "Advance account," "Log account," "Loan account," "Interest account," "Loader account," "Lumber account," "Brent account," "Insurance account," "Reserve account," "Millard Reynolds— Reg. Acct.—Ret. acct.—old acct.," "Timber account," "Tie account," and "New account."

Reynolds has known Brady and W. E., Jr. all his life. He owns no interest in the Corporation, the Sales or Wood Products Companies, nor do these companies or Brady or W. E., Jr. own any interest in his pulpwood and timber business. The headquarters of his business is located at Maplesville, a distance of about 20 miles from Centreville, the site of the main operations of the Belcher companies.

Reynolds buys pulpwood as standing timber in place and contracts with independent producers to cut and deliver it to his yard. Reynolds himself does not cut pulpwood. Some of the funds lent by the Corporation are used by him to purchase standing tracts of timber. During the last five years he has not cut more than 800 to 1000 cords of pulpwood from Corporation lands. Reynolds buys saw timber from time to time with money lent to him by the Corporation. The Corporation purchases lumber from Reynolds. For such purchases he is paid weekly.

From time to time the Corporation has endorsed Reynolds' notes at the Bank of Maplesville and the Brent Banking Company. The Corporation has not had to make good on its endorsement. At the time of the trial there were outstanding balances owing by Reynolds at each of said banks on notes so endorsed.

The Corporation advanced money by check to Reynolds. These checks were deposited by the Corporation in accounts solely controlled by Reynolds.

An early agreement contemplated that the Corporation would get 25¢ per cord of pulpwood for the use of its funds. The advances exceeded the deliveries of pulpwood to the several paper companies. This resulted in a large balance owing by Reynolds. Beginning about 1961 or 1962 Reynolds began paying an additional 25¢ per cord to apply on the debt. In 1964 he also began paying $25.00 per carload on pulpwood delivered.

Reynolds now ships to seven paper companies, but it appears that the Corporation gets its 50¢ per cord only from one of these companies—Rome Kraft.

The Corporation finances Reynolds at the rate of $250.00 on bill of lading for each car of pulpwood shipped. The original 25¢ has been variously referred to as being in lieu of interest, as a commission, and as a sharing of the profits of the Reynolds business, also as an amount to be paid to the Corporation for its getting the contracts with the paper companies, the purchasers of the pulpwood.

Payments received from Reynolds are applied on principal and not on interest, perhaps because there has never been an agreement as to the whole of the interest claimed by the Corporation. The Corporation is on an accrual basis and annually includes the Reynolds interest accruals (to the extent at least of the original 25¢ per cord) in its income tax return as taxable income.

Some of the agreements with the paper companies were made by Reynolds directly. Others were made through the agency of the Corporation. The value to the Corporation of maintaining these contacts is difficult to determine. The pulpwood sales of the Corporation have averaged only around $20,000.00 to $25,000.00 per year for the past twelve. This is a small amount in relation to the total sales of more than $3,000,000.00, but in view of the fact that the Corporation has substantial pulpwood timber, the contacts with pulpwood purchasers, cultivated and maintained through the years, could inure to the considerable advantage of the Corporation. Reynolds has had considerable experience in the pulpwood field, and there is nothing to indicate that his relationships with pulpwood purchasers are other than satisfactory. He has, or there is available to him, considerable assets. His current net worth is more than sufficient to satisfy the indebtedness due the Corporation.

Much evidence was taken respecting the Reynolds' indebtedness. In short summary the chief complaints are the lack of judgment in extending credit and making advances, inadequate formalization of the agreement between Reynolds and the Corporation, poor bookkeeping, failure to act diligently in collecting the sums owing, failure to obtain security for the debt, permitting Reynolds to convey assets to others without intervention on the part of the Corporation, and the crediting of sums received from Reynolds against principal first rather than interest. Conceding that there is some evidence to support these complaints, the Court finds that weighing all the evidence in the light of governing law there is a failure to meet the burden of proof on the part of cross-claimants.

In Van Antwerp Realty Corp. v. Cooke, 230 Ala. 535, 162 So. 97, the court stated the principle on which officers of a corporation may be held liable at the instance of minority stockholders as follows:

"We think a fair statement of the principles on which officers of a corporation may be held liable in such a suit is made in the text of 14a Corpus Juris, 102, 103, § 1869, as follows: 'The directors owe a duty of managing the corporate affairs honestly and impartially in behalf of the corporation and all the stockholders. They are liable for losses of the corporation caused by their wilful and intentional departures from duty, their fraudulent breaches of trust, their gross negligence, or their ultra vires acts. They are not liable for losses happening through mere mistakes of judgment.'"

This principle was reaffirmed in the more recent case of Sellers v. Head, 261 Ala. 212, 73 So.2d 747.

The Corporation has very extensive charter objects and purposes, including the right "to loan money and extend credit in connection with the promotion of its businesses."

From Waldrop v. Martin, 237 Ala. 556, 188 So. 59, the following declaration of the law as to the discretion of management in the conduct of corporate affairs is noted:

"Complainants are minority stockholders, and it is to be borne in mind that 'those who embark in a corporate

enterprise as stockholders do so under an implied agreement that the business shall be controlled and directed by a majority of the stockholders.' Phinizy v. Anniston City Land Co., 195 Ala. 656, 71 So. 469, 471; Dixie Lumber Co. v. Hellams, 202 Ala. 488, 80 So. 872; 14-A Corpus Juris 1123.

. . . . . . .

" 'When the question is one of mere discretion in the management of the business or of doubtful event in the undertaking in which the concern has embarked, a remedy cannot be sought in a court of equity.' "

The transactions between Reynolds and the Corporation were matters within the sound exercise of business judgment on the part of management, and the errors and mistakes that have been made are not such as to fall within the interdiction of the principles announced in *Van Antwerp, supra,* and above set out, and cross-defendants are not liable.

The Court finds that cross-claimants' right to maintain the claim as to the acts arising out of the Reynolds transactions is not defeated by a violation of or for a failure to comply with Rule 23. In view of the Court's finding and conclusion of no liability arising from such acts, the Court will not decide the issues of laches and limitations.

## BARBER SHOP RENTALS

In the 1920's W. E. Belcher, Sr. erected a barber shop on land then owned by him. In September 1941, this land was conveyed by him to the Corporation. The land on which the shop is located is more particularly described as Lot 17 of Block C of Fair's Addition to the Town of Centreville. The Corporation immediately went into possession of this particular property, has held the same adversely, and has throughout the intervening years assessed and paid taxes on the property. The Corporation has from year to year defrayed certain of the expenses incurred in the operation of the barber shop. Such expenses were reported by the Corporation as business expense in its income tax returns. The shop has been rented, and since Mr. Belcher's death the rents in the form of cash have been collected by Brady at intervals of six months or more. Brady kept the rentals in a little tin box in his desk until February 16, 1965, at which time he caused $5,119.00, which he claims was the total of all rentals collected by him, to be deposited in the Brent Banking Company to the credit of Brady Belcher, W. E. Belcher and Mr. Maxwell as executors of and trustees under the will of W. E. Belcher, Sr. The deposit was made the day before Brady's deposition was taken in this action. Brady, W. E. and Ruby Maxwell, the wife of Mr. Maxwell, are each beneficiaries under the will.

The estate tax returns filed by the executors of Mr. Belcher's estate did not list Lot 17, or any property located thereon, or any rentals collected as assets of his estate.

The barber shop rentals were not listed on any federal or state income tax return until 1965, at which time they were reported as income of the estate of W. E. Belcher, Sr. The barber shop property was conveyed by the Corporation as security by the 1953 mortgage executed by it to the Equitable Life Assurance Society.

Brady kept no written records of the money placed in the tin box, except certain small notes reflecting the amount of money placed in the box from time to time, and these have been destroyed. He did not know the amount of money in the box at any given time. Mr. Hayes, the tenant, bought supplies for the barber shop out of the money before it was turned over to Brady.

Brady told no one, with the possible exception of W. E., Jr., that he was collecting the rent from the barber shop. No one else had access to the tin box, or was present when the rent money was removed and counted. There was nothing attached to or contained in the box to indicate the source of the funds, or to whom they belonged.

At his deposition in Case 370–B on November 29, 1963, Brady was asked to state the businesses, other than the lum-

ber business, in which the Corporation was engaged. In replying he omitted reference to the barber shop. On his deposition on February 17, 1965, he testified that the barber shop was situated on the "house property," which belonged to his mother.

The barber shop rentals since the deposit on February 16, 1965, have been paid over to the estate. At the stockholders meeting held on December 15, 1965, Brady and those stockholders aligned with him defeated a resolution offered by the Trustee attempting to inquire into the status of the rentals already collected and those that would be collected in the future.

It certainly was not good business practice for the president of the Corporation over a period of twenty years to collect rents and accumulate them in a tin box, and fail to keep a record of them, and to report them as income for federal income tax purposes.

■■■■■ The barber shop and the land on which it is situated belongs to the Corporation and not to the estate of W. E. Belcher, Sr. The rents collected from the operation of the barber shop belong to the Corporation and not to said estate. Neither the officers, directors or majority stockholders of a corporation can give away the property of the corporation as was here attempted. This principle is fundamental in corporate law, and is the law of this jurisdiction as so pointedly announced in Textile Mills, Inc. v. Colpack, 264 Ala. 669, 89 So.2d 187, where it was said:

"The general rule is stated in 19 C.J.S., Corporations, § 768, p. 125, thusly: '. . . The law does not permit the directors or officers of a corporation to give away its property except where they are the sole stockholders and no rights of creditors are impaired, and unanimous consent is given, . . .'"

At the least the deposit of the funds to the credit of the executors and trustees of the estate of W. E. Belcher, Sr. was a gift, and as such contravenes the principle announced in the case referred to.

■■■■ Cross-claimants on behalf of the Corporation are entitled to a judgment against the executors and trustees of the estate of W. E. Belcher, Sr. for the $5,119.00 received by them, with interest at the legal rate from February 16, 1965, and to an accounting for rents collected by them since that date. These rents should have been but were not included in the Corporation's income tax returns for the years involved. Brady will be required to indemnify the Corporation against any interest and penalties to which it may be subjected on account of his withholding these rents. The defenses asserted by the cross-defendant lack merit and are disallowed.

## BELCHER MOTOR COMPANY

Belcher Motor Company is a corporation. One per cent of its stock is owned by Brady Belcher, 98% by his wife Beulah, and 1% by his brother-in-law George P. White. Mrs. Belcher is president and treasurer. Brady is vice-president. The Belcher Motor Company uses all or parts of Lots 22–27, Block C of Fair's Addition to Centreville, Alabama. Lots 24–27 were deeded to Mrs. Belcher by Brady on November 14, 1955. The Motor Company has since 1955 paid Mrs. Belcher $400.00 per month rent. Lots 22 and 23 are owned by the Corporation. The Corporation acquired the land from W. E. Belcher, Sr. by deeds of September 29, 1941, and October 10, 1944. The lots have been assessed to the Corporation since 1941. They are subject to the mortgage heretofore referred to from the Corporation to the Equitable Life Assurance Society. This mortgage was signed by Brady as president of the Corporation. George P. White has rendered an opinion that title to the lots is in the Corporation. There is now no dispute that the lots belong to the Corporation, that the Motor Company has asserted no title by adverse possession, that the Motor Company now occupies and has so occupied said lots since

prior to the construction of the new building in 1954 or 1955, and has paid no rent to the Corporation for the use of these lots.

At the time of the construction of the new building there was a question as to where the Corporation's property ended and Mrs. Belcher's property began, but notwithstanding this question the building was constructed, and during the intervening years Brady and Mrs. Belcher were aware of the fact that perhaps the Motor Company occupied land that didn't belong to it or Mrs. Belcher.

The Court finds that there were no negotiations between the Motor Company and the Corporation for the permissive use of Lots 22 and 23 by the former, and that there was no such permissive use granted to the Motor Company.

█ Since Brady was both president of the Corporation and vice-president of the Motor Company, and his wife was a substantial beneficiary of the income of the latter, he was under a special duty to deal fairly as between the Corporation on the one hand and the Motor Company and his wife on the other to the end that his obligations as president and director of the Corporation be not subordinated to his personal interests in the Motor Company. As heretofore noted:

"The directors or officers [of a corporation] cannot lawfully appropriate the corporate property, funds, or credit to their own use or make any self-serving disposition thereof . . ." 19 C.J.S. Corporations § 768, at 125, quoted with approval in Textile Mills, Inc. v. Colpack, *supra.*

█ The evidence establishes a fair market value of $750.00 per lot for each of the two lots involved. Rental value of the lots together was established at $25.00 per month as vacant property and of some greater value with a part of the Motor Company building located thereon. Just what this greater value is, is not shown in the evidence. Expert testimony as to value, though not of conclusive force, may be accorded some weight, Dayton Power & Light Co. v. Public Utilities Commission of Ohio, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, in determining the value of property, and although the testimony may be uncontradicted, the Court can exercise its independent judgment. The Conqueror, 166 U.S. 110, 131, 17 S.Ct. 510, 41 L.Ed. 937.

Mrs. Belcher receives rent of $400.00 per month for four lots. However, this is not just ground rent. She constructed the building at an estimated cost of $60,000.00. The rent covers her total investment in the property.

█ In the absence of evidence of greater value by virtue of the fact that part of the building is located on Lots 22 and 23, the Court accepts the value of $25.00 per month as the reasonable rental value for the use and occupancy of said lots and so finds.

█ Under the facts here revealed and the authorities referred to, the Court finds no impediment by way of limitations, laches, or otherwise to cross-claimants, Mrs. Davis and the Trustee, maintaining this action against the Belcher Motor Company on behalf of the Corporation for an accounting of rents from January 1, 1955, at the rate of $25.00 per month, with interest at the legal rate on each monthly payment.

█ Since the structure permanently encroaches upon the lots and in effect renders the same of little or no value for other purposes, and therefore most probably unsaleable to persons or entities other than Mrs. Belcher or the Motor Company, the Corporation by appropriate corporate action is free to convey said lots to Mrs. Belcher or to the Belcher Motor Company, or to others, upon the payment to it of the fair market value of not less than $1,500.00. Otherwise, the Motor Company will continue to make rental payments to the Corporation until the amount of said rental be modified in appropriate proceedings to that end.

## CENTREVILLE OIL COMPANY, INCORPORATED

The Centreville Oil Company was incorporated on May 16, 1951. The com-

mon stock of the company was and is owned 2% by Brady Belcher, 96% by his wife Beulah White Belcher, and 2% by his brother-in-law George Phillips White. Mrs. Belcher is president and treasurer and receives a salary of $500.00 per month. Brady is vice-president and receives a salary of $300.00 per year. Each stockholder is a director. Prior to its incorporation and beginning in the 1930's the Centreville Oil Company was operated by Brady Belcher. From that time to the present it has supplied the Corporation with substantially all its petroleum and allied products requirements.

Since 1939 Centreville Oil Company has been a "jobber" for Gulf Oil Corporation, and as such it buys and sells gasoline and diesel fuel for its own account. It is Gulf's only "jobber" in the State of Alabama. In other places in the state the wholesale function is performed by "distributors," who sell Gulf products for Gulf on commission.

Cross-claimants contend that those in control of the Corporation have failed to have it purchase gasoline and diesel fuels from one of the major oil companies, including Gulf, in substantial single deliveries of 8,000 gallons each, thus enabling the Corporation to qualify for a "transport" price, which is lower than the price at which the Corporation purchases these products from the Oil Company at wholesale. Under the existing setup the Corporation buys these and allied products at the same wholesale prices at which they are supplied to other wholesale customers of the Oil Company. Consequently the Oil Company makes the same profit on sales to the Corporation as to other wholesale customers. The price at which the Corporation buys gasoline is also the dealer's tank wagon price, and is the same as that which the Oil Company sells to retail filling stations.

Transport prices are offered by some of the major oil companies to large consumers where such customers install their own storage facilities, different tanks being required for diesel fuel and gasoline. Separate tanks are also required for gasoline of different octane rating. Under the arrangement which has existed for so long the Oil Company furnishes at its own expense services and equipment which are not furnished under the transport price arrangement. The Oil Company has installed at its cost as its property the tanks of the Corporation, both at Centreville and Plantersville. It also supplies without cost 55-gallon drums to the wood crews of the Corporation. All such equipment is maintained by the Oil Company. Allied products such as batteries and tires are not supplied under the transport price system.

Sales to the public are made from pumps located on the Corporation's property at Centreville and Plantersville. Sales to the public are prohibited under the transport pricing system. Under the wholesale dealer system the Corporation is able to obtain advantage of frequent price wars at these two locations. The transport system does not take into account any price adjustment for gasoline price wars, although the transport purchaser is free to go and fill up at a service station at price-war prices. Those supporting the present arrangement for purchases from the Oil Company by the Corporation contend that these several factors and advantages offset any advantage attributable to the transport price system.

Gulf's pricing system permits the Oil Company to buy regular gas at 1¢ per gallon and premium gas at 1½¢ per gallon less than what the Corporation would pay Gulf at transport prices.

The Oil Company receives and almost invariably takes a 1% discount from Gulf for payment within ten days, but does not offer a like discount to the Corporation. The Oil Company receives from Gulf from time to time certain "temporary competitive allowances," but like allowances are not made to the Corporation. The 1% discount would be available to consumers buying at transport prices.

The Corporation uses 170,000 gallons of gas a year and would qualify for the transport price. The cost of installing a 10,000-gallon tank underground, with all necessary fittings and pump, is from $2,-000.00 to $2,500.00. The normal life of a tank is 20 years.

Consumers who buy gasoline and diesel fuel in transport quantities usually have someone stationed at the tank to make sure that the fuel is dispensed properly and not stolen. The pumps and equipment must be maintained. There is some loss from evaporation.

There is no contract between the Oil Company and the Corporation regarding the purchases made by the latter, and the directors have apparently never considered any such contract, nor have they considered the purchasing from one of the major oil companies at transport prices. The subject of the price paid has never come up at any meeting of the directors of the Corporation.

W. E., Jr. knew that the Corporation was buying its fuel requirements from the Oil Company. He didn't know how much profit the Oil Company was making on the sales to the Corporation, but expressed satisfaction with the arrangement.

Mrs. Maxwell also knew of the sales to the Corporation, but was without knowledge as to the prices charged by the Oil Company. She never made any kind of an investigation as to such.

Mrs. Davis likewise knew that the Oil Company was selling to the Corporation. She knew nothing about the arrangement between the Oil Company and the Corporation, and nothing as to the prices charged. She never registered a complaint regarding the matter. Her husband Fred was also acquainted with the fact that the Corporation was purchasing its fuel needs and related supplies from the Oil Company.

Turner Rice, vice-president and trust officer of cross-claimant Trustee in charge of administering the A. R. Belcher trust, had been told that gasoline and oil purchases of the Corporation were funnelled through the Oil Company. He stated that he had known these facts from the inception of the trust, but stated that he had been told by someone that the prices were the same at which any other competitor would sell to the Corporation. Cross-claimant Trustee also had available to it Dun & Bradstreet reports. The one from its files of March 16, 1951, reported that the Belcher Motor Company made a small portion of its sales to the W. E. Belcher Lumber Company, Inc. on regular terms and at regular prices less 5%, and that intercompany relations of the Centreville Oil Company with the Lumber Company were reported to be the same as those reported for the Belcher Motor Company.

The Centreville Oil Company's fiscal year ends April 30. One of the compilations which the Court finds to be reasonably accurate reflects sales of gas and diesel fuel by the Oil Company to the Corporation and the Oil Company's gross margin thereon and sales of other products as follows:

| | Dollar sales of gas and diesel fuel | Gross margin thereon | Other products | Total sales |
|---|---|---|---|---|
| 1957 | 81,856.28 | 12,859.91 | 35,713.13 | 117,569.41 |
| 1958 | 86,050.42 | 12,244.50 | 35,990.53 | 122,040.95 |
| 1959 | 86,241.11 | 13,256.52 | 37,407.60 | 123,648.71 |
| 1960 | 90,540.16 | 13,783.09 | 43,755.40 | 134,295.56 |
| 1961 | 70,823.27 | 10,388.87 | 35,450.49 | 106,273.76 |
| 1962 | 64,666.13 | 9,273.56 | 35,540.07 | 100,206.20 |
| 1963 | 57,211.08 | 7,728.48 | 40,307.17 | 97,518.25 |
| 1964 | 58,644.50 | 7,957.69 | 39,241.40 | 97,885.90 |
| 1965 | 64,378.38 | 9,711.25 | 40,663.70 | 105,042.08 |
| | | $97,203.87 | | |

Total sales of gasoline at both Centreville and Plantersville for the years indicated consisted of 1,132,466 gallons of regular gas and 957,323 gallons of premium gas. At Centreville there were 956,273 gallons of premium gas and 561,074 gallons of regular gas purchased by the Corporation. The ratio of premium to regular at Centreville ran from a high of 3.06 for the year 1962 to a low of .99 for 1965, with an average of about 1.75 per year for the 9 years. As noted the Oil Company's profit was greater on premium than on regular.

Total sales of Centreville Oil Company for the years involved and the percentages of the sales to the Corporation to the whole are:

| 1957 | $545,639.43 | 21.3 % |
| 1958 | 532,711.90 | 22.46 |
| 1959 | 549,098.92 | 21.68 |
| 1960 | 560,972.02 | 23.5 |
| 1961 | 543,233.18 | 19.79 |
| 1962 | 547,472.81 | 18.2 |
| 1963 | 574,797.20 | 16.74 |
| 1964 | 552,114.92 | 17.12 |
| 1965 | 535,739.25 | 19.34 |

The taxable income of the Oil Company as shown by its federal returns for the years shown below and the tax thereon was as follows:

| Year ending April 30th | Taxable income | Tax |
|---|---|---|
| 1957 | $17,903.88 | $ 5,371.16 |
| 1958 | 14,257.01 | 4,277.10 |
| 1959 | 15,142.24 | 4,542.67 |
| 1960 | 20,880.31 | 6,264.10 |
| 1961 | 2,651.48 | 795.44 |
| 1962 | 20,468.49 | 6,140.55 |
| 1963 | 11,620.16 | 3,486.05 |
| 1964 | 21,227.72 | 6,101.88 |

As already noted Brady has been since the organization of the Corporation a stockholder, its president and a director, and at the same time a stockholder, vice-president and a director of the Oil Company.

The rule governing dealings between corporations having a common director or directors is succinctly stated in the much cited case of Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425, in the following language:

"The relation of directors to corporations is of such a fiduciary nature that transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation; and where the fairness of such transactions is challenged, the burden is upon those who would maintain them to show their entire fairness; and where a sale is involved, the full adequacy of the consideration. Especially is this true where a common director is dominating in influence or in character. This court has been consistently emphatic in the application of this rule, which, it has declared, is founded in soundest morality, and we now add, in the soundest business policy."

And as respecting sales by an officer to a corporation the rule was stated by the Court of Appeals for the Fifth Circuit in an appeal from this district in the case of Drennen v. Southern States Fire Ins. Co., 252 F. 776, 790 (1918), as follows:

"The burden is upon the officer to show that no advantage was taken of his position, and that the transaction was in good faith. It may easily occur that such an officer may sell property to the corporation at a price in excess of its value; but it is essential to the validity of the sale that he, and those representing the corporation, thought it within the value, or thought that some benefit would accrue to the corporation by the purchase. The good faith in the transaction will preserve it. But there must be good faith; there must be no imposition upon the corporation; there must be no taking advantage of the position; there must be no exercise of an improper influence upon the persons charged with the management of the affairs of the corporation."

Alabama follows this rule as to the burden of proof. Western Grain Company Cases, 264 Ala. 145, 85 So.2d 395.

■ Where such an arrangement as here exists is challenged, the Court will scrutinize the transaction closely and set it aside unless it clearly appears to be fair or just in every respect. Caldwell v. Dean, 5 Cir., 10 F.2d 299.

■ Alabama also follows the rule that where the interests of officers of a corporation are antagonistic and adverse to the corporation the question of actual injury or detriment to the corporation is immaterial. Holcomb v. Forsyth, 216 Ala. 486, 113 So. 516. Subject to these rules, and as stated in The Western Grain Company Cases, *supra*:

"The general rule that a director occupies a fiduciary relation is not to be taken as prohibiting him from having any personal dealings with the corporation and the other directors and stockholders. The duty imposed on the director in such dealings is necessarily defined by, and dependent upon, the particular facts and circumstances involved. Each case must be considered separately on the basis of its own facts."

The chief complaint is that management has not taken adequate steps to see to it that the Corporation bought gasoline and diesel fuel from a major oil company at transport prices. All of the stockholders, directors and officers have long known of the dealings herein discussed. As a matter of fact these dealings antedate the incorporation of both the Corporation and the Oil Company and appear to have existed for more than thirty years. It is true that the stockholders did not know the exact profit being made by the Oil Company on sales to the Corporation, but this information could have been ascertained by them years ago. They could scarcely assume that the Oil Company was handling at a loss or without profit to itself. The operation required a continuous outlay of capital and involved expenses and the rendition of services, and they could assume that a reasonable profit would result to the Oil Company. The Corporation obtained its requirements at wholesale and was treated no differently from others buying at wholesale. There is at least a serious question whether entry into the transport-price arrangement, considering all the factors involved, would have been, or would be, to the advantage of the Corporation cost-wise or otherwise. It is not to be overlooked that we are here dealing with a matter of business judgment, the decision as to which must rest in the first instance with the Corporation.

■■ In view of the fact that the transactions between the Oil Company and the Corporation are, at most, voidable and not void, the stockholders and the other directors without an independent and substantive act of ratification could ratify such transactions from long acquiescence with knowledge, thereby waiving the right to avoid the transactions and their consequences. 19 C.J.S. Corporations § 783; and Griffin v. Smith, 7 Cir., 101 F.2d 348. From all the facts the Court finds that a ratification and waiver has resulted, and that cross-claimants are not entitled to relief on the claims made with respect to the transactions between the Oil Company and the Corporation. However, this holding is not to be construed as freezing the status quo or precluding the Corporation from surveying the existing situation in the light of sound business judgment from the viewpoint of the Corporation.

## MRS. ELLA BELCHER—SALARY

Mrs. Ella Belcher, the widow of W. E. Belcher, Sr., is the mother of Brady, W. E., Jr., Mrs. Maxwell and Mrs. Davis. She is the grandmother of the plaintiff, Charles Donald Belcher, the only child of her deceased son A. Roland Belcher. She was elected Chairman of the Board of the Corporation by the stockholders at their 1944 annual meeting and was authorized at that meeting to receive a salary of $100.00 per month. In 1948 or 1949, and prior to the creation of the Roland Belcher Trust B, Mrs. Belcher disposed of all her stock and under the

by-laws of the Corporation then became ineligible to occupy a directorship. The minutes of the Corporation do not disclose any action to rescind the salary payment to Mrs. Belcher. Thereafter Brady authorized the "Company" to make salary payments to his mother. She has had no duties to perform for the Corporation and has performed no duties whatever for it. W. E., Jr. doesn't know when he first learned that his mother was drawing a salary from the Corporation. She was already on a salary when he first knew about it. He then consented to it and never took any steps to inform the Trustee. Salary payments have been made to her as follows:

| 1951 | $ 1,218.25 |
|------|------------|
| 1952 | 1,158.06 |
| 1953 | 916.19 |
| 1954 | 918.25 |
| 1955 | 1,223.75 |
| 1956 | 1,232.00 |
| 1957 | 1,200.00 |
| 1958 | 1,200.00 |
| 1959 | 1,200.00 |
| 1960 | 1,200.00 |
| 1961 | 1,200.00 |
| 1962 | 1,200.00 |
| 1963 | 1,200.00 |
| 1964 | 1,200.00 |
| | $16,266.50 |

She continues to draw the sum of $100.00 per month. Mrs. Maxwell understood that her mother was receiving a salary from the Corporation. Mrs. Davis knew that her mother was drawing money but did not know that it was a salary.

In the Corporation's financial statement for the year ending October 31, 1954, under "accounts receivable" there was listed: "Mrs. W. E. Belcher—Salary account $4.80." There was a corresponding entry for the year ending October 31, 1955: "Mrs. Ella Belcher—Salary account $6.18." These statements were furnished to the Trustee. There were check marks opposite these entries. Mr. Rice testified that check marks opposite an entry in any financial statement indicated that he had made inquiry concerning that item.

Standing alone the above notations are more misleading than informative. There is nothing on the books otherwise to indicate that Mrs. Belcher was receiving $100.00 a month as "salary."

The Court finds that the Trustee did not have knowledge that a salary was being paid to Mrs. Belcher.

The Corporation had no pension or retirement plan that would cover the "salary" payments to Mrs. Belcher.

The Trustee contends that the payments to Mrs. Belcher as "salary" constitute a waste or diversion of the corporate assets.

This claim appears to fall squarely within the holding of Adams v. Smith, 275 Ala. 142, 153 So.2d 221, decided by the Supreme Court of Alabama in 1963. There the directors adopted a resolution to pay certain sums to the widows of the deceased president and comptroller. A minority stockholder challenged this action and sought a recovery of the directors and the widows for the sums paid, and for injunctive relief against further payments. After quoting from Smith v. Dunlap, 269 Ala. 97, 111 So.2d 1, to the effect that a corporation could not give its property away over the protest of a minority stockholder, the court said:

". . . [P]ayment was made by the directors who were agents or trustees of the corporation. The rule applicable here, it seems to us, is as follows:

'So, if a trustee misapply trust funds, and pay them out for a purpose not authorized by the trust, and the person to whom he pays them has knowledge that they are trust funds, this is a breach of trust in each, and the person receiving the fund under these circumstances, becomes a trustee, liable for the performance of all the trust duties which rested on the lawful trustee. Perry on Trusts, §§ 810, 814, 835, 836, 840, 841. . . .' Preston & Stetson v. McMillan, 58 Ala. 84, 89.

". . . [T]he widows, in the case at bar, had notice that the money paid to them was the money of the

corporation, and the widows have not parted with value.

. . . . . .

"We hold that the principle of voluntary payments under mistake of law does not apply to the payments to the widows. Recovery against the widow was allowed in Moore v. Keystone, etc., supra [370 Pa. 172, 87 A.2d 295]. See also: Bronaugh v. Evans, 204 Ala. 153, 85 So. 556; Wood v. Hendon, 16 Ala. App. 327, 77 So. 921."

██ Love and affection of a son for his mother are laudable qualities but in this instance they do not comport with the legal obligations imposed upon him as president, director and stockholder with respect to the handling and preservation of the Corporation's funds, nor do they lessen the legal duty of the Bank, as Trustee, with respect to the enforcement and discharge of its trust obligations as a stockholder.

██ The six year statute of limitations, Title 7, § 21, Alabama Code 1940, is applicable to Mrs. Belcher for money had and received by her. Consequently, payments made to her prior to August 6, 1958, are barred. No fiduciary relationship existed between her and the Corporation, as existed between Brady and the Corporation. In Spann v. First Nat. Bank of Montgomery, 240 Ala. 539, 200 So. 554, the court said:

"[T]he principle is established in this jurisdiction that as between the trustee and a stranger the statute of limitations runs as in other cases, and if the trustee is barred the cestui que trust is also barred."

██ Brady standing in a fiduciary relationship to the Corporation and the other stockholders was under an affirmative duty to disclose the fact that he had authorized the payments to his mother. Hudson v. Moore, 239 Ala. 130, 194 So. 147. The Court does not find such corporate approval or acquiescence as to enable him to shield himself behind the defenses of laches or limitations against this wrongful disbursement of the Corporation's funds. Jacksonville Public

Service Corporation v. Profile Cotton Mills, 236 Ala. 4, 180 So. 583.

The Trustee, on behalf of the Corporation, is entitled to a judgment against Mrs. Belcher for sums received by her as "salary" since August 6, 1958, with interest thereon at the legal rate, and to a judgment against Brady for a misapplication of corporate assets, back to and including payments authorized by him and made to her for the years 1951 and subsequent thereto, together with interest thereon.

There was no resolution for redress offered by the Trustee to the directors with regard to the matter of sums paid to Mrs. Belcher as salary. However, a resolution was offered by the Trustee with respect to small loan interest income received by Mrs. Belcher. Such resolution died for want of a second. All other requests for action by the Trustee at said meeting were voted down. From all the evidence of hostility to the Trustee by Brady and those aligned with him, and for reasons heretofore noted, demand for action against Mrs. Belcher and Brady would have been entirely futile.

## MRS. ELLA BELCHER—SMALL LOAN INTEREST INCOME

Prior to 1944 the Corporation was making loans to its employees. During that year there was a Wage and Hour examination at which time this activity was disapproved. The procedure was then changed and the interest on the loans was no longer retained by the Corporation but was thereafter credited and paid over to Mrs. Ella Belcher.

If an employee wants money he goes to the Corporation's payroll clerk, who determines how much unpaid time the employee has and the amount that he can borrow. If he has time due him, she adds 10% to the amount loaned, takes back a "cash slip" for the amount plus 10%, and deducts the amount of the cash slip from his next pay check. The clerk then turns the interest income over to the cashier of the Corporation who receipts for it as "misc. revenue"

and deposits the amount of the charge to the employee to the credit of Mrs. Belcher. The interest income so derived since the date of the Trust in 1951 has through 1964 been as follows:

| 1951 | $ 7,255.52 |
|------|------------|
| 1952 | 13,717.34 |
| 1953 | 14,105.51 |
| 1954 | 14,035.78 |
| 1955 | 14,306.57 |
| 1956 | 16,409.33 |
| 1957 | 18,700.27 |
| 1958 | 17,083.33 |
| 1959 | 17,399.94 |
| 1960 | 15,740.23 |
| 1961 | 14,665.94 |
| 1962 | 16,625.20 |
| 1963 | 19,189.90 |
| 1964 | 18,886.34 |
| | $218,121.20 |

Mrs. Belcher reported this interest income on her federal income tax returns and paid the tax thereon. Since Mrs. Belcher has been receiving the income the Corporation has not reported the same on its returns.

Following Mr. W. E. Belcher, Sr.'s death in 1945, Mrs. Belcher collected the proceeds of certain insurance on his life and loaned the Corporation the sum of $58,500.00, evidenced by two promissory notes. The Corporation has through the intervening years paid her interest of $2,400.00 per annum on this outstanding loan.

The defendants assert that all of the stockholders of the Corporation agreed to this payment of interest income to Mrs. Belcher. However, the evidence does not sustain this claim.

Mr. H. H. Maxwell, a stockholder and director, may have heard that some money was loaned to the employees, but he did not know what was done with the interest income. He did not remember anyone talking to him about it.

Mrs. Maxwell had no recollection of having known anything about the interest income before the lawsuit. Prior to this litigation she had not given her consent to any such agreement.

Mrs. Davis did not know about the interest income and was unaware that it was deposited to the account of her mother until advised by one of the counsel for the Trustee after this litigation ensued.

Turner Rice of the Trustee Bank had no knowledge of the loans to "Company" employees. The financial statements furnished him made no disclosure of interest income on loans to employees. Brady did not recall ever mentioning the matter to Mrs. Davis, Mrs. or Mr. Maxwell.

Brady directed the Corporation's employees to make the loans and to deposit the interest income in Mrs. Belcher's account. W. E., Jr. knew about the interest income being collected and paid to Mrs. Belcher and consented thereto.

Defendants further assert that the proceeds of the loan by Mrs. Belcher to the Corporation were used as a revolving fund from which to make the loans to employees. Again, the evidence does not bear out the claim, and it is refuted by the fact that the Corporation paid Mrs. Belcher interest in the amount of $2,400.00 per year on the $58,500.00 loan, and deducted the same as an expense on its tax returns. Why the Corporation should pay her interest on funds being employed for her use is unexplained. The money borrowed from Mrs. Belcher is in the general account of the Corporation. There has been no segregation of said funds into a special account or otherwise. Only corporate funds from the Corporation's general account were used to lend to the employees. When money is loaned to employees no entries are made on the corporate books as far as Mrs. Belcher's account is concerned. The Corporation's account with Mrs. Belcher did not fluctuate with loans to and collections from its employees.

The Corporation provided all the clerical assistance required for the conduct of the small loan business. There is evidence that an average of about $10,000.00 was regularly employed in this small loan operation. The Corporation has not received interest on the funds so employed.

The Corporation has never been licensed to conduct a small loan business.

The maximum allowed to be charged under the small loan laws of Alabama is 3% a month. A party who participates in the violation of the law, Acts 1959, p. 968, § 3, is subject to criminal penalties of a fine or imprisonment or both. The amount charged the employees far exceeds 3% per month.

Based upon the findings and conclusions herein made and stated, the Trustee is entitled to relief on behalf of the Corporation against Mrs. Ella Belcher, Brady and W. E., Jr. as herein directed.

There is, however, presented a serious question whether the Trustee can on behalf of the Corporation recover the interest income collected from the employees of the Corporation, and paid to Mrs. Belcher, which income was collected in violation of the law of Alabama, or whether its recovery will be limited to the legal interest on the funds used by the Corporation for Mrs. Belcher's account together with clerical costs incurred in her behalf.

In National Trust & Credit Co. v. F. H. Orcutt & Son Co., 7 Cir., 259 F. 830, a corporation organized for the purpose, *inter alia*, of purchasing accounts receivable made a written contract with a wholesale merchandising company. The court held the contract to be a loaning agreement and void as being beyond the corporate powers of the corporation. Creditors of the company were awarded an accounting of usurious interest collected by the corporation. The court in reversing, as far as closed transactions were concerned, said:

"Holding, as we do, that the real transaction between these parties was intended to be, and was in fact, for loans of money and not sales of accounts, and that appellant had not the legal capacity to enter into such transactions, the contract had no validity whatever, and neither party could enforce it, nor predicate upon it any right of recovery."

See also Central Transportation Co. v. Pullman's Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55.

The illegal interest collected in this instance was not an exaction from the Corporation but from its employees, and to permit the Corporation to recover this illegal exaction on an accounting would constitute an unjust enrichment and would insofar as the fruits of the transactions are concerned in effect put the Corporation in the small loan business retroactively, and amount to a court ratification of transactions which were and are contrary to public policy and in violation of a criminal statute.

Although a borrower of money may have the usurious sums paid deducted from the principal when he is sued, Title 9, § 65, Alabama Code 1940, but prior to January 5, 1960, and in the absence of fraud or mistake of fact, he could not recover back usurious interest voluntarily paid. Bell v. Barnes, 238 Ala. 248, 190 So. 273. By virtue of Section 290 (8) of Title 5, Alabama Code 1940, a borrower can now recover usurious interest paid by him, but another is not authorized to effect a recovery in his behalf.

These observations do not lead to the conclusion that officers of a corporation acting without authority of the corporation can deal with impunity with its funds under the facts here shown and thereby incapacitate those proceeding in its behalf from recovering from those responsible legal interest on its funds used by them, and expenses and costs incurred by the corporation at their instance. Although the transactions as to the loans be void, the Corporation may nevertheless recover the outlays which it had made and the losses to which it has been subjected. *National Trust & Credit Co.* and *Central Transportation Co., supra.*

Where a party though not in privity participates in a wrongful appropriation of funds, such party may be required to respond on an accounting. 1 C.J.S. Accounting § 31, at 662; Harris v. Harris, 160 Or. 276, 84 P.2d 500.

Mrs. Belcher had the use of the Corporation's funds and services over a long period of time, and whether the Trus-

tee's claim is one strictly for an equitable accounting or for the use of its funds and services, the law will not leave it remedyless in view of its prayer for general relief.

■ Interest is compensation for the use of money and will be allowed on funds wrongfully used where, as here, the conduct of the parties merits its allowance. 47 C.J.S. Interest § 13, at 23; Perfect Photo, Inc. v. Grabb, (E.D.Pa.) 205 F.Supp. 569. Substantial costs were incurred by the Corporation in servicing the loan business for Mrs. Belcher. As to the application of the statute of limitations the outlays of funds though in the form of salaries to employees would appear to be no different from the direct use of the funds in making loans to the employees.

■■ Under Section 21, Subd. 5, Title 7, Code of Alabama 1940, the statute of limitations for the recovery of money upon a loan is six years. The use of funds for the payment of salaries to the employees and the interest on the loans to employees would, in the Court's opinion, fall within the bar of the six-year limitation as to Mrs. Belcher. As to Brady and W. E., Jr., who stood in a fiduciary relationship to the Corporation and the other stockholders, the principles as to limitations referred to in this opinion in regard to salaries paid to Mrs. Ella Belcher are equally applicable here.

■ The evidence establishes and the Court so finds that there was a wrongful and unauthorized use of the funds and of the personnel of the Corporation. An accounting is directed to determine the average amount of funds of the Corporation annually employed in the small loan operation, the amount of interest thereon at the legal rate, the expenses incurred by the Corporation in conducting such operation, and the interest thereon at the legal rate, following which a judgment will be entered against Brady, W. E., Jr. and Mrs. Ella Belcher.[1b] The accounting as to Brady and W. E., Jr.

will extend to the date of the establishment of the Trust, and as to Mrs. Belcher to August 6, 1958.

## SILAS LUMBER COMPANY

The issue presented by this claim is that of the alleged underpayment of commissions by the Silas Lumber Company to the Sales Company from July 23, 1951, to the spring of 1956.

Brady Belcher Interests, Inc. is a corporation with 100 authorized, issued, and outstanding shares of stock. Brady Belcher owns 98 shares, his wife one share and George Phillips White one share. Silas Lumber Company is the trade name used by Brady Belcher Interests, Inc. in a sawmill operation located at Silas, Alabama, some 140 to 150 miles from Centreville, Alabama.

During the period involved and up to 1958, Brady received from Silas a total of $8,800.00 in salary, and Mrs. Belcher received $2,200.00. They also received $17,428.08 and $4,095.00, respectively, in interest income from Brady Belcher Interests, Inc.

Silas manufactured airdried yellow pine and hardwood lumber. The records of the Sales Company reflect that the Sales Company purchased the lumber from Silas and then resold that lumber for its own account at a price of 2% above the purchase price. Cross-claimants assert that as a fact the transaction between the two represented a sale of Silas lumber products by the Sales Company on a commission of 2%.

The Sales Company was paid average commissions of 7.2% for sales made by it for outside lumber mills during the period of 1950 through 1953. Under the output agreement, hereinafter separately considered, the Sales Company was paid a 9.84% commission on sales for the Corporation.

From July 13, 1951, to January 31, 1964, the Sales Company made a profit of $6,784.66 on purchases totaling $343,-218.00 from Brady Belcher Interests, out

---

[1b.] Indemnity will also be required of Brady, W. E., Jr., and Mr. and Mrs. ■ Maxwell to protect the Corporation from Small Loan Act violations.

114

of which it bore the cost of overhead and loss from bad debts. Of this total Silas was paid $331,295.84. On the basis of 7.2% commission to the Sales Company, the profit would have amounted to $33,772.65 for the period mentioned.

During the years 1952 through 1957 Silas earned more on products sold through the Sales Company than on those sold elsewhere. The average price per thousand board feet on sales through others was $67.725, and through the Sales Company $74.297, or a difference of $6,572. There was an extra profit on footage sold through the Sales Company of $31,175.52. During more than half of the time involved the Sales Company paid Brady Belcher Interests for Silas products before they were delivered.

There is evidence tending to establish that Silas competed with the Corporation. There is countervailing evidence that the two were not competitors in that Silas produced airdried, high grade boards, while the Corporation kiln-dried its lumber of the same class. The evidence establishes that the Corporation air dries some of all grades of its lumber. The Court finds that the weight of the evidence is with the defendants on the issue of competition.

The Corporation also was placed at a disadvantage by the 2% profit or commission paid by Silas in that the Internal Revenue Service has found that a part of the 9.84% commission expense allowed the Sales Company was not allowable as a corporation expense. The Corporation was required to accept a formula whereby the commission was determined by the average commission realized by the Sales Company on purchases from outside mills. The inclusion of Silas Lumber Company at 2% during the three years prior to February 1957, necessarily reduced the average. The average was reduced to 7%. This reduction increased the corporate tax burden.

Brady owned a 20% interest in the Corporation and a 34% interest in the Sales Company. By failing to adjust the commission paid to the Sales Company to that allowed by the Internal Revenue Service as expense to the Corporation, Brady obtained a preferential advantage because of his disproportionate interest in the two entities.

The Dun & Bradstreet report of November 17, 1952, on Brady Belcher was produced from the files of the Trustee Bank. In this report it was stated that Brady owned 98 of the 100 shares of Brady Belcher Interests, Inc. and that 90% of its sales were "through Belcher Lumber Sales Co., Centreville, Ala., remainder (10%) to 10 wholesalers in southern states" with terms of thirty days net with 2% discount when paid within 10 days. The same information was also contained in the report of April 17, 1952. These reports also revealed that Brady Belcher Interests owned and operated the Silas Lumber Company. The Dun & Bradstreet reports on the Corporation of March 16, 1951, July 5, 1956, January 7, 1957, May 14, 1958, August 5, 1959, January 21, 1960, and January 20, 1961, likewise reveal that Brady Belcher Interests, Inc. operated the Silas Lumber Company. These reports were also received by the Trustee Bank.

Mrs. Maxwell knew nothing about sales of lumber by Silas to the Sales Company. W. E. Belcher, Jr. knew about the arrangement but didn't know whether Silas paid the Sales Company anything for selling its lumber. The record appears to be silent as to knowledge on the part of the other officers and directors of the Corporation. No one except Brady was aware of the fact that Silas lumber was being handled on the basis of a profit or commission of 2%.

The evidence establishes that the Sales Company would on occasion fill orders from Silas which could not be profitably handled with the products of the Corporation, that Silas promptly filled its commitments, and that when there was a demand for lumber that the Corporation could not supply, rather than send the customer elsewhere and run the chance of losing him, the order was filled or partially filled with lumber manufactured by Silas. By this method of

dealing the Sales Company could thereby retain the customer and his good will.

Assuming that the arrangement to deal with Silas was a desirable one, yet there is no justifiable explanation as to the very substantial difference of 9.84% on sales by the Corporation to the Sales Company and 7½% commission on sales for other mills on the one hand, and 2% on sales by Silas on the other hand, other than the fact that Brady owned 98% of Brady Belcher Interests, the owner of Silas Lumber Company, while owning only 34% of the Sales Company and 20% of the Corporation.

■ While a partner is not precluded from dealing with his own firm, 68 C.J.S. Partnership § 100 at 539, he cannot use the firm property for his individual use or benefit, nor derive a secret personal profit out of the business of the firm. *Id.* § 99.

The Supreme Court of Illinois in Grossberg v. Haffenberg, 367 Ill. 284, 11 N.E.2d 359, has succinctly stated the duty owed by a partner to the other partners and his burden of showing conformance with the required legal standards as follows:

"Each partner owes to each other partner the utmost good faith, and when he, himself, benefits from transactions with the firm, he will be required to show, not only that he is within the law, but that his conduct conforms to the highest standards of honor and honesty. . . ."

The Court of Appeals of Kentucky is even more explicit when it defines the duty, as it did in Stephens v. Stephens, 298 Ky. 638, 183 S.W.2d 822, in the following language:

"The relationship of partners is a close one and imposes upon each the obligation of loyalty, integrity and the utmost good faith and fairness with respect to the partnership affairs. This obligation begins with the preliminary negotiations and continues throughout the life of the relationship . . . No undue advantage of one over another by misrepresentation or concealment will receive the approval of the law . . . One partner will not be permitted to obtain secretly any right that should belong to the partnership and put it to his own individual profit . . . The criterion is not an actual evil motive, for the courts look to the result of any such action regardless of evil intent. If such action results in profit or advantage, the courts will require an accounting . . . ."

■ Being the dominant and managing partner of the Sales Company, while at the same time controlling Silas Lumber Company, through stock control of Brady Belcher Interests, Inc., Brady was under a legal duty, as declared by the authorities herein noted, "to place the cards face up on the table," so that his fellow partners in the Sales Company be made acquainted with the fact that they were being unequally treated and Silas was being favored respecting sales by Silas to the Sales Company in contrast to sales by outside mills and by the Corporation to the Sales Company. Nothing in the Dun & Bradstreet reports touched on the unequal treatment complained of.

The Court finds no sufficient advantage that inured to the Sales Company by virtue of its purchases from Silas that would offset or justify the disparity in treatment.

■ The results, herein shown, speak for themselves. Brady will be required to account to the Sales Company to the extent that the Sales Company has suffered because of the disparity between the profits or commissions on sales made to the Sales Company by Brady Belcher Interests, Inc. and Silas on the one hand and by outside mills and the Corporation on the other.

Limitations and laches available to Brady Belcher Interests, Inc. and Mrs. Brady Belcher are not available to Brady as between him and the other partners of the Sales Company. Moore v. Moore, 255 Ala. 393, 51 So.2d 683.

## OUTPUT AGREEMENT

In 1944 the Corporation and the old partnership, predecessor of the Sales Company, entered into an agreement whereby in consideration of the old partnership's using its best efforts to sell the Corporation's lumber and other products at the highest prevailing market price, the Corporation agreed to sell to the old partnership its entire output of lumber and other products at the price at which the Sales Company sold same to its customers, less 8% and a 2% cash discount.

Upon the formation of the new Sales Company partnership in July 1951, the partnership entered into a new output agreement with the Corporation whereby it was agreed that the Corporation and the Sales Company "shall be bound by and shall be entitled to all the benefits of" the old output agreement. This new agreement became effective on July 22, 1951.

It had been the practice during the old partnership and during the existence of the old output agreement for the Corporation to make certain sales direct from its plant at Centreville. This practice has been pursued continuously since the formation of the new partnership and the execution of the new output agreement. The Trustee Bank and Mrs. Davis charge that the action of the Corporation in making direct sales has constituted a breach of the new output agreement by the Corporation.

The total of direct sales made by the Corporation from July 22, 1951, through 1964 amounted to $1,379,264.97. The Sales Company's commission on that amount under the output agreement would amount to $135,719.68. The Trustee's share (16½%) would amount to $22,393.74. Based upon 130 shares ownership in the Trustee until the sale of 30 shares in 1963, the Trustee owned a 13% interest in the Corporation before such sale and a 10% interest thereafter, and, consequently, suffered a loss on commissions of the difference between its 16½% interest in the Sales Company and its 13%, and later its 10%, interest in the Corporation.

The output agreement provides that the Sales Company will pay for the products of the Corporation from 15 to 30 days after delivery. Since August 1957, the Sales Company has continuously made advances to the Corporation against future shipments by it, amounting at one time in 1963 to $211,831.21. The Corporation has paid no interest on these advances. The advances were entered on the records of the Sales Company as "advances to mills," of which the Corporation was chief. If it be assumed that interest should have been paid on same, the Trustee was penalized since it owned a one-sixth interest in the Sales Company and was required to provide one-sixth of the operating cash advanced to the Corporation, while it owned less than a one-sixth interest in the Corporation. Mrs. Davis' interest in the Corporation has always exceeded her interest in the Sales Company. This is also true of the interests of W. E., Jr. and Mrs. Maxwell, each of whom along with Mrs. Davis owns a one-fifth interest in the Corporation, while owning only a one-sixth interest each in the Sales Company. On the other hand, Brady owns a two-sixths interest in the Sales Company and a one-fifth interest in the Corporation. The transactions complained about penalized Brady more than the Trustee, while at the same time they worked to the financial advantage of Mrs. Davis, W. E., Jr. and Mrs. Maxwell.

The Trustee received Dun & Bradstreet reports on the Sales Company and the Corporation beginning at least as early as March 16, 1951, and has continued regularly to receive such reports. All of these reports, with some slight change in verbiage, contained the following paragraph:

"Distribution: Except for retail sales comprising about 6% of the volume, the entire production of lumber and other wood products is sold to Belcher Lumber Sales Company. Retail sales of lumber and other wood

products are principally to contractors and home owners, general store sales to a general class of consumers."

The Trustee makes complaints of insufficiency of the Dun & Bradstreet report, including a complaint that the quoted paragraph fails to disclose that the Sales Company was not fairly compensated for said "retail sales." It says that it was not informed that the Sales Company was not allowed interest on the advances that it made to the Corporation. The Trustee had notice of the fact through many years that the Corporation was making retail sales comprising about 6% of the volume of its entire production. If it was concerned, and the Court finds nothing that was sufficiently material to mislead it, it could have easily ascertained the fact that the Sales Company was not being paid commission on retail sales or interest on "advances to mills," including advances to the Corporation. It was fully aware that more than 90% of purchases by the Sales Company were from the Corporation, and that there was scarcely any other mill or mills which would likely be recipients of such advances, especially of such size as those shown for 1963.

 The Court is of the opinion that under the authority of Sherrill v. Alabama Appliance Co., 240 Ala. 46, 197 So. 1, the output agreement is not lacking in mutuality in that it requires the Corporation to sell but does not require the Sales Company to purchase the entire output.

The Corporation has always made local sales at Centreville direct to its customers who come to the plant for their requirements. The Sales Company has had no personnel stationed at the sheds where such local sales are made.

By custom, practice, and with the knowledge and acquiescence of the partners, the partners have treated the output agreements as not including such local sales. These sales have been made largely for the convenience and accommodation of the particular customers involved.

 After the elapse of so many years and under the facts disclosed by the record and those here found, cross-complainants will not be heard to complain respecting direct sales by the Corporation and interest on the advances, and therefore are not entitled to relief on behalf of the Sales Company.

## ENGINEERED STRUCTURES, INC.

This corporation was formed in 1959 with a capital stock of $5,000.00. Each of the four stockholders, Brady Belcher, W. E., Jr., Mrs. Maxwell and Mrs. Davis, owns 25% of the stock. Brady is its president. The corporation was organized to use W. E. Belcher Lumber Company products in the manufacture of roof trusses and other structural members. It was not intended that the corporation pay a dividend. The Trustee declined to invest in it for the reasons stated in letter of August 28, 1959, as follows:

"We have concluded not to enter into the capitalization of 'Engineered Structures, Inc.' by reason of the fact that Roland Belcher's estate is largely nonliquid and will require all of the cash we can lay our hands on and more besides to pay estate taxes. In view of the fact that the new corporation is not expected to pay cash dividends within the foreseeable future, we do not believe that it would be to the interest of the trust or of the estate to enter into the program at this time."

However, its operations have been financed by extensions of credit or prepayment on merchandise sold by the other Companies (principally the Corporation) in which the Trustee was interested. The balance due the Corporation has run as high as $31,000.00, but with a running balance in the neighborhood of $25,000.00.

The Sales Company does not get a commission on sales made by the Corporation direct to Engineered Structures, Inc., but is paid a commission of six per cent on sales made by it on products manufactured by Engineered Structures. It does not buy and resell for Engineered Structures, or handle its accounts. If

there is a bad debt Engineered Structures takes the loss. It has not paid any dividends or any salaries to any of the Belchers.

The Corporation has profited by sales made to Engineered Structures. The lumber sold to it has been sold at higher prices than to other customers. For example, No. Two 2 x 4's 8 feet long, 10 and 12 feet long, 14 feet long, and 16 feet long, were sold to other customers at $88.00 per thousand, $83.25, $84.93, and $88.07, respectively, as against $104.00, $99.03, $103.13 and $105.00 on sales to Engineered Structures.

The Sales Company has profited to the extent of the six per cent commission on sales made by it. From July 1959, to August 1965, the Corporation sold Engineered Structures 2,275,249 board feet of lumber at a cost of $248,382.44.

Engineered Structures consumed in its manufacturing processes random lengths and odd lots of lumber that were hard to sell to others. Furlong testified that "the purpose of Engineered Structures was to consume this lumber, and also to be a liability shield from [for] the Corporation on any of those products. It had no interest other than that."

The Trustee complains about direct sales by the Corporation to Engineered Structures, and claims that since it is not a stockholder of the latter it has no way to recoup the loss of commissions on direct sales to it by the Corporation, which commissions if handled under the output agreement would have been received by the Sales Company and in which it would have shared to the extent of 16½%. Considering the substantial benefits received on direct sales by the Corporation, in which the Trustee is pecuniarily interested, the commissions received by the Sales Company on sales by it, the purpose for which Engineered Structures was organized, the office which it has served in the use of odd sizes of lumber manufactured by the Corporation, and the fact that no dividends have been paid, or salaries received by any of the Belchers, the Court concludes that the Trustee is not entitled to an accounting respecting the operations of Engineered Structures, Inc. in relation to commissions on direct sales or as to advances made to it on future sales.

## FOREST INDUSTRIES

For several years prior to 1965, the Sales Company, utilizing local lumber sales companies, had sold lumber manufactured by the Corporation in the Moline, Illinois, area. Beginning about fifteen years ago it used Larsen Lumber Company. Later Dick Larsen, the son of the owner of the latter company, and Roy Manis formed L & M Forest Products. This company was a commission lumber company and later began the business of building crates or boxes for use in packaging farm machinery for export as a commercial exporter. During 1964 James Bennett, who since 1947 had been an employee and foreman in the shipping, exporting and warehousing division of J. I. Case Company, approached Manis and Larsen of L & M and suggested the setting up of a factory to fabricate boxes. Later Mr. Bennett met Brady Belcher and learned that the Sales Company was the source of the lumber that L & M had sold to Case. In the latter part of 1964, or early 1965, Mr. Bennett helped set up a factory for the production of boxes by L & M.

Forest Industries, Inc. is an Iowa corporation formed on January 29, 1965, with its place of business in Moline, Illinois. The Sales Company subscribed to and had issued to it 510 of the total of 1000 shares of its capital stock. Thereafter, on February 14, 1966, the outstanding 490 shares were acquired by the Sales Company. The subscription price of the initial stock acquisition was $510.00. The subsequent acquisition was at no cost.

Mr. Bennett became a full-time employee and manager of Forest Industries on March 11, 1966.

The business of Forest Industries originally was that of the manufacturing and sale of boxes to manufacturing concerns for crating of equipment prior to ship-

ment. On November 11, 1965, the business was expanded and changed by the addition of a commercial exporting function. This included in addition to the manufacture of boxes, the receipt of machinery, its disassembly, the packing of the machinery parts and their shipment.

Shipments from the Sales Company to "Forest Industries" commenced on September 2, 1964. The current volume is 125,000 board feet per month. By December 8, 1964, L & M was conducting what was referred to as a pilot operation designated "Forest Industries," with an obligation to the Sales Company of $28,-346.11. Between the latter date and January 29, 1965, "Forest Industries" had paid, or was credited with, the sum of $41,270.00, including a credit for $12,000.00 for a check that was not good, but which was made good in February by a note made by L & M at the Brent Bank and endorsed by the Sales Company. Further extensions of credit left a balance due the Sales Company on January 28, 1965, of $24,767.86.

Cash payments to the Sales Company during March and April, 1965, amounted to $23,265.00, but there were no payments thereafter. However, credit was continued. By December 1965, Forest owed the Sales Company $65,000.00, and on May 26, 1966, the Sales Company was due $143,226.29. Forest showed a nominal profit at its inception, but at the time of the trial was unable to meet its debts as they matured and was insolvent.

On or prior to December 9, 1964, the Southeast Bank of Moline agreed to lend money to Forest Industries on the endorsement of the Sales Company. The amount of contingent liabilities so incurred is not shown by the records of the Sales Company and is not known, but at the time of the hearing on this issue was estimated by Furlong to amount to about $25,000.00. Blank notes with the Sales Company's endorsement by Brady have been furnished Forest.

As early as December 8, 1964, Brady had determined to take an interest in Forest Industries, but no mention of this fact was made during the stockholders meeting of December 16, 1964, and December 15, 1965, at which all partners were present. The facts involving Forest were not communicated to either Mrs. Davis or the Trustee Bank until the June 1966, hearing. The extent of Mrs. Maxwell's knowledge is not clearly revealed. She apparently thought that Brady and W. E., Jr. were the owners personally of the Forest Industries stock. There was a reference in a footnote appended to the Sales Company's financial statement for the year ending January 31, 1965, to the fact that the Sales Company owned 51% of the capital stock of Forest Industries, Inc. The Trustee had requested this statement in February or March 1965, but copies were not delivered to the partners until June 1966. The 1966 financial statement was delivered to the Trustee on June 3, 1966. This statement reflected the acquisition of the remainder of the capital stock of Forest and an account receivable from it as of January 31, 1966, of $85,816.18. Neither statement made mention of any contingent liability of the Sales Company in connection with Forest Industries.

It is remarkable, if not astounding, that the transactions involving Forest Industries began after the filing of the cross-claims and the complaints made therein as to secret deals in respect to Bell and Norris, and other matters, and have been conducted by Brady and W. E., Jr. without the knowledge of other partners during the progress of this litigation which had from the outset seriously challenged their right to so conduct themselves in the operation of the Sales, Wood Products and Lumber Companies.

■ Without the consent of the other partners, Brady and W. E., Jr. lacked power and authority under the Articles of Partnership of the Sales Company to organize and acquire stock control of Forest Industries, Inc., and having done so with such lack of power and authority,[2]

2. In Fortugno v. Hudson Manure Co., 51 N.J.Super. 482, 144 A.2d 207, it was held that the principle that less than all the partners may not bind the part-

to extend credit to it by the Sales Company, and to obligate the Sales Company contingently on its behalf. The record does not disclose any such consent. The law respecting these matters has been fully stated in the part of this opinion dealing with Bell and Norris and will not be here restated. The relief there indicated as due to be awarded against Brady and W. E., Jr. is due to be and will be awarded respecting the transactions here involved.

## COSTA RICA TIMBER EXPLOITATION

Like Forest Industries the Costa Rica Timber matter came to light and into focus after the inception and during the progress of this litigation. Neither that matter nor this was covered by the pleadings or by the pretrial order. However, both this matter as well as Forest Industries have been put in issue and very considerable evidence has been heard as to each. Briefs have been submitted by the parties in support of their respective contentions. The Court will consider the pleadings and pretrial order as being amended respecting both matters to meet the issues tendered and to conform to the evidence which has been offered.

Brady Belcher first became interested in South American lumber in 1959 and more definitely so with his involvement with the J. L. Bell Company in 1960.

Beginning in July 1964, Dr. William R. Sizemore, timber consultant, began to examine the feasibility and the use of Central American logs on behalf of the Corporation, and in connection therewith made six trips to Costa Rica. His final reports were prepared in April 1965, but first came to light in August 1965, in response to a subpoena duces tecum

issued to him at the instance of the plaintiff. Dr. Sizemore also became the active negotiator on behalf of the Corporation for the final Costa Rican timber contract with the Institute of Lands and Colonization known as ITCO, an agency of the Costa Rican Government. A Mr. Henker was the representative of the Corporation designated to be in charge of the operations and also took part in the negotiations which culminated in the final contract of April 14, 1966.

The evidence establishes that the Corporation was to finance the Costa Rican project. Nothing was said about the proposed venture at the 1964 meeting of the stockholders of the Corporation. On July 15, 1965, Brady exercised the option granted by the contract for the undertaking, issuing his personal check for $10,000.00.

At the stockholders meeting in December 1965, Brady circulated a letter in which it was stated:

"During the current year we purchased a tract of approximately 3,000 acres of land and timber near the Sixaola River in Costa Rica. This tract contains a dense stand of cativo and tangare timber.

"Currently we are negotiating with the Costa Rican government for cutting rights on an additional 2,500 acres. It is anticipated the purchase price of the timber will be used to build a road into the area where the timber is located. Presently our representatives are in Costa Rica carrying on these negotiations, as well as contacting potential logging contractors."

No other information relevant to the Costa Rican project was communicated to the stockholders or to the directors. A

---

nership by an act or acts not performed for the purpose of carrying on the usual business of the partnership was applicable to a situation where one of several, but not all of the partners, sought to incorporate a partnership and transfer the assets of the partnership to the corporation. In the course of the opinion the court said: "It is, of course,

basic that no one can be made a stockholder in a corporation without his knowledge and consent. . . ." Although by a slightly different route some of the partners of the Sales Company find themselves, without their knowledge and consent, stockholders in a foreign corporation—Forest Industries, Inc.

stockholder's request for further information was denied.

To carry on the venture Brady caused to be formed a Costa Rican corporation, of which he is president, having a "paper" capital of $25,000.00. The stock is held by Brady's nominees. The Board of Directors of the Corporation has never met to discuss the formation of the Costa Rican "subsidiary." Mrs. Maxwell did not participate in any action looking toward the creation of the Costa Rican corporation. Nor was Mrs. Davis or the Trustee consulted in connection with the undertaking. When questioned at the trial, Brady stated that he had consulted neither the Trustee nor Mrs. Davis because "I think I would have gotten a no answer on it . . . ."

It is estimated that the annual yield of lumber directly produced will amount to 6,000,000 board feet and that an additional amount of 500,000 board feet will be purchased, of which the Centreville operation will use about 2,500,000 board feet in the plywood or veneer process. The balance of the production of logs will be sold to others.

Under the contract the right of exploitation continues for a period of nine years and eleven months. The estimated annual exploitation cost is $50,000.00.

The corporation is to design and construct and maintain 23 km of road passing through public lands and to acquire right-of-way, construct and maintain an additional 9 km of road, passing through public lands, for the life of the agreement. At the end of the term the road will be turned over to the Government. Dr. Sizemore estimated the cost of construction of the road to be from $240,000.00 to $289,000.00. There was no estimate of the cost of right-of-way acquisition or cost of maintenance. Dr. Sizemore estimates that earth moving and road equipment will cost $85,000.00.

The total known annual cost to the Corporation based on the contract obligations will amount to $51,780.00, or $510,000.00 for the whole term.

The initial contemplated capital investment by the Corporation is estimated at from $365,000.00 to $473,000.00. Thereafter the average annual capital investment after allowance for depreciation will amount to $198,000.00. The cash outlay during the ten-year period will be considerably in excess of that sum.

Brady and W. E., Jr. contend that the Corporation's supply of gum and poplar is very limited and that the Costa Rican hardwood will replace the gum and poplar; that the undertaking was entered into only after a careful evaluation of the feasibility of the project, and that the evidence shows the project to be a reasonable business venture well within the capacity and suited to the needs of the Corporation. Those in opposition contend that the whole undertaking is fraught with uncertainty, and involves outlays of capital extraordinary in size when related to the financial condition and posture of the Corporation as a result of the pending litigation.

The evidence developed as to this issue portrays an indifference, if not callousness, of those in control of the Corporation towards those who have a common interest but who are not so situated. The least that Brady and W. E., Jr. could have done was to first fully inform their fellow directors and stockholders that the venture *was to be* undertaken, and what was involved in the undertaking, rather than to present them with a *fait accompli,* the chief facts of which would be disclosed only in the course of the trial and which disclosure would serve to further inflame an already overheated controversy.

The facts here found present the primary question of Brady's authority to act for and on behalf of the Corporation.

Assuming that the Corporation under its broad charter powers (paragraph, Second, subparagraphs (1), (7), (14), (20) and (22) in particular) could have engaged in the Costa Rica venture upon proper authorization of its Board of Directors, it does not follow that the president and general manager has the power to engage in the venture on behalf of the Corporation.

Article II, Section 1, of the By-laws of the Corporation, provides that "The affairs and business of the Company shall be under the control of a Board of five (5) Directors . . ." Article IV, Section 3, provides, *inter alia*, ". . . The President or the Vice President shall sign and execute *all contracts and other commitments* in the name of the Company *when authorized to do so by the Board of Directors.* The President shall have general supervision of the affairs and business of the Company . . ." (Emphasis supplied) This section also provides that " . . . [The President] shall keep the Board of Directors fully informed and shall freely consult with them concerning the affairs and business of the Company . . ."

▉▉▉▉▉ Whatever authority the president of a corporation has must be expressly conferred on him by statute, charter, or by-laws or by the Board of Directors or be implied from express powers granted, usage or custom or the nature of the company's business. 19 C.J.S. Corporations § 752, at 97. Unless the authority of a general manager is restricted, his authority and powers "are coextensive with the powers of the corporation itself, and he has authority to do any act on its behalf . . . *in the ordinary course of the company's business* . . ." (Emphasis supplied) Sheip, Inc. v. Baer, 210 Ala. 231, 97 So. 698.

In Middleton v. General Water Works & Electric Corp., 224 Ala. 268, 139 So. 273, the vice-president and general manager of a waterworks and electric corporation, which was in the nature of a holding company, with power to own and operate public utilities and with general powers broad enough to include a coal mining business, was held to be without authority to bind his corporation to buy the stock of a coal mining company for $1,000,000.00. The court there said:

"Does the office of general manager carry the implied power to conclude such a transaction without the approval of the governing body, or some other officer authorized to approve same?

. . . . . .

"As the title implies, it carries the power to manage the business in which the corporation is engaged; he is the alter ego of his company in all matters incident to the carrying on of its ordinary business. This rule is for the protection of the public, as well as to enable the corporate body to function; and secret restrictions on the power of one held out as general manager are not effective as against one who deals with him on the faith of his position, without knowledge of such restrictions . . .

"The employment of a general manager, however, does not mean it becomes a one-man corporation, nor imply an abrogation of the usual powers of the board of directors. The powers of the general manager are limited to the scope and character of the business committed to his management. In ordinary cases, it may be said the scope of such business is generally known and understood by those who have transactions in that line of business. They are chargeable with such knowledge.

. . . . . .

"For the purposes of this case, it is sufficient to say the office of general manager does not carry power to control and augment the scope of the business by entering into entirely new fields not indicated by the corporate name. General policies of that character are presumed to be retained by the board of directors."

▉▉▉▉▉ While the harvesting of timber and the manufacture of lumber are two of the things the Corporation was organized to do, the Court is, however, of the opinion, and so holds, that the Costa Rica venture, involving actual outlays and contractual commitments, apart from operation charges of almost one million dollars, and further involving prolonged dealings with a foreign government located in an area where tempers are volatile, revolutions frequent and expropriation not unknown, required the action of the Board of Directors of the

Corporation. The undertaking by Brady purportedly on its behalf was not in the ordinary course of the Corporation's business, was beyond the scope of the authority and power of the president and general manager, and was not authorized by the directors of the Corporation. Accordingly, Brady and W. E., Jr., who was acting with him, must assume this undertaking as their own, and account to and indemnify the Corporation against sums expended and obligations incurred on the Costa Rica project.

## THIELE LANDS

The Thiele lands were made the subject of inquiry in one of the discovery depositions of Brady Belcher in March 1965, but were not included as an issue in the pretrial order of May 13, 1965, nor encompassed in an amended or supplemental pleading. However, the matter was gone into on the first day of the trial on May 17, 1965, and has been present more or less regularly since that date. It, like some of the other issues uncovered as the trial progressed, grew and grew until it was full grown at the end. Like Forest Industries and Costa Rica the Court will consider the issue in like manner as those issues, and will consider the pleadings and pretrial orders amended accordingly.

In early 1960 Brady and W. E., Jr. became interested in the establishment of a paper mill in association with other Belchers, cousins of theirs, who owned many thousand acres of timber land.

On September 28, 1960, one John T. O'Neal while acting for the "group" acquired an option to purchase the Thiele lands as a paper mill site. These lands consisted of 1847 acres in fee simple and a ½ interest in fee simple in one hundred acres owned by Willie Day. There was an estimated 2,500,000 board feet of timber on the lands. The lands were closer to the Corporation's Centreville operation than to the operations of the others of the group. When it was decided that the paper mill project was to be abandoned, it was agreed that the others would withdraw and that the deal for the land would be closed by Brady and

W. E., Jr. The option was assigned to the Corporation on January 16, 1961.

The Thiele lands were appraised as an industrial site by Vance Miles, Vice-president of the Gulf States Paper Corporation, as having a value in excess of $200,000.00.

The Trustees of the Gulf States Paper Corporation Trust Fund took a first mortgage on these lands at the time of acquisition in the sum of $175,000.00. The total consideration for the lands, including $700.00 paid for the purchase option, was $175,465.00, after taking into account a closing balance of $235.00 due the purchasers from the mortgage proceeds. This sum of $235.00 was paid to the Belcher Investment Company on the instructions of Brady Belcher. The cost of acquisition, including the cost of recording the deed of $806.55, was paid by the Corporation.

Conveyance of the lands by deed was made to Brady and W. E., Jr. on August 8, 1961. On January 1, 1962, the land was leased to a Mr. Zimmerman for farm purposes by lease executed in the names of Brady and W. E., Jr.

On the 11th day of August 1961, the Belcher Investment Company gave the State Highway Department an option to purchase soil aggregate from a part of the land located in the NE ¼ of the NW ¼ of Sec. 4. The option recites that the consideration of $1.00 was received and acknowledged by "We, W. E. Belcher Lumber Company."

Sometime between February 1st and April 30, 1962, a journal entry dated as of October 31, 1961, was made in the Corporation books to reflect the acquisition of the "Thiele lands" by the Corporation and the mortgage thereon and to account for expenses in connection therewith.

Payments received on the lease and the soil aggregate option above referred to were deposited in the bank account of the Corporation.

Neither Brady nor W. E., Jr. consulted Mrs. Maxwell about the acquisition of the Thiele lands. Mrs. Davis never heard of the lands until the lawsuit. The Trustee

was never notified that the lands were being held for the Corporation. The directors of the Corporation have never taken any action as to the purchase of the lands.

The Court finds that in the outset the lands were optioned by the group, interested in the paper mill venture, as an industrial site for the paper mill; and that when the paper mill venture was abandoned it was decided by Brady and W. E., Jr. to acquire the property for the Corporation. One of the first steps taken to this end was the assignment of the option to the Corporation on January 11, 1961. Brady and W. E., Jr. acknowledge a trust in favor of the Corporation.

The Trustee and Mrs. Davis contend that the acquisition of the "Thiele lands" was made without the authority of the directors of the Corporation, and that the lands were not suitable for use in the usual and ordinary business of the Corporation.

 As set up on the books of the Corporation, the land was valued at $110,895.50, the timber at $75,000.00. These lands are not primarily timber lands. Under Section 3 of Article IV of the By-laws of the Corporation, quoted in respect to Costa Rica exploitation, it was required of Brady and W. E., Jr. that they keep the directors informed of all such transactions. The Court is of the opinion that the action in respect to the acquisition of these lands and the placing of the mortgage thereon were not matters as to which Brady and W. E., Jr. could act on behalf of the Corporation without the approval of the Board of Directors of the Corporation. The lands are located on the Alabama River adjacent to the Hammermill Paper site and are primarily industrial property, and were initially acquired as such and not as timber lands. The purchase of timber was no more than a secondary consideration. It was not a part of the Corporation's usual business to acquire and develop industrial sites such as here undertaken.

The controversy presented represents another of those instances where Brady, with the cooperation of W. E., Jr., has struck out on his own without informing the other directors and stockholders. Such unilateral action can only give, and has given, rise to suspicions of skulduggery, whether well founded or not.

 Brady and W. E., Jr. and their respective wives will be required to convey the Thiele lands to the Corporation, following which an appraisal will be made of the properties for the purpose of determining their value and whether the Corporation has suffered a loss on account of the unauthorized acquisition of these properties. An accounting will then be had of Brady and W. E., Jr., if the appraisal reveals a loss on account of the acquisition and the expenses incident thereto. Pending an appraisal the Court will defer a ruling with respect to the necessity of a sale of the properties to establish their value.

### LOANS AND ADVANCES WITHOUT INTEREST

The Trustee, joined by Mrs. Davis, challenges interest-free loans and advances made by the Corporation, the Sales Company and the Wood Products Company at the instance of Brady and W. E., Jr. to themselves and business enterprises owned or controlled by Brady.

Brady borrowed money from the Corporation as follows:

| July 23, 1953 | $10,000.00 | repaid July 31, 1953 |
| August 10, 1953 | 10,000.00 | repaid August 10, 1953 |
| November 22, 1954 | 30,000.00 | repaid December 14, 1954 |
| November 5, 1956 | 6,500.00 | repaid April 10, 1957 |
| February 13, 1957 | 14,000.00 | repaid October 31, 1958 |

There is an item of February 23, 1953, for $10,000.00, purportedly the amount of check #890. This check is reflected in the balance owed by Brady to the Corporation as a credit.

Brady borrowed money from the Sales Company as follows:

| | |
|---|---|
| January 6, 1954 | $24,000.00 |
| August 13, 1954 | 15,000.00 |
| March 26, 1955 | 1,500.00 |
| May 16, 1955 | 3,000.00 |
| November 1, 1955 | 30,000.00 |
| March 8, 1956 | 10,000.00 |
| February 28, 1956 | 5,000.00 |
| June 30, 1956 | 6,000.00 |
| March 27, 1957 | 2,500.00 |
| October 31, 1958 | 12,000.00 |
| October 13, 1959 | 5,000.00 |

The book entries reveal that some of these loans were repaid the same day or within a few days.

On November 4, 1954, the Corporation issued its check to the Belcher Motor Company, Inc. in the amount of $4,000.00. This item remained unpaid until October 31, 1955. It was used as an addition to the operating funds of the Motor Company. As heretofore noted, Brady's wife owned 98% of the stock in the Motor Company.

On November 7, 1961, the Corporation advanced $18,500.00 to the Motor Company. This loan was used for the temporary financing of trailers purchased on the order of the Corporation and was repaid on November 15, 1961.

Brady Belcher Interests, Inc. has had an account with the Corporation since April 18, 1952. This account appearing on the receivables ledger reveals a number of advances by check of the Corporation to Brady Belcher Interests, Inc. Among the larger are a $6,000.00 advance of May 27, 1954, which was repaid July 31, 1954, one of $12,500.00 of July 15, 1954, and one of August 1, 1954 (entered as J 59). The balances on these charges, together with other charges, were paid by credits of $10,000.00 on August 31, 1954, and $9,964.80 on October 30, 1954. There was a check for $10,000.00 on November 4, 1954, and one of $5,000.00 on January 18, 1955. These with other charges were paid October 31, 1955. There was a check for $1,000.00 on September 26, 1957, which was paid October 4, 1957. The account was substantially closed on February 8, 1961. It was finally closed on April 7, 1964.

Brady Belcher Interests, Inc. appears to have received loans from the Sales Company during the five-year period following the organization of the Sales Company.

The Sales Company records reveal a disbursement by it of $4,877.55 on January 29, 1955, to pay an income tax deficiency assessed against Brady. This item remained unpaid for some time.

There was at least one instance where Brady obtained money from the Sales Company in the amount of $1,500.00, then loaned this at interest to a third party (Jacob Lowery, Jr.). He personally received the interest income but did not pay interest to the Sales Company.

All sums which Brady borrowed from the Corporation and the Sales Company have been repaid, but without interest. Brady's tax returns for the years 1951, 1952 and 1953 show that for each of said years he collected $360.00 with interest from the Corporation, for the use of money he loaned to the Corporation.

W. E. Belcher, Jr. had an account with the Corporation known as the "Regular account," and also an account designated "House account." On November 17, 1965, the former account revealed a balance of $10,839.07. This was paid down to zero on April 25, 1966. At the time of the examination of W. E., Jr. there was a balance in the house account of $2,319.-12, which had been outstanding since September 8, 1959. The balance in these accounts came about primarily by the Corporation's paying the accounts of W. E., Jr. covering personal purchases from others made by W. E., Jr. and charged to the Corporation.

In December 1961, W. E., Jr. used $2,500.00 of the funds of the Wood Products Company to finance the purchase of a personal automobile by him for the use of his family. The first payment on this debt in the amount of $500.00 was

made in May 1965. The account was not paid in full until November 30, 1965.

W. E. Belcher, III also had an account with the Corporation beginning October 29, 1962, and extending to March 15, 1965, with a balance on the latter date of $585.69. Most of this account represents funds disbursed by the Corporation to pay personal items purchased by W. E. Belcher, III from others and charged to the Corporation by him.

The balance owing by W. E., Jr. to the Corporation was reduced to zero on April 25, 1966. The other accounts due by Belcher Motor Company, Belcher Investment Company, W. E. Belcher, III, Brady Belcher Interests, Inc. and Brady Belcher were paid June 8, 1966.

■ The attempted justification for the use of the funds as hereinabove indicated is that the funds were used pursuant to a "custom and practice" permitting such use [3]. Brady claims that their use was also justified insofar as he was concerned as a kind of offsetting compensation due him for his personal endorsement of notes of the Corporation and the other Belcher enterprises in order to obtain operating capital.

The "custom and practice" theory is not borne out by the evidence. It is refuted by the facts respecting the arrangement for the loan for the purchase of the Ramsay lands. It is further refuted by the records of the Corporation regarding advances to Roland Belcher. On June 25, 1942, the Corporation took action with respect to advances to Roland on his undertaking, the Battelle Lumber Company, the minutes reciting that:

"[S]aid sums of money were to be a debt due . . . to the Corporation *which was to be repaid* without interest; that with the sums so advanced . . . [certain lands, timber, machinery and equipment] had been purchased; that the title [thereto] . . . had been taken in the name of [the

Corporation] . . . *for the purpose of securing the repayment of said sums so advanced* . . ." (Emphasis supplied)

No authorization of the directors was ever procured for the numerous loans and advances made as hereinabove noted.

Certain advances against drawings were made by the Sales Company to the Trustee to meet pressing hospital bills incurred by Roland, but the evidence reveals that these advances were agreed to by the general partners.

The "custom and practice" which is asserted to have existed was not known to Mr. and Mrs. Maxwell prior to the litigation, nor was it known to Mrs. Davis, or the Trustee.

The various financial statements of the Corporation for the years 1952 through 1956 furnished the Trustee listed as "accounts receivable" sums due from various individuals, including Brady, W. E., Jr., Belcher Motor Company, Fred Davis and others, but they do not indicate that cash loans and advances were being made to Brady, W. E., Jr. and the others herein set out. For aught appearing these reflected sales and other transactions made in the due course of business.

In his deposition Brady conceded that there was nothing on the statements from which a person could tell that the sums shown were for loans as distinguished from transactions in the regular course of the Corporation's business.

■ Equating the custom and practice asserted to have been established to the common law rule governing customs and usages, it would be necessary for the one asserting such custom and practice to show knowledge on the part of those sought to be held thereto, or to show that the practice was so generally known as to justify the presumption that such parties knew of it. Wye Shipping Co., Ltd. v. Hunter, Benn & Co., 211 Ala. 326, 100 So. 475.

---

3. The unauthorized use of corporate funds, however short the time of such use, Loft, Inc. v. Guth, 23 Del.Ch. 138, 2 A.2d 225, 232, cannot be justified by the fact that others have used funds without authorization. Holcomb v. Forsyth, 216 Ala. 486, 113 So. 516.

■ It scarcely need be again repeated that by established principle of law officers and directors of a corporation stand in a fiduciary relation to the corporation and the stockholders and that partners occupy a like relationship to other partners in the transaction of the partnership business. A custom or practice that conflicts with established principles of law governing such relationships cannot prevail.

In Arrant v. Georgia Casualty Co., 212 Ala. 309, 102 So. 447, it was held that tabulated lists of policies showing expiration dates compiled by an agent during his agency could not be claimed by the agent by reason of a custom or usage prevailing in Alabama in view of the fact that the custom would conflict with the principles of law regulating the relation of agency. The court said:

"But 'no [custom or] usage is good which conflicts with an established principle of law, any more than one which contravenes or nullifies the express stipulations of a contract.' "

There was no agreement that Brady would be paid anything for his personal endorsement or that he could have free use of the funds belonging to the three Belcher enterprises. Apposite to such a situation is the language of the court in Sears v. Corr Mfg. Co., 242 Mass. 395, 136 N.E. 266, as follows:

"There was no implication of contract because the plaintiff lent his property and credit or because his services were valuable. Neither did any presumption arise therefrom that the assistance was rendered for reward as it was not of the character usually and commonly the subject of hire. . . . No special facts are shown pointing to the existence of an implied agreement as a rational explanation of the plaintiff's course."

■ Brady, W. E., Jr. and W. E. Belcher, III will be required to account to the Corporation, the Sales Company and the Wood Products Company for interest on loans or advances to any one of them, or payments made on their behalf, or loans or advances to the Belcher Motor Company and Brady Belcher Interests, Inc., as the case may be. There are a number of cases sustaining the right to recover interest. Of particular note is that of New England Inv. Corp. v. Sandler, 329 Mass. 230, 107 N.E.2d 16, where it was said:

"He [the corporation's former treasurer and director] also contends that he is not responsible for interest on his personal loans from the corporation. The findings of the master clearly demonstrate breaches of Sandler's fiduciary duty to the corporation extending substantially over the entire period in question. Mere belief on his part that he owned or had control of all the stock of the corporation does not relieve him of his obligation to account for the moneys of the corporation which he has improperly used for his own purposes. . . . He is also accountable for interest on the moneys of the corporation which he has caused to be paid wrongfully either to himself or to others."

See also 47 C.J.S. Interest § 13, at 23.

■ The applicable law on the question of the statute of limitation and laches has been discussed in the Court's decision on the *Ramsay Lands* and *Mrs. Ella Belcher—Salary*, and will not be repeated at this point. The transactions relating to W. E. Belcher, III are not barred.

## RESTRICTIONS ON THE SALE OF THE CORPORATION'S STOCK

The Trustee seeks a declaration (1) removing any cloud on its title to any stock in the Corporation, and (2) declaring that it has a right to alienate same without any limitation on the right of purchase by the Corporation or any other stockholder. Mrs. Davis seeks the same declaration as to her stock. The claims of Fred Davis involving these specific issues will be separately treated.

On the 22nd of May 1963, the Trustee accepted the bid of Fred Davis for the purchase of 30 shares of the stock of the Corporation held by it as Trustee. The Trustee shortly thereafter tendered

to the Corporation Certificate No. 53 for 130 shares with a request that a new certificate for 100 shares be issued to it and one to Fred Davis for 30 shares. Brady Belcher acting on behalf of the Corporation refused to make the transfer, and on June 13, 1963, caused a declaratory judgment action to be filed in the Circuit Court of Bibb County by the Corporation against the Trustee Bank and Mr. and Mrs. Davis. In this action, which was designated No. 370–B, it was alleged that there was an "understanding" among the stockholders that ownership of the stock in the Corporation "would be held in substantially the same proportions by the children of W. E. Belcher and their descendants" and that the Corporation would have the opportunity to buy "at a fair price" any stock offered for sale for the protection of all stockholders and "to prevent outsiders from acquiring any interest in the family enterprise."

On his deposition Brady testified as follows:

"Q. Well, now who comprises the family that will be the ones that will ever be entitled to stock?

A. Blood relations.

Q. Blood relations?

A. Yes."

Section 62 of Title 10 of the Code of Alabama 1940 provides that:

"There shall be no lien in favor of a corporation upon the shares represented by a certificate issued by such corporation *and there shall be no restriction upon the transfer of shares so represented by virtue of any by-laws of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated upon the certificate.*" (Emphasis supplied)

In Security Life & Accident Ins. Co. v. Carlovitz, 251 Ala. 508, 38 So.2d 274, the court held invalid a by-law which had attempted to set a restriction on the transfer of shares, there being no restriction stated in the certificate. In the case of Birmingham Artificial Limb Co. v. Allen, 280 Ala. 445, 194 So.2d 848, decided January 26, 1967, it was decided that restrictive provisions contained in the articles of incorporation and printed on the certificates requiring stockholders to offer shares for sale to the remaining stockholders before the shares could be sold did not apply to a transfer between stockholders.

Neither the certificate of incorporation of the Corporation, nor its by-laws, nor the certificates of stock contained any restrictions on the sale of shares.

 The evidence wholly fails to establish any agreement or understanding, expressed or implied, imposing any restrictions upon the transfer of shares in the Corporation. The evidence and the acts of the parties with respect to same are to the contrary. As for example, Brady has willed his shares to his wife, who, of course, is not a blood relative. On April 16, 1951, he pledged his shares to the First National Bank of Birmingham to secure a $35,000.00 loan, and has repeatedly included his shares in financial statements to lending institutions without any mention of restrictions on their sale. Mr. Maxwell, a non-blood relative, has continuously been a stockholder. The minutes of the stockholders meeting of July 15, 1951, authorizing the 1951 option agreement with Roland Belcher, recited that not only Roland's heirs, but his "assigns" could exercise the right of redemption. Brady signed the minutes of that meeting. The indenture of trust between Roland and the Birmingham Trust National Bank granted the Bank, as Trustee, the power to "sell, exchange, or otherwise dispose of, convey or transfer" all or any property the subject of the trust. The stock owned by Roland was the subject of Trust B. Prior to the acceptance of the bid of Fred Davis for the 30 shares, the Trustee had not been advised, nor did it know, that the stock was subject to any restriction. Mrs. Davis knew nothing of any claimed restriction prior to the filing of action 370–B. W. E., Jr. testified that there was no agreement, written or oral, just "an understanding."

Brady knew of no promise by any stockholder to another stockholder that he would not sell or give away his shares outside the group of persons composed of lineal descendants of his father and the Corporation itself. Neither W. E., Jr. nor Mrs. Maxwell knew of any such promise.

The Trustee and Mrs. Davis are entitled to the declaratory relief sought by them as set out in the opening paragraph of this part of the Findings and Opinion.

### FRAUD IN 1963 SALE AND PURCHASE OF STOCK

As noted in the section dealing with restrictions on the sale of the Corporation's stock, the Trustee on May 22, 1963, sold to Fred Davis 30 shares of the Corporation's stock. This was at a price of $2,100.00 per share, the highest of a total of three bids. Cross-defendants claim that there was fraud in the sale and purchase arising from the acts of Turner Rice for the Trustee and from the acts of Fred Davis and those acting for him, and have caused the Corporation to refuse to make a transfer of the shares. Both Davis and the Trustee deny any fraud. Davis seeks an order requiring the Corporation to transfer on its books and to issue to him a certificate for thirty shares of the Corporation's stock purchased from the Trustee. He also seeks a removal of the cloud on his title to said stock and a declaration of his right to alienate same. In the section above mentioned the Court has ruled that there are no valid restrictions upon the right of the stockholders of the Corporation to sell and transfer their stock in the Corporation. That ruling is equally applicable to the same claims of Fred Davis and will not be restated at this point. This leaves only the issue of fraud.

On May 12, 1963, the Trustee called for the submission of sealed bids on 30 shares of the stock held by it as Trustee to be submitted not later than 12 Noon on May 22, 1963.

On the afternoon of May 21, Davis, a member of the Alabama House of Representatives, asked a fellow member, Foster Etheredge, if he would prepare or help him prepare some bids for the purchase of the W. E. Belcher Lumber Company stock. Etheredge being engaged, suggested to Davis that John Ansley, a partner of his who was then present in the House Chamber, prepare the bids. Ansley prepared two bids and turned them over to Etheredge, who took them to Davis. After looking the bids over he signed one on behalf of his wife,[4] Robena, for $1,710.00 per share, and one for himself for $2,100.00 per share. Each bid was placed in an envelope and sealed and handed to Ansley for delivery to the Trustee the next day. The sealed bids were placed in Ansley's hands between 2 and 3 p. m. After the sealed bids were placed in his hands neither he nor Etheredge had any conversations with either Mr. or Mrs. Davis concerning the bids, nor did he have any conversation with Rice, to whom the bids were delivered around 10 a. m. on the 22nd of May.

The asserted basis for the charge of fraud is that Mr. and Mrs. Davis used information she had obtained as to the amount which the Corporation would bid for the thirty shares being offered for sale. This information supposedly was obtained during certain telephone conversations between Mr. and Mrs. Davis and Mrs. Maxwell beginning at 6 p. m. and ending at 10 p. m. on the night of May 21. Mrs. Maxwell testified that she told Davis that "our bid" would probably be around book value. Mr. Davis denied that Mrs. Maxwell told him the price the Corporation would bid. Mrs. Davis said that in none of the conversations was the price the Corporation proposed to bid revealed to her, and that she did not know what price the Corporation proposed to bid. The Davis' testimony is corroborated by the fact that the Corporation's bid was not arrived at until the conference between Brady, W. E., Jr., Furlong and Mrs. Maxwell with

4. From whom he held a power of attorney. The bid is not signed by him as such attorney.

their attorney, John J. Coleman, at the latter's office on the morning of the 22nd of May.

The book value of the stock for the fiscal year ending October 31, 1962, was $1,687.65 per share, and at the conference last referred to Brady did not want to submit a bid as high as book value. Before this bid was submitted Coleman was instructed to try to get Rice to do something beside going on with the sale. When Brady was told that Rice was going on with the sale, Brady then "indicated we should submit a bid," but stated that he did not want to submit a bid as high as book value. The bid finally submitted by the Corporation was $1,702.73 per share. In a discussion with Rice sometime prior to the submission of the bids Rice recalled that Davis had asked him what he thought it would take to buy the shares. Rice told him that he had no idea, but that they "were shooting for book value." Davis did not recall these particulars. Substantially the same answers were given by Rice to Attorneys Coleman and Arendall. Rice testified: "I told Mr. Coleman and Mr. Arendall that we hoped to get book value or better."

Inconsistent with the claim of fraud on the part of Mr. Davis was his suggestion included in the telephone conversation with Mrs. Maxwell on the night of May 21. In that conversation Mrs. Maxwell stated that Mr. Davis suggested the advisability to her of "getting somebody like Hollman Lumber Company to put a bid in, an outsider." Mrs. Maxwell demurred to bringing in an outsider.

Fraud, when alleged, "must be clearly and satisfactorily proven." Southern R. Co. v. Arnold, 162 Ala. 570, 50 So. 293; Cross v. Maxwell, 263 Ala. 509, 83 So.2d 211. As previously shown fraud is never presumed but "must be established by clear and persuasive evidence." Jett v. Zink, 5 Cir., 362 F.2d 723, 729.

In McDonald v. Pearson, 114 Ala. 630, 642, 21 So. 534, 536, the court declared:

"An elementary principle is that fraud is not to be presumed, when parties do not stand in fiduciary relations; and will not be imputed when the facts and circumstances from which it is supposed to arise are fairly, and reasonably consistent with honesty of intention. . . . [T]he facts and circumstances relied on as evidence, must naturally and logically indicate its existence. If they are of doubtful significance, as reasonably consistent with innocence as with guilt, the proof of fraud is wanting."

See also, Henderson v. Gilliland, *supra,* quoted from in connection with the Ramsay Lands.

 Fred Davis did not stand in a fiduciary relationship to the other parties involved in the transaction complained of. The evidence of fraud in the sale and purchase of the thirty shares of stock does not meet the test required by law. The Court finds no fraud. Fred Davis is entitled to the relief sought by him.

## W. E. BELCHER, SR. ESTATE

By paragraph 80(a) of the amended cross-claim of the Birmingham Trust National Bank, as Executor under the will of A. Roland Belcher, deceased, the Bank, as such Executor, seeks an accounting of the income of the estate of W. E. Belcher, Sr., deceased, to the time of Roland's death on February 7, 1959.[5] The Executor also claims that the executors and trustees of the latter estate should have paid the funeral expenses and the expenses of the last illness of Roland.

W. E. Belcher, Sr. died on July 14, 1945, leaving a last will and testament dated February 27, 1941. His sons Brady, Roland, W. E., Jr., and his son-in-law Howard Maxwell were named in the will, probated December 3, 1945, as executors and trustees. These four, and since Roland's death the remaining three, have continued to occupy these fiduciary offices.

---

5. By separate suit pending in this Court, No. 65–596 W, Charles Donald Belcher seeks a recovery as income beneficiary of the income from the testamentary trust since the date of his father's death.

The trust established by the will provides in ITEM THREE, paragraph FIRST that the Trustees shall stand possessed of the trust estate on condition as follows:

"During the lifetime of my beloved wife, Martha Ella Belcher, *to pay the entire net income* from the trust estate one-sixth each to my said wife and to my children, Brady Belcher, Ruby Belcher Maxwell, Roland Belcher, W. E. Belcher, Jr., and Robena Belcher;" (Emphasis supplied)

The quoted provision is limited by a proviso that if Mrs. Belcher's one-sixth is less in the opinion of the majority of the Trustees than necessary for her support and maintenance any additional sums necessary shall be charged against the income shares of the other five. The paragraph concludes:

"The share of such income payable during my wife's lifetime to any child who dies leaving a lineal descendant or lineal descendants surviving shall be paid by my Trustees to or for the benefit of the lineal descendant or lineal descendants so surviving, if more than one, in equal shares, per stirpes. *The net income shall be paid over by my Trustees, as above provided, in convenient periodical installments and not less often than every three months.*" (Emphasis supplied)

Paragraph FOURTH of ITEM THREE sets out the powers of the Trustees. Subparagraph (g) thereof provides that when in the opinion of the Trustees the income from the trust estate is insufficient, the Trustees may:

"[A]dvance or utilize for the maintenance, support or education of any beneficiary entitled to income from any part of the trust estate so much of the corpus or principal of the principal share, a portion of the income derived from which is payable to such beneficiary, as the Trustees may deem necessary or proper. Any such advances or the money so utilized shall be deemed to be partial distributions and not debts of the recipient or beneficiary or his or her estate."

The subparagraph further provides for the reimbursement of the sums so advanced when the Trustees deem the income of any such beneficiary is more than adequate for his or her reasonable maintenance and support.

Subparagraph (h) of said paragraph FOURTH provides:

"Upon the death of any beneficiary hereunder who is at the time of his or her death entitled to income from the trust estate, to pay the funeral and burial expenses and the expenses of the last illness of any such beneficiary from the corpus of the principal share, a portion of the income derived from which has been payable to any such beneficiary;"

Mr. Belcher's estate was and is solvent. The net estate after the payment of estate taxes amounted to $128,971.67. Except for $338.17 received by each of the children in 1946 (but not including Mrs. Belcher), no income from the estate has been distributed to the income beneficiaries. The estate has earned income each year. As of December 31, 1965, this income after the payment of all costs, expenses and taxes, amounted to a total of at least $91,703.79.

No accumulation of income is provided for under the trust indenture. On the contrary, as noted, it is provided therein that the net income should be paid over "not less often than every three months."

The language as to the distribution of income is not precatory, nor do any other provisions of the trust render it so.

Mr. Rice was informed by Borland, Furlong and Roland that W. E. Belcher, Sr. had left his estate in trust for the lifetime of his widow and that no member of the family would participate therein until after her death. Rice did not obtain or see a copy of the will until 1965, and did not learn either from Roland or Charles that Roland was an income beneficiary. Neither Brady, W. E., Jr. nor Mr. Maxwell ever told him that Charles had become an income beneficiary, or that the income of the estate was being impounded. The withholding of trust income and the lack of notice

thereof will be further considered in connection with the options.

The provisions of the will as to the distribution of income have clearly not been complied with. The Court finds no agreement by the beneficiaries of the trust that might justify such withholding.

█ The Bank, as Executor of the will of A. Roland Belcher, is entitled to an accounting of one-sixth of the net income of the estate of W. E. Belcher, Sr. to the date of the death of Roland with interest. Mrs. Davis also seeks an accounting for her one-sixth interest. She is likewise entitled to an accounting of income with interest. Mrs. Belcher did not require any of the income from the estate, and it was for this apparent reason that she did not receive an initial distribution of $338.17 in 1946.

W. E. Belcher, Jr. paid Roland's funeral expenses in the amount of $1,-307.50. He obtained reimbursement therefor from the Bank, as Trustee and Executor of Roland's estate. He stated that at the time he sought reimbursement he was not aware of the provisions of his father's will enabling the trustees to pay funeral expenses of a beneficiary. The Trustee and Executor was not aware of such provision at the time it made the payment.

During his last illness Roland incurred medical and hospital bills amounting to $8,291.36, and it is charged that notwithstanding the knowledge of the Trustees of Roland's financial needs the Trustees of the testamentary trust failed to exercise or consider the discretion contemplated by subparagraphs (g) and (h) above quoted, by invading the corpus of the principal share to the extent of no less than $7,091.36, the sum remaining after an assumed income of $1,200.00.

█ Under paragraph FOURTH of ITEM THREE the Trustees are vested with very broad discretionary powers as to the use of the corpus of the trust. However, the law will not allow the non-use or capricious use of such powers to defeat the purpose of the trust. With respect to the duty of trustees to exercise their discretion, the court in Strawn v. Caffee, 235 Ala. 218, 178 So. 430, stated:

"Under our settled construction, the trustee could not close her eyes to their [beneficiaries] needs, but was charged with the duty to keep reasonably advised in that regard and to exercise the discretion with which the testator clothed her to the end that the full purposes of the trust be accomplished.

"Sound reasons support the doctrine that the conscience of the trustee is charged with an active obligation to effectuate the ends of the trust he has accepted. Good faith demands no less. Actual fraud in management, or in the use of the estate, is not necessary.

"We are of opinion the facts averred in the bill are sufficient to support the further allegation that the trustee has failed to exercise the discretion contemplated by the will, or has exercised same arbitrarily and capriciously."

If any part of Roland's funeral expenses and expenses of last illness had been paid "from the corpus of the principal share," such payment would have been a charge against his interest therein. Since these expenses were not paid therefrom the principal remains intact, and a breach of trust as to their non-payment would not require an accounting but would be relevant if such breach resulted in a deprivation of funds that might have been used, at least in part, by the Trustee Bank in the exercise of the 1959 option. So stated, the question of a breach of trust will merit further consideration when the issue of the options is reached.

### OPTIONS

On July 1, 1949, A. Roland Belcher conveyed 40 shares of the stock of the Corporation to the Corporation at a price of $650.00 per share, which was about 60% of book value at that time. The sale was subject to an option to repurchase within ten years all or a portion of said

shares at a price of $650.00 per share plus accretions to book value from the time of sale. The option was not exercised and the financial statements of the Corporation treat said shares as having been retired although no action has ever been taken by the Board or shareholders to retire said shares and they have been held as treasury shares.

On July 16, 1951, Roland conveyed 30 shares of the Corporation's stock subject to an option to repurchase said shares at any time within ten years. The sale was $750.00 per share and the same formula was used to determine the option price. The option was not exercised. These shares were transferred to the Sales Company in 1952. The proceeds of this sale were disbursed in installments as provided in the sales agreement. The Sales Company made the payments becoming due thereunder.

According to computations made by Furlong, the redemption value of the 40 shares was $1,020.33 per share as of May 31, 1959, and the redemption value of the 30 shares was $1,177.81 per share as of October 1, 1961.

The failure of the Trustee Bank to procure and the failure of Brady and those in control of the Corporation, the Sales and Wood Products Companies, and the W. E. Belcher, Sr. estate to provide funds for the exercise of the options, and to avoid the necessity of the sale of 30 shares to Fred Davis in 1963, represent a major area of controversy in this litigation as between the plaintiff and the Trustee, plaintiff and the other principal defendants, and as between the Trustee and the cross-defendants.

In 1953 the Corporation made an application to borrow $1,200,000.00 from the Equitable Life Assurance Society, and in connection therewith Dr. Sizemore at the expense of the Corporation, made a cruise of the 91,051 acres of lands then owned by the Corporation. Dr. Sizemore's appraisal summary revealed a value of the lands of $6,856,154.00, not including the value of the mill property and city real estate. Mr. Huff of Equitable expressed an opinion that the then "present market value" of the Corporation's timber lands was $7,100,000.00.

On February 24, 1958, the Corporation applied for and was granted an additional loan by Equitable of $750,000.00. A Mr. Lee of Equitable reinspected the Corporation's timber lands in November 1957 and appraised their then "present market value" at $8,804,000.00. Mr. Lee made another inspection in September 1959, following which he reported to Equitable that growth had exceeded cut "and present timber volume is 10% to 15% greater than when property was reappraised in 1957 . . ."

In the summer of 1960, Dr. Sizemore in connection with the paper mill venture, heretofore adverted to, made a preliminary appraisal of the 114,059 acres owned by the Corporation and the Sales Company as having a current market value of $14,000,000.00. (Exhibit 1080)

In December 1960, the Corporation requested Equitable to grant an extension with respect to certain payments due under the 1958 mortgage. In connection with this application Mr. Huff wrote Equitable that the property had increased substantially in value since the 1953 loan and was estimated to have a value in excess of $12,000,000.00.

The book value of the Corporation's investment in timber was stated on the balance sheets contained in its financial statements, which after approval by Brady were furnished to the Trustee.

The book value of the Corporation's timber for 1958 was $532,351.57, for 1960 $487,730.52, and for 1962 $525,326.60. The book value of the Sales Company's timber for 1960 was $178,691.45. The years referred to were those preceding the expiration of the two options and the sale of the 30 shares to Fred Davis. The board feet of timber on the lands were shown by the books respectively as 104,059,006; 97,586,868; and 99,547,647 for the years referred to. In September 1964, Sizemore gave officials of Hammermill Paper Corporation, who had expressed an interest in the ac-

quisition of the land and timber of the Corporation, an estimate of 278,137,000 board feet. Sizemore prepared a report in connection with his 1964 study in which he projected an annual growth of 20,645,000 board feet.

Brady was informed as to and had knowledge of appraisals, cruises, estimates, and reports and of the values and amounts above catalogued and shown therein. Neither Mrs. Davis nor the Trustee was ever advised of these appraisals, estimates, reports or projections prior to this litigation, and in 1960 in response to a question directed to Mr. Arendall and Mr. Furlong, Mr. Rice representing the Trustee was told that there was in existence no cruise or appraisal.

Neither Mrs. Davis nor the Trustee was ever informed of the various inquiries by companies and persons interested in the purchasing or leasing of the Corporation's lands, or the negotiations and conversations concerning same.

On December 17, 1964, Mrs. Davis served interrogatories on Brady in which she inquired whether there had been "any cruise or appraisal made at any time since January 1, 1949." On February 15, 1965, Brady answered: "The only cruise or appraisal I now recall is one made at about 1953 by C. T. McDonald.[6]"

Pursuant to a stipulation entered into in the course of the taking of Brady's deposition on March 4, 1965, it was agreed that the Trustee would be furnished an additional list of "documents and papers" that would be produced on March 11, 1965. This list included "the original of each cruise and appraisal at any time of the land of the Corporation or partnership." Copies of the 1953 Equitable cruise and appraisal and the Sizemore preliminary appraisal of September 1960 (which is Exhibit 1080) were not produced. On July 30, 1965, the Court entered an order requiring production of cruises and other

documents on August 2, 1965. Again, the cruises and appraisals were not produced. The Sizemore September 1960 appraisal was produced in Court on August 9, 1965,[6a] following a subpoena duces tecum issued to Dr. Sizemore.

In answers to interrogatories made by the Corporation and Sales Company and sworn to by Brady Belcher and filed on May 17, 1965, it was stated that "lands owned by the Company have not been subject to a cruise since 1950."

In a telephone conversation with Dr. Sizemore on May 31, 1965, Mr. Davis learned that the Corporation's lands had been cruised by Dr. Sizemore in 1953. On June 24, 1965, the Trustee took the deposition of Mr. McLean, Vice-president of Equitable, in New York. During the taking of the deposition the 1953 cruise was produced.

Shortly after Roland's death Brady was aware that a cash shortage created for the Trustee a problem of paying estate taxes. He also knew the terms of the option agreements, that these were held by the Trustee, and that the Trustee did not have sufficient cash available to redeem the option and to pay the debts of Roland's estate.

Prior to the 1959 expiration date of the 1949 option, the Trustees of W. E. Belcher, Sr. trust had on hand net income of the trust allocable to Roland's one-sixth share between $7,000.00 and $8,000.00, and prior to the expiration of the 1951 option they had on hand net income allocable to Roland's one-sixth share between $9,000.00 and $10,000.00. Prior to the date of the sale of the 30 shares in May 1963, the allocable net income had increased to more than $11,500.00. These Trustees, also directors and stockholders of the Corporation, were aware of the Trustee's need for money on the several crucial dates and were under a duty to disclose to the Bank as Trustee and Executor and to disclose to Charles after he became an income

---

6. Mr. McDonald's appraisal was of the plant and equipment of the Corporation.

6a. It now appears that plaintiff's counsel had recently uncovered and produced #1080.

beneficiary the amount of the accumulated income.[7] This they did not do, although inquiry was made by Rice of Brady and W. E., Jr., as well as Furlong, as to whether they knew of any assets which Roland's estate might own.

During the year 1959, Rice had a number of conferences with Furlong and W. E., Jr., as to which Brady was informed, relative to obtaining the maximum amount of cash possible for the Trustee to meet the exigencies that it confronted arising from the shortage of cash. He was advised that "times were tough" all over the industry, and that the Companies needed funds for working capital because they were having to carry customers' accounts for longer periods. Rice inquired of Furlong and W. E., Jr., if the Corporation would be interested in purchasing the options, or extending the time for the exercise of the 1949 option. They told Rice that they would check with Brady, who was away from the office sick. Thereafter Furlong advised Rice that he had conferred with Brady and stated to Rice that "there is no prospect for any extension of the termination of the option.[7a]"

The June 1960 distribution of the Sales Company to the partners was not made, which according to Furlong was due to the very poor conditions prevailing in the lumber industry, and on account of the notes owed by the Corporation and the Sales Company.

On November 17, 1960, Brady visited Rice and advised him that "times were tough and profits were difficult to come by." This visit was about two weeks before Brady and W. E., Jr. made available $14,000.00 of Sales Company funds to the Bell Company to enable the latter to meet its pressing debts. This advance to the Bell Company in November was followed by another in December in the amount of $61,064.17. This was from the proceeds of a loan to the Sales

Company by the First National Bank of Mobile and was to enable the Bell Company to secure the release of South American lumber from a bonded warehouse. With the consent of Brady this lumber was sold or consumed by the Bell Company in the ordinary course of its business.

In March 1961, Furlong at Brady's direction asked the Trustee to concur in an extension agreement as to certain payments due under the 1958 Equitable mortgage, arising from the fact that the Corporation and Sales Company were about to run out of funds. Rice was not advised that the Companies were using or needing funds to finance the operations of the Bell Company.

On April 26, 1961, Rice wrote Brady that the Trustee was under the necessity of selling some of the assets of the trust to meet due and unpaid Federal estate taxes and inquiring whether the Sales Company or the Corporation would be interested in purchasing a sufficient number of shares to provide the necessary funds. Having no reply Rice wrote Brady again on May 26, 1961. In response to this letter, Brady dispatched Attorney Arendall to confer with Rice to ascertain what the Trustee wanted for the stock. In a conference on May 30, 1961, Arendall advised Rice that if the Trustee would so request, the Corporation would arrange to buy all the shares of stock held by the Trustee at $1,027.00 per share, but that it would not be a cash transaction, that payment, other than initial payment, would have to be deferred over a period of years, and that the Trustee would not be granted an option to repurchase. On the day previous in a conference between Arendall, Brady and Furlong, Brady told Arendall that the Sales Company had already made some advances to the Bell Company, and instructed him to prepare an option whereby the Sales Company would be granted the right to acquire 60% of the Bell

---

7. In a little over two weeks before the first option expired Brady caused this trust to lend the Corporation $10,000.00.

7a. Brady also promptly rebuffed a suggestion of a loan by the Company by a claim of a lack of available funds.

Company stock.[8] No mention of these facts was made in the May 30 conference.

The Trustee declined to negotiate a sale of any of its stock on the basis suggested.

Arendall knew nothing of the value of the properties of the Corporation and had no knowledge of the cruises and estimates of value. Brady, W. E., Jr. and Furlong did have knowledge of the same, but took no steps to inform Arendall of such value. Yet he was dispatched to conduct the negotiations. Based upon the values contained in Sizemore's appraisal, each share of stock had a value of $14,000.00,[9] and not $1,027.00.

During the first part of May 1963, the Trustee, having determined that it would be necessary to sell 30 shares of its stock to pay Federal estate taxes, mailed invitations for bids. Following receipt of the invitation to bid Brady again sent Arendall to see Rice in a further attempt to purchase the Trustee's entire interest in the Corporation, the Sales and Wood Products Companies for $401,000.00 or failing in that respect, to negotiate a private sale of the 30 shares. The $401,000.00 figure was referred to by Rice as a "feeler" and not a firm offer. On May 17, 1963, following a fourth request for the report of the Sales Company for the year ending January 31, 1963, Brady requested Arendall to go to Birmingham again and confer with Rice. Arendall took with him the report, which for the first time contained footnotes mentioning Bell and Norris. Arendall told Rice that Bell and Norris presented a bad situation which was going to cause the Sales Company substantial losses, in view of which he thought it would be in the interest of the Trustee to sell out its entire interest for the $401,000.00, the amount which "Brady thinks it is worth." Rice informed him that he would not sell all the Trustee's interest without having a comprehensive appraisal. On the morning of May 22 Attorney Coleman on the instructions of Brady repeated the offer made by Arendall.

On June 3, 1963, after the Trustee had notified Mr. Davis of the acceptance of his bid, Brady, W. E., Jr. and Mrs. Maxwell wrote the Trustee on behalf of the Corporation that it was willing to increase its bid for the 30 shares to $63,000.00 to meet the Davis bid. In this letter it was stated: "We believe that the Corporation made a fair offer for the thirty shares of stock. . ."

Prior to the crucial option dates of July 1, 1959, and July 16, 1961, the Corporation was advancing large sums of money to Millard Reynolds. As of September 16, 1959, the principal balance (exclusive of the interest account) due the Corporation on these advances amounted to $115,578.68, and on October 31, 1961, the balance exceeded $80,000.00. While between these dates some of the many accounts with Reynolds had been closed and some reduced, on others there were substantial increases. For example, the advance account went from zero to $7,288.13, the Brent account from $31,976.42 to $57,140.74.

In 1958 Brady learned that if the Corporation could avail itself of "Sub-Chapter S" of the Internal Revenue Code corporate profits could be passed on to the stockholders without the imposition of a corporate tax. The Code provision was not available, however, because the trust owned part of the stock, and no way was found for the Corporation to avail itself of the provision in view of that fact.

Whether the tax-saving prospect so presented was the motive for obtaining the trust stock, as it is charged, it did not justify the attempted purchase of the stock at a small percentage of its value. It did not justify the non-disclosure and concealment of values by those in a fiduciary relationship who

---

8. This option has been previously mentioned in the opinion dealing with Bell and Norris and as there noted was not executed.

9. This value includes Sales Company lands, but does not include other corporate properties of offsetting value.

stood to profit by the expiration of the options and by the purchase when consummated. The information as to such value was vital to the Trustee in formulating its decision as to the exercise of the options and as to the sale of the stock not under option.

In their dealings with the Trustee Brady, and those speaking and acting for him, have minimized the lack of value and maximized the lack of cash, thereby "making the ephah small and the shekel great," in the eyes of the Trustee.

As heretofore noted, Article IV, Section 3, of the By-laws of the Corporation required the president to keep the Board fully informed concerning its affairs and business.

In King v. Livingston Mfg. Co., 192 Ala. 269, 68 So. 897, it was stated:

> "It is not the duty of a stockholder to investigate the management of the corporation, nor to discover and correct the incapacity of its managing officers. 10 Cyc. 834. Hence, unless the stockholder is shown to have had knowledge of such things, he cannot be said to have acquiesced therein by his failure to protest."

It would have required $40,813.20 to have exercised the option for the 40 shares expiring July 1, 1959, and $33,534.20 for the 30 shares expiring July 16, 1961. When the former option expired the Corporation acquired the 40 shares for $26,000.00, and when the latter option expired the Sales Company acquired the 30 shares for $22,500.00, these sums being the original sales price.

Based upon the 1958 market value of the Corporation's timber lands alone, each of these 40 shares had a value in underlying assets of $8,800.00, and in 1960 each of the 30 shares had a value similarly based of $12,000.00 per share.

The acquisition of the 40 shares by the Corporation increased the underlying value of each of the remaining 960 shares approximately $325.00 per share.

The acquisition of the 30 shares by the Sales Company increased the underlying value of each 1% interest in the Sales Company approximately $3,000.00. Brady owned a 34% interest in the Sales Company, the others 16.5%. The acquisition by the Sales Company resulted in a recoupment by the Trustee of some $50,000.00 of the approximately $300,000.00 to $325,000.00 loss in underlying value due to the Trustee's ownership of 16.5% of the Sales Company. A like or a little larger sum was recouped when the Corporation acquired the 40 shares due to the enhanced value of the remaining 160 shares held by the Trustee. The net loss of underlying value of those shares following the acquisition of the same was approximately $260,000.00 [10].

It is hardly conceivable that if the Trustee had been advised of the underlying value of the shares in 1959, 1961, and 1963, it could not and would not have arranged for the procurement of the cash necessary to have exercised the options and to have avoided any necessity for the sale. In any event there would scarcely have been need to permit the options to lapse as to all the shares, or the sale to involve as many as 30 shares. The collateral value of the shares would have been enhanced in direct ratio to the known underlying values.

In Williams v. Riddlesperger, 217 Ala. 62, 114 So. 796, the court said:

> "With respect to existing stockholders, a failure by directors to inform them of their company's insolvency, or bad financial condition, before inviting or receiving their subscriptions for additional stock, would undoubtedly amount to actionable fraud, because the relationship is one of trust and confidence. King v. Livingston Mfg. Co., 192 Ala. 269, 68 So. 897; Wolfe v. Underwood, 96 Ala. 329, 331, 11 So. 344."

On principle there would be no difference as to a director's duty where there was a failure to disclose the actual value

---

10. The Court has not overlooked the Equitable mortgage, but even with that taken into account the underlying assets on each of the dates approached ten times the price at which the shares were acquired.

of the corporation's assets at the time of the acquisition of an owner's stock or the attempt to acquire same. Actual concealment of the value or the appreciation in value would render the director's act even more offensive to the principle.

A stockholder with options to redeem part of its stock already sold would stand on the same footing as a stockholder owning stock not yet sold. For example, in Speed v. Transamerica Corp., (D.Del.) 135 F.Supp. 176, aff'd 235 F.2d 369 (3 Cir.), the court held that where a Class A stockholder had an option, when confronted with a call, to convert to Class B, the call to redeem Class A by the corporation was illegal where the assets were so concealed that Class A stockholders were not apprised of the advantage to be gained by the exercise of their option. This case, reported initially in 99 F.Supp. 808, together with the companion case of Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, and the case of Mansfield Hardwood Lumber Co. v. Johnson, 5 Cir., 263 F.2d 748,[10a] fully sustain the view that the officers and directors of a corporation who have inside information as to the value of the corporate assets and who do not disclose same, or who conceal same from stockholders not so informed, all as shown by the evidence in this case, cannot retain the fruits of their breach of duty when brought to account by stockholders who have been injured thereby. Nor can the Corporation or the Sales Company retain the same. The failure to disclose and the misrepresentations with respect to the underlying values, the continuing attempts to buy the shares at the repeatedly published book value or less[11], the concealment of the cruises, estimates and reports of value, the failure to make available funds due the Trustee from the W. E. Belcher, Sr. estate, the issuance of unnecessarily discouraging reports on the prospects for distributions and the limitation of such[12] prior to the crucial dates, with knowledge of the Trustee's need for cash, constituted breaches of duty on the part of Brady and W. E., Jr. which entitles the Trustee to redress[13]. The final decree will direct that the options be reinstated, that the Trustee be given a reasonable time to exercise same, and if exercised that the 40 shares acquired by the Corporation be reissued to the Trustee and the 30 shares acquired by the Sales Company be transferred to it. This relief is consonant with the claim and alternate prayer for relief asserted in the Trustee's amended cross-claim of June 29, 1966.

## RECOVERY BACK OF SALARIES

The Trustee in its cross-claim seeks an accounting for salaries paid to Brady

10a. For full history see, 143 F.Supp. 826, aff'd 242 F.2d 45, 159 F.Supp. 104, aff'd 263 F.2d 748, rehearing denied 268 F.2d 317.

11. Such attempts to buy were an implied representation that the prices offered were fair prices, *Speed*, 99 F.Supp. at 843.

12. During the four years ending January 1, 1959, the Sales Company distributed 78% of its profits. During the next four years ending January 31, 1963, it distributed only 51% of its profits. Distributions from Wood Products were maintained.

13. Section 21(63) of Title 10, Code of Alabama 1940, successor to Section 92, Title 10, makes it a criminal offense for an officer or director of a corporation to depreciate the value of its stock with an intent to buy. Said section provides:

"Any president, director, or managing officer of any corporation, by whatsoever name or title he may be known or called, *who shall do or omit to do any act*, or who shall make any declaration or statement in writing, or otherwise, with the intent to depreciate the market value of the stock or bonds of such corporation, and with the further intent to enable such president, director, or other managing officer, or any other person, to buy any such stock or bonds at less than the real value thereof, must, on conviction, be fined not more than five hundred dollars, and shall be sentenced to hard labor for the county not less than six nor more than twelve months." (Emphasis supplied)

and W. E. Belcher, Jr. by the Corporation and by the Sales and Wood Products Companies. Mrs. Davis by her amended cross-claim seeks like relief.

W. E. Belcher, Sr. was paid $25,000.00 per year as president of the Corporation. When Brady succeeded his father in 1944, the year before the latter's death, his salary as president was established at $15,000.00 per year and his salary has remained at that figure. Since the formation of the Sales Company in July 1951, the Sales Company has paid Brady $3,600.00 per annum as salary. The Wood Products Company has paid him $4,800.00 annually.

Prior to 1954 W. E., Jr. received an annual salary, as vice-president of the Corporation, of $7,500.00. Since that time his annual salary has been $10,-500.00. He has also received an annual salary of $4,800.00 from the Wood Products Company.

Mrs. Maxwell and Mrs. Davis have each received a salary of $100.00 per month from the Corporation and $200.00 per month from the Sales Company.

On October 23, 1945, A. Roland Belcher was elected vice-president of the Corporation and his salary fixed at $6,000.00 per year. On the 30th of June 1949, he was relieved of all his duties in connection with the Corporation's business and his salary was set at $300.00 per month "until such time as his health will permit more active duties." Roland's health remained impaired. He continued to draw the $300.00 per month until his death in 1959.

All the brothers and sisters were directors of the Corporation until Roland's retirement in 1949. The others have continued as directors. W. E., Jr. was elected vice-president at the time Roland was relieved of his duties. Mrs. Davis succeeded W. E., Jr. as Secretary. They have continued to fill these offices.

Brady has been continuously in the active management of the Corporation, Sales and Wood Products Companies. W. E., Jr. has assisted him.

The Corporation has throughout the years taken all of the salaries paid its officers into account in the computation of its corporate income taxes and presumably each individual who has received salaries from the Corporation, as well as the Sales and Wood Products Companies, has included same as income in his or her individual returns.

Distributions from the three Companies, exclusive of salaries, for the period from October 31, 1950, to October 1, 1965, amounted to $1,912,500.00. Net surplus addition amounted to $563,595.-42.

From July 21, 1951, to May 21, 1963, Brady received salaries from the three Companies of $251,727.27 and distributions from the Sales Company of $385,-559.00. He also received substantial distributions from the Wood Products Company. He received $198,449.50 more in distributions from the Sales Company than did the other partners due to the fact that his percentage distribution from the Sales Company was 34% while that of the other partners was 16½%.

It is charged that Brady and W. E., Jr. have been continuously disloyal to the interests of the three Companies, and have been guilty of such gross misconduct or gross negligence in the management of the affairs of the Corporation and the Sales Company that they should forfeit all right to compensation for services and should be required to account for all compensation received by them. The Trustee cites a number of authorities to sustain its contention. See 90 C.J.S. Trusts § 407, at 756, et seq., and 88 A.L.R.2d 1437.

The disparity in salaries and distributions received by Brady was known to the directors and stockholders. All of the salaries were approved in advance by them. The partnership agreements provide that each of the partners shall be entitled to share in the profits, and be responsibile for the losses, in the proportions of 34% to Brady and 16½% to the other partners of the Sales Company, and 20% to Brady and 20% to the other partners of the Wood Products Company,

except that Mrs. Maxwell's share is 10% and her two daughters 5% each. Brady who was so much better circumstanced than the Trustee because of the disparity was thereby placed in a position to exert economic pressure by withholding distributions to the Trustee, but this is not of significance in the context of the issue of salaries *per se.*

 Although the salaries paid by the Corporation were paid to Brady as president and to W. E., Jr. as vice-president, the principal services rendered by them were in the everyday management of the Corporation. The salaries received by them from the Sales and Wood Products Companies were received as managing partners of such companies [14]. The services rendered by Brady and W. E., Jr. have been many and varied and have extended over a long period of years. The other directors and stockholders knew that they were rendering such services. The salaries received by them bear a reasonable relation to the value of the services rendered, apart from and notwithstanding the facts made the basis of the findings and conclusions, and the relief decreed against them. The Court is of the opinion that such relief will serve to mark the Court's disapprobation of their conduct. Jacobus v. Munn, 38 N.J.Eq. 622; 90 C.J. S. Trusts § 407, *supra.* Forfeitures are not favored and are to be avoided when possible. 37 C.J.S. Forfeitures § 4, at 8. Furthermore, the rule sought to be invoked is not so inflexible as to leave no room for the exercise of judicial discretion. Richardson v. Blue Grass Mining Co., (E.D.Ky.) 29 F.Supp. 658, 670. "Each case must be determined largely on its own peculiar facts." 90 C.J.S. Trusts § 407, *supra.*

"Fortunately, there is no unbending rule which a court of equity is bound, under all circumstances, to apply in cases of this kind; but that may be done which in good conscience ought to be done in each particular case." Appeal of Biddle, et al., 129 Pa. 26, 18 A. 474, 475.

Exercising what it believes to be a sound discretion grounded on all the circumstances presented by this record, the Court will pursue the course thus marked rather than that of forfeiture, and will deny an accounting for salaries received by Brady and W. E., Jr.

## STOCKHOLDERS MEETINGS AND COMPLIANCE WITH RULE 23(b)

The Corporation's by-laws provide for an annual stockholders meeting on the third Wednesday in December. The Alabama statute, Title 10, § 35, § 21(49) of the Code of 1940, as revised, requires that "meetings of the stockholders of a corporation shall be held annually . . ."

Minutes of the Corporation reveal that since the death of W. E. Belcher, Sr. and prior to the controversy involved in this litigation, stockholders meetings were held on October 23, 1945, June 30, 1949, July 28, 1950, December 16, 1950, December 17, 1953, November 13, 1956, February 24, 1958, December 29, 1960.

These meetings are referred to as special meetings and none of them fall on the third Wednesday in December. Accordingly, there was a non-compliance with both the by-laws of the Corporation and the statute as to the holding of annual meetings [15].

Upon insistence of the Trustee, the annual meeting was held on December

14. See Navco Hardwood Co. v. Bass, 214 Ala. 553, 108 So. 452, where it was held that an active general manager or superintendent may recover the reasonable value of necessary services rendered to a corporation whereas corporate officers were presumed to serve without compensation where there was no express prearrangement as to salaries.

15. There have been no meetings of the two partnerships, other than the organizational meetings in 1951 for the Sales Company and in 1956 for the Wood Products Company.

18, 1963. However, prior to the date of the meeting, Brady, W. E., Jr. and Furlong met in the office of their attorneys, Pitts & Pitts of Selma, Alabama, and decided to adjourn the meeting as soon as it was convened. Mr. and Mrs. Maxwell concurred in this planned course of action. After the meeting was called to order Mr. Teel, representing the Trustee, made a request to speak before the motion to adjourn was voted on, stating that "we want to take up some matters about which Mr. Belcher had been personally involved." The motion to adjourn without discussion carried and Teel was ruled out of order.

A special meeting of the stockholders was called by the Trustee to meet on January 15, 1964. This call was upon notice given on December 30, 1963, to each of the stockholders. The notice specified that it was being called for the purpose of directing the Corporation to commence and prosecute actions for relief against Brady and W. E., Jr. in the several particulars heretofore considered and then known to the Trustee. Following receipt of this notice, there was another meeting in Selma with the lawyers, including Attorney George Phillips White. A plan of action for the meeting was again agreed upon. It was decided that in the event any resolution offered by the Trustee received a second that all discussions would be prevented by a motion to table. Mrs. Maxwell agreed to go along with the plan. When the meeting was called to order, Mr. Teel was recognized and offered the resolutions calling for redress [16]. These resolutions were seconded by Mrs. Davis, with the exception of the one relating to a recovery from Brady and W. E., Jr. for money stated to have been wrongfully caused to be diverted to the use of her mother. The latter resolution died for want of a second. All other resolutions were tabled over the votes of the Trustee and Mrs. Davis.

Following this action a motion was made, seconded, and passed by those previously voting to table, that the Trustee furnish a copy of the audit of the affairs of the Corporation made by Arthur Andersen & Company at the expense of the Trustee. The objections of Mr. Teel that the information had been developed at great expense, and that he knew of no law that required stockholders to disclose to corporations, were brushed aside. The resolution also covered an investigation of the charges to be made by Jim Wilson, company auditor.

At the December 16, 1964, meeting of the stockholders the adjournment procedure followed at the December, 1963, meeting was again resorted to. Immediately upon a nomination to re-elect the directors, and without giving the Trustee an opportunity to make a nomination, there was a motion made and passed to close the nominations following which the meeting adjourned.

Brady testified on deposition as to this meeting as follows:

"Q Well, do you understand that one of the purposes of having stockholders' meeting is to let stockholders make inquiry about the business of The Corporation?

A Yes, sir.

Q Of the officers?

A Yes, sir, certainly.

Q And get the officers to answer questions about this?

A Yes, sir. But I had figured there had been enough inquiry before this meeting for all to know about it. I didn't see the necessity to take up time in that meeting.

Q You did not answer any of the matters that are in litigation here at any of the stockholders' meetings, did you, Mr. Belcher?

A We answered them with the provision we were going to look into the charges that were made.

16. These resolutions are set forth in paragraph 191 of the Trustee's amended cross-claim.

Q That was all you ever told them [the stockholders] was that you were going to look into it?

A That is exactly right."

On June 28, 1965, a year and a half after the adoption of the resolution for an investigation by Mr. Wilson, no report of Mr. Wilson's findings had been made to the stockholders, though his work had been completed in the latter part of 1964.

Mr. Wilson admitted that he had not interviewed anyone other than Furlong, and that Furlong had not granted him the permission that he had sought to go to outside sources for information.

At the December 15, 1965, stockholders meeting the Trustee offered a resolution seconded by Mrs. Davis that the president report what, if any, recommendations Mr. Wilson had made and what action, if any, had been taken. The resolution was tabled over the objections of the Trustee and Mrs. Davis. All other resolutions relating to the affairs of the Corporation, seeking redress within the Corporation and requesting the Corporation to take action on matters which had been uncovered since the meeting of January 15, 1964, were tabled over the objections of the Trustee and Mrs. Davis. A resolution offered by Mrs. Davis concerning the terms of the agreement for attorney's fees to be paid by the Corporation was likewise tabled.

One can scarcely read the minutes of the meetings referred to and the evidence relating to them without reaching the firm conclusion that if any morsel of relief was to be obtained on behalf of the Corporation or the Sales and Wood Products Companies it would not be through the agency of the majority, who made short shrift of every attempt in that direction.

 Although the necessity and sufficiency of preliminary demands upon directors, and the circumstances which satisfy omission of such demands, under Rule 23(b), Federal Rules of Civil Procedure, is procedural in nature and governed by federal law, Meltzer v. Atlantic Research Corporation, 4 Cir., 330 F.2d

946, the Alabama decisional law appears to be in line with the federal decisions. See Ellis v. Vandergrift, 173 Ala. 142, 55 So. 781, quoted in the decision on the Florida lands. Also, King v. Livingston Manufacuring Co., 192 Ala. 269, 68 So. 897, where it was said:

"It appears that an appeal to the company, either through its officers or stockholders, for steps to be taken to enforce the liability of its offending directors as charged, would have been wholly vain and fruitless, since the defenders were themselves in full control of the company, both as directors and majority stockholders. It is well settled that in such a case a preliminary appeal to them is not necessary to enable a stockholder to enforce their liability to the company by a suit in his own name. Steiner v. Parsons, 103 Ala. 215, 13 South. 771; Wallace v. Lincoln, etc., Bank, 89 Tenn. 630, 15 S.W. 448, 24 Am.St.Rep. 625."

The federal cases are collected in Cathedral Estates v. Taft Realty Corporation, 2 Cir., 228 F.2d 85, in support of the rule which is stated to be as follows:

"It is clear that under Rule 23(b) and its predecessors a demand need not be made on the directors or shareholders where such a demand would be 'futile,' 'useless,' or 'unavailing.' . . . And where the directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attacked, a demand on them is presumptively futile and need not be made."

Arn v. Bradshaw Oil & Gas Co., 5 Cir., 108 F.2d 125, which construed Equity Rule 27, the predecessor of 23(b), is cited to sustain the second quoted part of the opinion.

 As already noted, the Court in deciding certain of the issues has ruled that there has been a compliance with Rule 23(b). The Court now finds and concludes that as to all other issues as to which relief is granted, there has either been a compliance as to preliminary demand or pleading and proof of

circumstances which satisfies the omission of such demand.

## SECURITIES EXCHANGE ACT VIOLATIONS

Although the Trustee made several general averments of manipulations and fraudulent devices in its original cross-bill and the earlier amendments, specific charges of violations of Section 10 of the Securities Exchange Act of 1934, 15 U.S. C.A. § 78j, and Rule X–10(b)–5, were first introduced into the case by an amendment filed on June 21, 1966. The Court reserved a ruling on the allowance of the amendment, the objections to it, and the motion to strike, insofar as the amendment related to the alleged violations.

The cross-bill was filed on August 6, 1964, and the first amendment to it on May 13, 1965. Additional facts were disclosed by the discovery proceedings pursued after those dates. Also, additional facts were brought to light during the trial which continued beyond June 21, 1966. Nevertheless, there is disclosure of facts in the cross-bill and in the amendment which reveal such knowledge on the part of the Trustee as would have enabled it to have asserted the alleged violations at a much earlier date than June 21, 1966. In that respect the claim is unlike the Florida lands and the Forest Industries claims, the whole facts as to which came to light for the first time during the trial.

The alleged Securities Act violations presented for the first time a Federal cause of action. Already evidence had been taken for fifty-three days. The issue presented by the amendment was not simply a question of conforming the pleadings to the evidence. It belatedly tendered a new cause of action. The objections to the allowance of the amendment asserting violations of Section 10 of the Securities Exchange Act of 1934, and Rule X–10(b)–5 will be sustained. Other aspects of the amendment will not be affected by this ruling.

## THIRTY SHARE SALE

Plaintiff seeks a judgment against Brady, W. E., Jr. and Mrs. Maxwell for damages claimed to have been sustained by him as a result of the sale by the Trustee of 30 shares of the Corporation's stock to Fred Davis. He also seeks to surcharge the Trustee for the loss sustained on the sale, subject to any right of the Trustee to indemnification or exoneration by the other defendants.

Plaintiff asserts that his damages should be the difference between the $63,000.00 received for the stock and the value as of June 7, 1963, of 3% of the Corporation's total stock of 1000 shares.

The Trustee seeks a "judgment against some one or more of the Corporation, Brady Belcher, W. E. Belcher, Jr., Ruby Belcher Maxwell and Robena Belcher Davis, for such damages as the Bank and the trust estate, either or both, have sustained by selling stock in the Corporation to Fred H. Davis in May 1963, at the price at which the said stock was so sold in that sale."

The following additional findings of fact relate in part and are applicable to the section dealing with the options and the dissolutions sought to be accomplished as well as to this subject.

One of the principal purposes for which the Corporation was formed was to provide a vehicle by which the timber lands of the Corporation could be exploited for the benefit of all the owners of the stock of the Corporation.

The purpose for which the Sales Company was formed was to provide a vehicle by which the money representing the profits from the exploitation of the Corporation's timber lands could be gotten out of the Corporation into the hands of the partners of the Sales Company in an advantageous manner from a tax standpoint.

Throughout the history of the Corporation and down to and including its fiscal year ending October 31, 1950, the Corporation made large profits each year

from the exploitation of its timber lands. Thereafter its profits, before taxes, and the extent of its exploitation of its timber lands, are reflected as follows:

| Fiscal Year Ended October 31 | Net Profit or (Loss) Before Income Taxes | Book Value of Timber Cut From Corporation Land |
|---|---|---|
| 1951 | $ 124,792.00 | $ 244,406.96 |
| 1952 | 95,979.18 | 364,226.79 |
| 1953 | 145,172.64 | 538,597.14 |
| 1954 | 305,177.50 | 230,306.54 |
| 1955 | 360,871.13 | 176,323.63 |
| 1956 | 185,949.37 | 270,850.02 |
| 1957 | ( 25,665.88 ) | 159,851.83 |
| 1958 | (314,794.55 ) | 73,944.68 |
| 1959 | ( 9,459.84 ) | 83,362.20 |
| 1960 | ( 9,285.51 ) | 74,682.65 |
| 1961 | 733.90 | 31,134.08 |
| 1962 | 29,878.02 | 19,404.83 |
| 1963 | ( 2,047.66 ) | 33,634.26 |

The downward trend of exploitation, beginning in late 1957 or early 1958, is not reflected in the annual sales of the Corporation, which were as follows:

| Fiscal Year Ended on October 31 | Annual Sales as Per Corporation's Financial Statements |
|---|---|
| 1952 | $ 2,688,204.51 |
| 1953 | 3,044,482.64 |
| 1954 | 2,846,284.49 |
| 1955 | 3,263,693.47 |
| 1956 | 3,234,231.12 |
| 1957 | 3,061,884.11 |
| 1958 | 3,125,539.07 |
| 1959 | 3,598,432.55 |
| 1960 | 3,467,158.02 |
| 1961 | 2,932,852.06 |
| 1962 | 3,349,757.90 |
| 1963 | 3,537,045.29 |

These figures establish that since the time mentioned much of the timber needed in the Corporation's manufacturing operations was supplied by timber purchased from outsiders. Timber thus supplied was at a higher cost basis than timber from the Corporation's own lands, and accounts in some measure for the drop in profits of the Corporation, and a loss in five of seven of the years involved. The reduction in cuttings from the Corporation's lands accounts to some extent for the September 1959 report of Lee of Equitable Life that "growth had exceeded cut and [that] . . . present timber volume is 10 to 15% greater than when property was reappraised" in 1957. The reduction in cuttings enhanced the marketable and liquidating values of the timber lands, and the underlying value of the shares of stock of the Corporation, while at the same time it reduced the corporate earnings on equal or larger sales.

As noted from the findings under the subject of the Output Agreement, the Sales Company was not required to pay for the products it purchased from the Corporation until 15 to 30 days after delivery. Until the latter part of 1957, the Sales Company was continuously indebted to the Corporation for substantial sums of money. Beginning in late 1957, the Sales Company was caused to discontinue making payments *after* delivery, and to begin to make payments *prior* to delivery, with the result that just prior to the expiration date of the 1949 option in 1959 the Corporation was indebted to the Sales Company in the amount of $211,101.47, while just prior to the expiration of the 1951 option in 1961, it was indebted to the Sales Company in the amount of $158,302.88. Just prior to the sale of the 30 shares in May 1963, it owed the Sales Company $90,288.36. If the purpose of the Output Agreement had been followed, the indebtedness of the Sales Company to the Corporation would have been $146,595.55, $165,014.-33, and $123,888.49, respectively, at the times indicated. Since the advance on deliveries was a continuing process much of the Sales Company's current funds was always tied up in advances to the Corporation.

The earnings of the Sales Company from July 1, 1950, to January 31, 1957, totaled $1,075,748.43, of which 85% plus, or $916,500.00, was distributed. Roland and the Trustee Bank's part of those earnings was $177,498.49, of which $151,222.50 was distributed. For the six years beginning February 1, 1957, and ending January 31, 1963, the Sales Company's earnings amounted to $757,-460.61 of which approximately 52%, or $391,316.27, was distributed. The Trustee Bank's part of those earnings was $124,981.01 of which $64,567.18 was distributed. For the three years beginning

February 1, 1963, to January 31, 1966, the Sales Company's earnings amounted to $498,613.65 of which 27.7%, or $138,000.00, was distributed. The Trustee's part of the earnings was $82,271.25. Its distribution was $22,770.00.

The undistributed earnings and earned surplus of the Sales Company on January 31, 1957, were $429,477.98. The Trustee Bank's part was $70,863.86. On January 31, 1959, these sums had increased to $580,785.58 and $95,829.62, respectively, and on January 31, 1963, to $795,622.32 and $131,277.69, respectively. On January 31, 1966, the sums had further increased to $1,156,235.97 and $190,778.94. Since the formation of the partnership in 1951, the records of the Sales Company have reflected an earned surplus of $244,143.72, of which $40,283.21 is attributable to Roland's interest.

Under the terms of the Sales Company partnership agreement, no part of the capital or profits thereof could or can be withdrawn, except by and to the extent specified in a written agreement signed by all the partners.

Under the Wood Products partnership agreement, each partner's share of the net profits thereof was and is required to be credited to the capital accounts of the respective partners and withdrawals from such accounts can be made only at such times and in such amounts as might be decided upon by majority vote of the general partners in meeting assembled in which Brady, W. E., Jr. and Mrs. Davis were and are each entitled to cast four votes, Mrs. Maxwell two votes, and Mrs. Maxwell's daughters one vote each.

Obviously from the very terms of the agreements the detention and distribution of funds in and from the earnings of the partnerships rests with and is subject to the control of any one of the partners of the Sales Company, and with a majority of the partners of the Wood Products Company.

 The literal terms of the agreements are not warrants to the controlling partner or partners to use the right of control as instruments of oppression to defeat the principal purposes for which the partnerships were formed. As for example, partners are required to pay income taxes on their share in the undistributed earnings of the partnerships. By the simple device of reducing the withdrawals, those in control can work an extreme hardship on those not in control, especially where the latter have no significant income from other sources. The evil thus wrought takes on an added odiousness when the control is so exercised by those not so circumstanced.

 When considered in relation to the crucial dates involved, the known and pressing needs of the Trustee Bank and its *cestui que* trust for funds to meet estate and income taxes and other needs, and their lack of knowledge of the actual values involved, the acts of Brady and W. E., Jr. (1) in reducing the cuttings from the Corporation's own lands with the resulting diminution of corporate income and with the attendant enhancement of the value of the timber lands with the probable intent of future acquisition; (2) in increasing the percentage of the retention of the earnings of the Sales Company and their employment as advances to the Corporation thereby creating a fund shortage in the Sales Company; and (3) their unauthorized diversion of Sales Company and Corporation funds into the Bell and Norris ventures, evidence a disregard of their fiduciary positions in the use of the funds of the Corporation, and the Sales Company, and establish a design and pattern on their part to obtain not only the thirty shares but the entire interest of the Trustee Bank at a price far less than the actual value of such interest.

It would needlessly extend the opinion and findings as to this issue to restate the facts found in the sections hereof dealing with the options and the alleged fraud in the 1963 sale and purchase. The facts there set out are adopted here. Among the facts found are those of the failure to divulge and the concealment of cruises, estimates and reports of the value of the timber lands belonging to

the Corporation. Such information was information that all of the stockholders were entitled to have and to share, and as to which the officers were under a duty to furnish. Brady and W. E., Jr. came to the market place armed with this information. The fact that they intended to acquire the stock for the Corporation rather than individually is of no consequence, since they would profit personally in either event. Standing in the relation which they occupied to the Trustee, as directors, stockholders, partners in the Sales Company, and as Trustees and Executors of the Belcher, Sr. estate, and possessing material information as to underlying values not possessed by the Trustee, the shield of "arm's length" dealings is not applicable.

Does the fact that the attempt to purchase did not succeed make a difference respecting liability? In footnote 13 the Court has set out in full Section 21(63) of Title 10 of the Alabama Code. This is a criminal section. Does it impose civil liability?

In Kardon v. National Gypsum Co., (E.D.Pa.) 69 F.Supp. 512, the court in quoting the Restatement, Torts, said:

"'The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if; (a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect. . . .' Restatement, Torts, Vol. 2, Sec. 286. This rule is more than merely a canon of statutory interpretation. The disregard of the command of a statute is a wrongful act and a tort. As was said in Texas & Pacific R. Co. v. Rigsby, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874, 'This is but an application of the maxim, Ubi jus ibi remedium.'"

■■■ The Fifth Circuit in Hooper v. Mountain States Securities Corp., 282 F.2d 195, stated: "we now adopt, as we earlier foreshadowed, (in Reed v. Riddle Airlines, 266 F.2d 314, 315) the principles set forth in the trail-blazer decision of Kardon v. National Gypsum Co., E.D. Pa., 1946, 69 F.Supp. 512, that a violation of rule 10B–5 gives rise to a private right of action." In the absence of an Alabama authority construing Section 21 (63) to the contrary [17], the Court holds that civil liability arises from a violation of the statute.

■■■ A violation of the statute results when an officer of the corporation *does or omits to do* any act " . . . with the *intent to depreciate* the market value of the stock . . . of such corporation, and with the further *intent to enable*" such officer, *"or any other person,* to buy any such stock . . .

---

17. There are numerous decisions dealing with the question of civil liability for the violation of penal and criminal statutes and traffic and safety regulations, Prosser, Law of Torts 3rd Ed., § 35, p. 191, including decisions of the Supreme Court of Alabama, one of the earliest of which is that of Grey's Ex'r v. Mobile Trade Co., 55 Ala. 387 (1876). There the court considered and applied an act of Congress, which was enacted "for the safety of the lives of passengers" on board of vessels propelled by steam, and which provided that cotton and other ignitible cargo should not be carried on the deck unless protected by a covering to prevent ignition from sparks. There was a penalty of one hundred dollars for each such offense. The carrier failed to cover the cotton aboard the boat and it became ignited by the act of a careless smoker, a passenger. A suit for the cotton resulted. Notwithstanding the fact that property and not a passenger was involved in the suit, and the cotton was ignited by a smoker and not from the sparks from the engine, the court in ruling as it did said:

"No rule of law is better settled, than that the violator of both the letter and spirit of a statute is amenable to any person who is injured proximately by such violation, if the injury be within the mischief intended to be prevented.

. . .

"[W]e hold, that the appellee, in running its boat in palpable disregard of the act of congress, as to a complete covering of the cotton, rendered itself accountable for the damage which resulted to the appellee, the same being manifestly a direct consequence of such disregard of the statute."

at less than the real value thereof . . ." Webster defines the word "enable" as meaning "to make able; to give [one] strength or authority sufficient for the purpose." In Bordonaro Bros. Theatres, Inc. v. Loew's, Inc., (W.D. N.Y.) 7 F.R.D. 210, the court stated: " 'Enabled' as defined by Webster means the ability to do; not the doing."

■■■■■■■ The Court holds that a violation of the statute occurs when the officer does or omits to do the act and the requisite intent is established and does not depend upon the fact of purchase [18]. The Court finds that Section 21(63) was intended to protect those who have an ownership, legal or equitable, in the shares of the corporation from conduct such as here shown, and that Brady and W. E., Jr., but not Mrs. Maxwell or Mrs. Davis, violated the statute in that they concealed and failed to divulge information as to the value of the timber lands of the Corporation with the intent to depreciate the market value of the stock of the Corporation with the further intent of enabling the Corporation to buy the 30 shares offered for sale at less than the real value of those shares. They knew the underlying values.[18a]

■■■■■■ The statute is directed to a violation by the act or omission to act of any officer of a corporation, but not to a violation by the act or omission to act of the corporation itself. The statute does not purport to penalize the corporation as such.

■■■■■■ On account of the violation referred to, Brady and W. E., Jr. will be required to account to the plaintiff for the damages sustained by him on the sale of the 30 shares of stock. This of necessity will require a determination of the value per share of the 30 shares of stock at the time of the sale.

If the accounting establishes a value of the 30 shares in excess of the sum paid by Davis, Brady and W. E., Jr. will have the option of discharging any such sum or damages by tendering shares owned by them at the value so established, otherwise a judgment will be rendered against them for any such damages.

The question of the liability of the Trustee to the plaintiff will be determined in that part of this opinion dealing with the claims made by the plaintiff against the Trustee.

## DISSOLUTION AND RECEIVERSHIP

The Trustee and Mrs. Davis seek a dissolution of the Corporation and the Sales and Wood Products partnerships. Mr. Davis joins them with respect to the Corporation. The Trustee, ancillary to a dissolution, seeks the appointment of a receiver. The plaintiff likewise seeks the appointment of a receiver whether or not a dissolution is decreed. Title 10, § 21(78)[19] of the Code of Alabama (Recompiled in 1958) provides, *inter alia*, that a corporation may be dissolved:

"(a) In an action by a stockholder when it is established: . . .

"(2) That the acts of the directors or those in control of the corporation are illegal, oppressive or fraudulent; or

"(3) That the corporate assets are being misapplied or wasted;"

■■■■■■ The parties differ sharply as to whether the adoption of this section

---

18. See Cochran v. Channing Corp., 211 F. Supp. 239 (S.D.N.Y.), and Miller v. Bargain City, U.S.A., Inc., 229 F.Supp. 33 (E.D.Pa.), holding that under Rule 10b–5 of the Securities Act the seller of stock may maintain an action against the wrongdoer even though a person other than the wrongdoer purchased the stock.

18a. Mrs. Maxwell, though participating in the submission of the bid and in the offer to match the Davis bid, like Mrs. Davis was unacquainted with such values.

19. Section 21(78) as well as much of the Alabama corporation law appears to have been taken from the "Model Business Corporation Act." Section 21(78) is a substantial reproduction of Section 90 of that Act and is virtually a verbatim copy of the Illinois Act of 1933. Smith v. Flynn, 275 Ala. 392, 155 So.2d 497.

worked a substantial change in the Alabama law. As observed in Phinizy v. Anniston City Land Co., 195 Ala. 656, 71 So. 469, the Alabama decisions "are not entirely harmonious in their statement of the conditions under which courts of equity will exercise the extraordinary jurisdiction" to dissolve a corporation. It has been declared that a minority stockholder cannot maintain a bill for dissolution "where the corporation is a going concern," Noble v. Gadsden Land & Improvement Co., 133 Ala. 250, 31 So. 856, even though its assets are less than its liabilities, Corey v. Wadsworth, 99 Ala. 68, 11 So. 350. It has been held that where a corporation still has large assets, although it has lost much money, a dissolution will not be decreed, *Phinizy, supra.* If, however, it appears beyond question that the continuance of a profitable business cannot be had, *Phinizy,* or the corporation has "failed of the purposes and objects of its creation," Ross v. American Banana Co., 150 Ala. 268, 43 So. 817, or has suspended its business or is a derelict, Alabama Central Ry. Co. v. Stokes, 157 Ala. 202, 47 So. 336, a dissolution may be decreed.

In *Phinizy,* which was decided in 1916, the court made the following pronouncement of the law:

"It needs no argument to show that this power of intervention, however wholesome and necessary its exercise may sometimes be, is extremely dangerous in its tendencies, and should be exercised only in the plainest cases. It is not enough that the past prosecution of the corporate enterprise or business has been a financial failure, nor is it enough that its future prosecution will probably be devoid of profit, however strong the probability may seem. On the contrary, so long as the corporation is a going concern; so long as it possesses the means and ability to pursue one or more of its primary purposes or lines of business; and so long as the conditions exhibited do not demonstrate to a moral certainty that its continuation must by inevitable necessity result in serious loss in the near future, and in complete ruin sooner or later—a court of equity will not and should not deprive the majority stockholders of their right to carry on their business under their chosen management, however speculative and uncertain its prospects may seem to a disapproving and dissentient minority."

In Henry v. Ide, 208 Ala. 33, 93 South. 860, it was held that relief by way of dissolution, may be granted, if necessary, to rescue the corporation from fraudulent mismanagement by majority stockholders.

 Reading Section 21(78) in the light of these decisions, the Court is of the opinion that Section 21(78) modified and liberalized the existing law and extended the *jurisdiction* of the court to liquidate and dissolve a corporation. Guided by equitable considerations and the applicable principles of law, the ultimate decision remains one for the trial court based upon the particular facts of each case.

There are many decisions of the Alabama Supreme Court governing the appointment of receivers for corporations. The court in Van Antwerp Realty Corp. v. Cooke, 230 Ala. 535, 162 So. 97, largely summarizes the law as follows:

"It is well understood that a receiver will not be appointed of a corporation at the suit of a minority stockholder when the corporation is solvent and a going concern transacting the business for which it was incorporated, except when there is no properly constituted board of directors, or by reason of dissensions among them it is impossible to carry on (Grand Lodge, K.P., v. Shorter, 219 Ala. 293, 122 So. 36), or there is a scheme to wreck the corporation and dissipate its assets, or 'when, by fraud, conspiracy, or covinous conduct, or extreme mismanagement, the rights of minority stockholders are put in imminent peril and the underlying, original, corporate entente cordiale is unfairly destroyed' (Gettinger v. Heaney, 220 Ala. 613, 127 So. 195, 198; Lost Creek Coal & Mineral Land Co. v. Scheuer, 222 Ala.

440, 132 So. 615), or 'to "prevent fraud, save the subject of litigation from material injury, or preserve it from threatened destruction."' Birmingham Disinfectant Co. v. Smith, 174 Ala. 374, 56 So. 721, 722; Fisher v. Bankers' Fire & Marine Ins. Co., 229 Ala. 173, 155 So. 538. And 'the fact that the directors and officers of a corporation are fraudulently misappropriating the assets of the company will not alone of itself constitute ground for the appointment of a receiver. If they are solvent, they can be brought to an accounting, which will afford complete relief and is therefore an adequate remedy' (Hayes v. Jasper Land Co., 147 Ala. 340, 41 So. 909, 910), or if any other remedy affords ample protection (Hayes v. Jasper Land Co., supra; Gettinger v. Heaney, supra), or 'that directors . . . have voted and paid to the estate of a deceased kinsman, who was a director, money of the corporation which they had no authority to so appropriate.' Alabama Coal & Coke Co. v. Shackelford, 137 Ala. 224, 34 So. 833, 97 Am.St.Rep. 23.

"When tested by those rules, the right to a receiver is not here shown. Insolvency of the corporation or its officers is not alleged, nor any other fact which justifies the appointment of a receiver to operate its affairs."

In Henry v. Ide, *supra*, the court stated:

"It is recognized by all the authorities that the appointment of a receiver upon application of the minority stockholders is a power exercised with the greatest caution. Several of the authorities illustrating that this power should be exerciseed only in the plainest cases are found cited in the recent case of Dixie Lumber Co. v. Hellams, 202 Ala. 488, 80 South. 872; but that such receiverships are necessary, although the corporation is solvent, under some circumstances, is shown by numerous authorities, as well as standard text-writers."

The Court has purposely deferred a decision on the issues of dissolution and the appointment of a receiver since many of the facts found on other issues reflect upon, are applicable to, and are refound as to these issues. Without stating at length the facts heretofore found, the principal facts so found may be summarized as follows:

1. The directors, or one or more of them, withheld pertinent information from the minority stockholders as to the (a) value of the properties of the Belcher Companies; (b) the purported acquisition of the Bell and Norris Companies; (c) the Costa Rican venture, and Forest Industries, Inc.; (d) the purchase of the Thiele lands; (e) the making of interest-free loans to Brady and W. E. Belcher, Jr.; and (f) the use of corporate monies to acquire Florida lands by Brady.

2. The directors failed to hold annual or other regular meetings of directors and stockholders.

3. They refrained and failed to make reports of the affairs of the Corporation and to furnish material information to the stockholders.

4. On one occasion Brady loaned money to the Corporation at a higher than the prevailing rate of interest.

5. On numerous occasions Brady, and W. E., Jr. (to less extent), borrowed money without authority from the Corporation for their individual use.

6. Brady used the funds of the Corporation to buy the Florida lands.

7. The majority with superior knowledge of the value of the stock tried to buy a minority stockholder's stock at greatly less than its real value.

8. Brady acted without authority of the directors of the Corporation by engaging in the Costa Rican venture on the Corporation's behalf.

9. Brady and W. E., Jr. acted without authority and beyond the powers of the Sales Company in engaging in the Bell and Norris and Forest Industries enterprises; and in expending large sums of money for and in obligating the Sales Company on behalf of those companies.

10. In many instances they failed to cause records to be kept that fully and accurately reflected the affairs of the Corporation and Sales Company.

11. Brady bid on the Ramsay lands without the knowledge of the other partners.

12. Brady kept the barber shop rentals for up to twenty years without reporting same.

13. The Belcher Motor Company, in which Brady had a personal interest, occupied Corporation's properties for many years without paying rent.

14. They engaged the Corporation in the small loan business contrary to law, and used the funds and personnel of the Corporation for that purpose.

15. They caused the Corporation to pay a salary to Mrs. Ella Belcher when no services were rendered by her and without its authority.

16. Brady caused the Silas Lumber Company, in which he had a personal interest, to be preferred over the Corporation as to commissions on sales made by the Sales Company for Silas and those made for the Corporation.

17. On one occasion Brady loaned the Sales Company's funds and personally retained the interest received.

18. The majority attempted to impose non-existing restrictions on the sale of the corporate stock other than to blood relatives.

19. Without a meeting of the Wood Products partnership and consent thereto by a majority of the partners, W. E., Jr. obtained in 1961 and used $2,500.00 of the partnership funds to purchase a personal and family automobile. Three and one-half years elapsed before any payment was made thereon.

20. No meetings of the partners of the Sales Company and Wood Products partnerships have been held since the organizational meetings in 1951 and 1956, respectively.

21. Brady and W. E., Jr. withheld from the Trustee Bank vital information as to values that had a material bearing upon said Trustee's failure to exercise the options and its offering of the thirty shares of trust stock for sale.

22. Brady and W. E., Jr. withheld from the Trustee Bank and Mrs. Davis information as to negotiations with persons and corporations interested in the acquisition of the timber lands of the Corporation and the Sales Company.

23. Brady and W. E., Jr. have effectively excluded the Trustee Bank and Mrs. Davis from the rights accorded them by law, by the charter of the Corporation, and by the partnership agreements, and have excluded them from the enjoyment of the income of the Sales Company.

24. Brady and W. E., Jr. have knowingly conducted themselves in disregard and in breach of material provisions of the partnership agreements and the fiduciary obligations imposed upon them as general partners.

25. Brady and W. E., Jr. have caused the Corporation and the partnerships to pay substantial attorney's fees for their personal representation in this litigation, thereby appropriating the Corporation and partnership assets to their individual use.

26. Brady and W. E., Jr. have acted oppressively as respects the minority stockholders and partners in their management of the Corporation and the partnerships. In particular they have acted oppressively in that by controlling available funds and withholding distribution of the income of the Sales Company, they have exercised an economic dominance over the minority stockholders and partners which has seriously prejudiced the latters' rights and interests.

27. On several occasions immediately prior to the end of the fiscal years of the Corporation and the Sales Company, Brady made paydowns by checks to the Corporation and the Sales Company on the balances on his obligations to them, and then immediately after the end of the fiscal years reborrowed the funds to cover the "payments," thereby concealing from the other shareholders and partners the existence of such indebtedness and giving an untrue and distorted finan-

cial picture of the conditions of the Corporation and Sales Company.

By enumerating the foregoing facts and findings the Court does not thereby exclude other findings.

The pattern of conduct in the particulars above enumerated and as otherwise shown herein, and the hostility toward the minority stockholders and partners have been such as to destroy the "corporate entente cordiale," as that term is defined in Altoona Warehouse Co. v. Bynum, 242 Ala. 540, 7 So.2d 497. The rapport between the partners in the two partnerships has been ruptured beyond rapprochement. The mutual confidence of the group out of control in the integrity of the controlling group to carry on the affairs of the Belcher enterprises no longer exists. Brady and W. E., Jr. have used the partnerships in a manner prejudicial to the best interests of all the partners.

Title 43, § 34, of the Code of Alabama 1940, provides:

"§ 34—A general partner is entitled to a judgment of dissolution [*inter alia*]: . . .

(2) when another partner fails to perform his duties under the agreement of partnership, or has been guilty of such conduct as tends to affect prejudicially the carrying on of the business . . ."

In Fogg & Vanderslice v. Johnston, 27 Ala. 432, 62 Am.Dec. 771 (1855), the court said:

"A court of equity may . . . decree a dissolution of the partnership, for causes arising subsequently to the formation of the contract, founded upon the misconduct, or fraud, or violation of duty, of one partner . . ."

"A limited partnership may be dissolved for the misconduct of a general partner, or for fraud practiced on the special partner by the general partner." 68 C.J.S. Partnership § 488a, at 1042. "The special partner may institute a suit for the dissolution of the firm, an accounting, and the appointment of a receiver when the misconduct of the general partner or the insolvency of the firm warrants it . . ." *Id.* at 1044, § 489a.

■■■ On the issue of dissolution of the partnerships, the Court cannot wink at the evidence disclosed by this record, nor the facts found herein. Applying the statute and the applicable common law to such evidence and findings, the Court is of the opinion, and so finds, that the two partnerships should be dissolved as prayed for. Such dissolution shall not be construed or given effect as to constitute a "withdrawal" by either Mrs. Davis or the Trustee Bank from the Sales Company on unfavorable terms, as the word "withdrawal" appears in Article "Ninth" of the Sales Company partnership agreement, but shall have effect as provided by the judgment entered herein.

Section 21 of Title 43 of Code of Alabama 1940, provides:

"The general partners are liable to account to each other, and to the special partners, for their management of the partnership, both in law and equity, as other partners."

"The equitable jurisdiction over partnerships is a necessary outgrowth of the jurisdiction over accounting, and the remedies of dissolution, injunction, and receivership are incidents necessary to a final and complete relief." 4 Pomeroy's Equity Jurisprudence (5th Ed. by Symons, 1941) at 1079, § 1421.

In Mitchell v. Williams, 264 Ala. 192, 86 So.2d 369, the court held:

"It is well setttled that when a right is shown to dissolve a partnership, equity will, upon an order of dissolution, appoint a receiver when in its judgment one is necessary to the proper settlement of the partnership affairs. Latimer v. Milford, 241 Ala. 147, 1 So.2d 649; Brooke v. Tucker, 149 Ala. 96, 43 So. 141; § 1162, Title 7, Code 1940."

The Court in Steele v. Steele, 262 Ala. 353, 79 So.2d 8, approved the fol-

lowing holding in Hunter v. Parkman, 259 Ala. 596, 67 So.2d 797:

" 'Of course there can be no partnership settlement until there is a dissolution of the partnership. The bill seeking the appointment of a receiver and a settlement of the partnership with a prayer for general relief as here will be treated as one seeking a decree of dissolution necessary to be made before the settlement is made. The court should make a decree dissolving the partnership, and then refer the cause to a special master to hold a reference and state the assets and liabilities of the partnership and the account of each partner with the partnership, showing whether he owes the partnership or it owes him over and above his liability to it on any account.' "

In Tutwiler v. Dugger, 127 Ala. 191, 28 So. 677, the court said:

"To present a case for an accounting in equity as between partners, . . . Since, as a general rule, the court will interfere only to finally settle the partnership, its dissolution should either be averred or prayed."

The Court can see nothing ahead for these partnerships except continued strife, dissension, discord, and likely insolvency of the Sales Company. The time has come, and is long past, when the partnership bonds should be severed by dissolution. The decree will appoint a receiver to wind up the affairs of the partnerships, and will provide that the special master take, state, and report an account of the assets and liabilities of the partnerships. The decree will also provide for the payment of costs incident to the dissolution, the accounting, and the receivership.

Although the evidence, in the Court's opinion, adequately supports a dissolution of the Corporation the Court in the balancing of equities and conveniences has carefully considered the consequences of such a dissolution on the continued operation of the mills, particularly the one at Centreville, and the fact that more than three hundred employees depend upon the continuation of the operation for a livelihood. The Court has also considered the claim of the majority group in regard to the tax consequences flowing from a complete liquidation. The minority group is willing to accept these consequences, and has no sentimental atttachments with respect to the continuation of the Belcher family enterprise, as the majority appear to have. The Court sees no prospect of harmony between the majority and minority. It sees only discord and hostility. The two groups are unequally yoked together.

The Court is of the opinion that an attempt to injunctively control the acts of the majority would present problems of policing and enforcement that would overburden the resources of the court, and would very likely be ineffective to prevent the oppressive conduct of the majority.

The Court finds no Alabama authority that points to a solution of the difficulty. However, the absence of precedents or novelty in incident presents no obstacle to the exercise of the jurisdiction of a court of equity. Vanderbilt v. Mitchell, 72 N.J.Eq. 632, 67 A. 97; Nashville C. & St. L. Ry. Co. v. McConnell, C.C., 82 F. 65; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 6 Cir., 54 F. 730, 751; and Riley v. Callahan Mining Co., 28 Idaho 525, 155 P. 665.

In the *Riley* case, the court stated:

"From its very nature, and in order to attain its objects, equity must often act without specific statutory authority and sometimes without legal precedent. Each case must stand on its own facts, and the degree of relief applied must be commensurate with the wrong to be remedied. As remarked by Mr. Justice Field in Sharon v. Tucker, 144 U.S. 533, 12 S.Ct. 720, 36 L.Ed. 532, in quoting from Pomeroy's treatise on Equity Jurisprudence:

'It is absolutely impossible to enumerate all the special kinds of relief which may be granted, or to place any bounds to the power of the courts in shaping the relief in

accordance with the circumstances of particular cases.' "

The *Riley* case, decided by the Supreme Court of Idaho in 1916, involved a bill for a dissolution and the appointment of a receiver. The court resolved the controversy short of a dissolution by decreeing the following relief:

"We shall not in this case compel the dissolution of the defendant corporation, but we conclude that plaintiffs are at least entitled to such a measure of equitable relief as will require the defendant corporation to reduce its capital stock to the extent required in order to enable it to distribute among plaintiffs, in exchange for the surrender and cancellation of their share certificates, a proportionate share of the corporate assets, after all the corporate obligations are paid. The stockholders will at once take the proper statutory proceedings to reduce their capital stock accordingly. If they prefer to dissolve the corporation altogether, they may of course exercise their statutory rights in that respect, but it is not the purpose of this decision to force them to do so."

The Court is of the opinion that the special master possibly can devise, and report to the Court for its consideration, a formula whereby the whole properties and assets of the Corporation, and the numerous parcels of timber land, can be valued as a whole and separately as parcels, so that those in the minority can tender their shares of stock to the Corporation (together with such owelty as may be required) in exchange for properties of the Corporation.

A grant of relief along these lines would in the Court's opinion have the following results:

1. First and foremost it would separate the warring factions and permit them to go their separate ways in peace to do whatsoever they wish with their own.

2. Selection can be made in such a manner that the Corporation will, at the least, retain the Centreville mill properties. After the application of mill property values to the whole, there would likely remain in the Corporation sufficient timber lands to permit the continued operation of the mill without disruption of employment, or the destruction of such sentimental values as may be attached to the operation.

3. Although the Court does not propose to pass upon the tax consequences, as such, it would appear that "Sub-chapter S" could be applied to a distribution of the earnings of the Corporation once the Trustee Bank is eliminated as a corporate stockholder, rendering unnecessary the organization of a partnership to avoid tax consequences. The capital gain tax consequences would likely be inapplicable except as to those exchanging their stock for properties. They would have to take such consequences as may result. If all the parties prefer an outright dissolution and liquidation that would be their choice.

The Court is of the opinion, and so holds, that the minority stockholders are at the least entitled to such a measure of equitable relief as the Court has outlined. If, however, the special master finds that a partition as above indicated is not feasible or possible, he shall so report to the Court. The Court will retain jurisdiction to dissolve the Corporation and to appoint a receiver in that eventuality.

The special master will be authorized to employ cruisers, appraisers, and such other assistance as may be required to effectuate the relief granted. The decree will provide for the payment of the expenses and costs incident thereto.

## ATTORNEY'S FEES

The Corporation, the Sales Company, the Wood Products Company, Brady and W. E. Belcher, Jr. made a contract with the law firm of Rives, Peterson, Pettus & Conway by the terms of which the legal expenses of this litigation would be borne 60% by the Corporation, 30% by the Sales Company, and 10% by the Wood Products Company. The attorneys were employed to represent them and others with no conflicting interests. This

representation extended not only to the three companies, Brady and W. E., Jr., but to H. H. Maxwell, Mrs. Maxwell, Mrs. Palmer, Mrs. Hallman, Mrs. Beulah White Belcher, Mrs. Clara Dukes Belcher, W. E. Belcher, III, Belcher Investment Company, Belcher Motor Company, Inc., Brady Belcher Interests, Inc., Southern Pine Homes, Inc., Centreville Oil Company, Mrs. Ella Belcher, and the Trustees and Executors of the estate of W. E. Belcher, Sr.

 The treasuries of the Corporation and the partnerships are not at the disposal of the officers of the Corporation or of the partners to bear the cost of the defense of charges against them personally. Some benefit must inure to the interest of the Corporation and the partnerships by the defense of the charges if they are to bear the attorney's fees or some part of them. Cf. Milone v. English, 113 U.S.App.D.C. 207, 306 F.2d 814; and Grace v. Dodge, 245 Ala. 346, 17 So.2d 237.

Directly in point is the case of Witherspoon v. Hornbein, 70 Colo. 1, 196 P. 865, where it was said:

"The stockholders are complaining of wrongful acts of the directors and officers and are asking relief for the benefit of the corporation, and the directors are defending their own acts on the theory that they are lawful and not wrongful corporate acts. The court found them to be wrongdoers, and appointed a receiver. Certainly wrongdoers in a suit in equity cannot ask in good conscience to be saved harmless from attorney's fees incurred in defense of their wrongful, unlawful conduct. It seems clear that the directors of the corporation who are responsible for the conditions which made the stockholders' suit necessary should bear the expenses of the attorneys employed by them to defend their own misdeeds in office, instead of the corporation. Godley v. Crandall, etc., Co., 153 App.Div. 697, 139 N.Y. Supp. 236, 249; Percy v. Millaudon, 8 Mart. (N.S.) La. 68.

"We think the rule correctly stated in 10 Cyc. 801:

'Directors cannot rightfully pay out the money of the corporation as an attorney's fee for their own defense against the suit of certain shareholders, which they are apprehensive will be brought to test the validity of their acts.'"

 The findings herein speak for themselves, but briefly stated the Court finds that Brady and W. E., Jr. have caused the Corporation and the two partnerships to pay substantial sums for attorney's fees for the defense of personal claims against themselves as defendants and cross-defendants and for the defense of others allied with them. Much of this defensive effort has in no way inured to the benefit of the Corporation and the partnerships, Coker v. Coker, 208 Ala. 239, 94 So. 308, but has been directed in opposition to claims made against Brady and W. E., Jr. for the purpose of vindicating the rights of the Corporation and the partnerships.

The special master shall ascertain and report the reasonable amount of any attorney's fees, costs, and expenses that should be paid by the Corporation and partnerships for all benefits received by them from legal services rendered and costs and expenses necessarily incurred. As to all other fees, costs, and expenses paid by Brady and W. E., Jr. with funds of the Corporation or partnerships, they will account therefor to the Corporation and the partnerships. The special master shall state an account as to same and report his findings to the Court.

The issue as to the attorney's fees to be allowed counsel representing clients suing on behalf of the Corporation and the partnerships is reserved for future consideration.

## PLAINTIFF'S CLAIMS AGAINST THE TRUSTEE

Plaintiff charges the Trustee, Birmingham Trust, with a failure to collect income, to preserve the trust property, to

control assets, and lack of care in the administration of the trust estate; and on account thereof seeks an equitable accounting and related relief.

The loss of the option shares and the 1963 sale of 30 shares of stock for $63,-000.00 are charged as the greatest single source of damage to the trust estate. Plaintiff charges that the options could have been and should have been exercised for $76,146.63, and that based upon values developed during the hearing plaintiff sustained a loss upon the option shares of $973,000.00 and upon the 30-share sale of $387,000.00.

In view of the relief granted to the Trustee, with respect to the optioned shares, which relief will restore the status quo between the plaintiff and the Trustee pertaining to such shares, the Court pretermits findings and a determination of liability of the Trustee to the plaintiff as regard such shares, and will limit its finding and determination of liability of the Trustee to the 30 shares involved in the sale to Fred Davis.

In determining the powers, duties and liabilities of the Trustee resort must be had to the trust instrument and to the rules of law governing trusts and trustees.

In the management and control of the trust estate the Trustee is empowered by the trust instrument to do:

"[A]ll things which in the sole judgment . . . of the Trustee may seem necessary, desirable or proper to promote, protect or conserve the interests thereof and of the beneficiaries thereof, in like manner as if the Trustee were entitled to said property beneficially and every determination of the Trustee in the construction of powers or in any matter with respect to which the Trustee may be empowered to act or exercise discretion hereunder . . . shall be binding upon all persons interested in the trust estate and shall not be objected to or questioned on any grounds whatsoever. *Powers and discretion, however, are vested in the Trustee as a fiduciary in the interest of the trust estate and its beneficiaries* and not for the personal advantage of the Trustee." Par. III (Emphasis supplied)

Paragraph III further provides that:

"[T]he Trustee, without notice to anyone or order of court, shall have and may exercise, among others, each and all of the powers following, *to be broadly construed with respect to the trust estate,* viz: The Trustee shall have power . . . to . . . sell . . all or any property at any time subject to the trusts hereof or any interest therein for such consideration . . and for such term . . . as the Trustee may deem proper . . ." (Emphasis supplied)

As seen from the quoted provisions, the trust instrument vests a wide discretion in the Trustee. This discretion is not unlimited, and cannot be since a court of equity will never favor a construction of a trust that "confers upon a trustee absolute or unbridled powers." Gaines v. Dahlin, 228 Ala. 484, 154 So. 101.

It is axiomatic that by accepting the trust the Trustee became bound to the duties imposed by the instrument and by law, and subject to the liabilities resulting from their violation.

The Supreme Court of Alabama in Birmingham Trust & Savings Co. v. Ansley, 234 Ala. 674, 176 So. 465, approved the following statement from 26 R.C.L. 1323, § 186, as stating the law in this jurisdiction:

"[T]rustees are held merely to the diligence and care which a prudent man ordinarily uses in his own concern. . . . However, if he does not strictly pursue the line of his duty, and a loss ensues, he will be liable to make that loss good, although such loss may have been wholly unexpected. And a trustee is liable for gross negligence, and for his own acts, in not carefully securing money loaned out by him."

In First Nat. Bank of Birmingham v. Basham, 238 Ala. 500, 191 So. 873, the court held that those engaged in business as trustees are taken as under an

implied promise to act "in good faith, with the wisdom, experience and prudence, which careful investors observe in their own affairs." Further the court stated that "banks, authorized by law to engage in a trust business, owe the same fidelity, and are subject to the same rules governing individual trustees, when applicable on principle."

The guidelines are clearly marked in these and other cases. The Court will not unduly extend this opinion on this point by the multiplication of authorities, but will instead proceed with the application of the guidelines to the facts of this particular case.

Plaintiff does not charge the Trustee with conscious or intentional misfeasance.

On May 8, 1963, the Trust Committee of the Bank authorized the sale of 30 shares of the common stock of the Corporation. Plaintiff charges that the Committee gave only cursory attention to the trust as demonstrated by the fact that it took only about one and one-half to two hours to review some seventy-five trusts. The Committee members were unacquainted with the values underlying the stock which they directed to be sold. The handling of the sale and the procurement of a fair price for the shares was left to Turner Rice. After the sale the Committee did not review or confirm the sale. However, the Committee was advised that a bid had been received and accepted. Rice's information as to the financial affairs of the Corporation and the two partnerships was derived from the financial reports furnished him by the respective Companies, Dun & Bradstreet reports, and from the various banks with which the Companies did business.

No stock of the Corporation had ever been publicly traded. The only sales whatever were those to the Corporation under the options for repurchase.

During the period here involved, the Trustee had no one in its trust department familiar with the lumber business or familiar with the value of land and timber except in a loan capacity.

From the inception of the trust Mr. Rice was convinced of the fact that there was a value to the shares of stock in the Corporation that was in excess of book value per share. How much such value exceeded the book value he was unable to state "without current appraisals or cruises." He further stated that "when we want timber land valued, we will select an appraiser known to us to be capable and competent, and have them conduct a survey and cruise of the timber."

The Trustee was unwilling to enter into any kind of negotiations for the sale of their entire holdings in the trust without having a cruise and appraisals of the property. These they deemed significant in determining the overall value of the property.

The Trustee made no inquiry of Brady or of any of the other officers or directors of the Corporation as to their judgment of the land and timber. It sought no outside advice or independent guidance in attempting to determine the value of the more than 100,000 acres of timber land.

There were some computations of values in the files of the Trustee prepared prior to the sale. These figures show that based upon 100,000 acres of timber land at $100.00 per acre less liabilities of $2,802,980.00 the shares were each worth $7,496.89, and upon $50.00 per acre $2,288.56 each. Neither of these assumed values included the manufacturing plant and equipment. Mr. Rice referred to these figures as "a wild estimate." The computations referred to reflect the Trustee's principal, if not sole effort, to determine the value of the shares. Mr. Rice considered the sale to be a securities matter and not a land and timber matter.

There was no public advertisement of the sale. Excluding the time for receiving bids, no information accompanied the invitation to bid other than the book value per share at the end of the preceding fiscal year.

On one of the computations made by Mr. Rice just before the sale there is a notation, "copy of Equitable appraisal." When asked what the significance of this

notation was at that time, Mr. Rice replied, "To find out if Equitable had an appraisal they could make available to us probably." Mr. Rice did not remember taking any steps at the time to obtain a copy of any such appraisal.

After Davis' bid was accepted but before his check arrived, the Corporation matched the Davis bid. If the Corporation had purchased the shares the value of the remaining shares would have been increased, and to such an extent the Corporation's bid was greater than the Davis bid.

It was stated in Cook v. Safe Deposit & Trust Co. of Baltimore, 172 Md. 398, 191 A. 713, that if the bidder can be held to his bargain the seller is also bound. The court stated that "once having accepted a bid, the executor or trustee cannot reopen the sale to let in disappointed or rival bidders." [20]

The principle was reaffirmed in Webb & Knapp, Inc. v. The Hanover Bank, 214 Md. 230, 133 A.2d 450. In line with the general rule, 90 C.J.S. Trusts 463, §§ 298, the court in *Webb & Knapp, Inc.* held that mere inadequacy of price alone would not ordinarily warrant setting aside a sale by a trustee. The court there further held that where the executors and trustees failed to obtain local expert advice in connection with the sale of a large tract of land near the City of Washington, and based their asking price upon an appraisal by a New York firm, not shown to have familiarity with Washington suburban values, their failure to obtain local expert advice amounted to the omission of a step which reasonable prudence called for and justified the trial court in refusing to ratify the sale. In the course of its opinion the court said:

"Fiduciaries undertaking to exercise powers of sale must, of course, make proper efforts to learn the value of what they propose to offer for sale.

Park & Tilford Import Corp. v. Nash, 166 Md. 373, 171 A. 339.

. . . . . .

"The decision to name a price carried with it the need to exercise prudence, care and diligence in fixing the price. That was the key to everything that was to follow. *Obviously, the first step was to obtain a sound appraisal of the property."* (Emphasis supplied)

In the cited case of Park & Tilford Import Corp. v. Nash, involving the sale of a trade-mark, the court pertinently observed:

"In the sale of the trade-mark and good will, it was the duty of the administrator to exercise the same degree of judgment and prudence as an owner would have done in the sale of his own property. If the administrator was without knowledge of the value of the trade-mark and good will, it should have made proper effort to have learned its value, and the greater the difficulty of learning its value, the greater was the effort required of the administrator. There can be no assurance of a sale being fair and just to the owners, unless the seller has some adequate knowledge of the value of the property which he is to sell. Robertson Mfg. Co. v. Chambers, 113 Md. 232, 77 A. 287; Hubbard v. Jarrell, 23 Md. 83; Hopper v. Hopper, 79 Md. 402, 29 A. 611; Carroll v. Hutton, 88 Md. 676, 41 A. 1081."

 It was the duty of the Trustee to act in light of the circumstances existing at the time of the sale and not at the time of the establishment of the trust, Gould, Trustee v. Chappell, 42 Md. 466, or upon an appraisal made many years before, Moore v. School Trustees, 19 Ill. 83. It was common knowledge in 1963 that there had been substantial increase in values generally. So much so that even the Equitable cruise made some ten

20. The Court has already held that Fred Davis did not stand in a fiduciary relationship to the other parties directly involved in the sale. Plaintiff concedes that Davis did not stand in any fiduciary relationship to him. Davis is not a defendant in plaintiff's suit. The Court is of the opinion that the Trustee could have held Davis to his bargain if Davis had not complied with his bid.

years before the sale, if it had been made available to the Trustee, could hardly have been relied on as a sole basis of value of the timber lands. At most it could serve only as a starting point.

 Before offering the 30 shares for sale the Trustee should have at the least sought expert advice from someone with knowledge of the underlying values. Under the circumstances it could not treat the sale of the stock as a security transaction. Mr. Rice conceded that he was unable to state the extent to which the value of the shares exceeded the book value in the absence of current appraisals or cruises, and that when they wanted timber land valued for the purpose of making a loan they would select a competent appraiser and have him conduct a survey and cruise of the timber. Further that the Trustee would have required a cruise and appraisal of the property before selling their entire holdings of 130 shares. In short summary the Trustee did not comply with their own standards nor the standards exacted by law, i. e., the diligence and care which a prudent man ordinarily uses and observes in his own concern and affairs. There is evidence that a cruise would have cost more than $25,000.00. The Court does not rule that a cruise of the timber land was required, nor is required, to determine the value of the shares prior to the 1963 sale, but is of the view, and so holds, that anything short of an appraisal by a competent appraiser would scarcely meet the standards required under the circumstances here involved.

Under the undisputed facts and the applicable principles of law, the Court sees no escape for the Trustee from liability for damages sustained by the plaintiff resulting from its dereliction in the particulars recited. The broad discretion vested in the Trustee to deal with the trust property as if the Trustee itself were beneficially entitled thereto cannot shield the Trustee where the evidence establishes that it has not dealt with the trust property in the manner it would have dealt with it if the Trustee had been beneficially entitled thereto.

The decree will provide that the Trustee will be surcharged with such damages as may be fixed upon a determination of the value per share of the 30 shares at the time of the sale.

 Much of plaintiff's brief is devoted to the questions of the availability of funds for the exercise of the options, the lack of necessity for the sale of the 30 shares of stock, and the irregularity of the sale. The argument on these questions covers a wide ambit. Plaintiff also seeks relief for the failure of the Trustee to collect interest on funds accumulated in the two partnerships. These funds along with the funds of the other partners were used as working capital, though not "capital" as such. None of the other partners in the enterprises received interest on such accumulated funds. There was no dereliction in this regard. Plaintiff also complains of a failure to collect income due the estate of Roland Belcher from the estate of W. E. Belcher, Sr. Under the facts found herein as to the W. E. Belcher, Sr. Estate, the Court finds that the Bank, as Executor, was not derelict as to such matter.

## TRUSTEE BANK'S CLAIM FOR INDEMNITY

As previously noted the Trustee Bank seeks a judgment against Brady, W. E., Jr. and others for such damages as it has sustained from selling the thirty shares it owned in the Corporation to Fred H. Davis. It seeks indemnification or exoneration from Brady and W. E., Jr. if it be held liable to the plaintiff on account of any of their wrongful acts.

The facts and findings upon which the relief here sought is predicated is amply stated and found in the sections dealing with the options, the sale of the thirty shares, and in other sections hereof, and a restatement at this point would be needless repetition.

In Uptagrafft v. United States, 4 Cir., 315 F.2d 200, 203, the court said:

"Though 'exoneration' and 'indemnity' are often used interchangeably,

the former refers to the right to be reimbursed by reason of having paid that which another should be compelled to pay, 35 C.J.S. Exoneration p. 227; the latter, . . . means compensation for loss already sustained."

While in Maryland Casualty Co. v. Charleston Lead Works, (E.D.S.C.) 24 F.2d 836, it was stated:

"[T]he right to exoneration arises between parties who are liable for the same debt, by which, when a party secondarily liable, has paid the principal's obligation, or any part thereof, he is entitled to be reimbursed by the principal debtor, and can bring a bill in equity to enforce that right. It is not alleged that anything has been paid in this case. Comstock v. Corbin et al., 191 Mich. 639, 158 N.W. 106."

▆▆▆▆▆▆ Indemnity though generally springing from contract, expressed or implied, may arise out of liability imposed by law. It is the general rule that indemnity will not be allowed where both parties are joint tort-feasors, and where the fault of each is of equal grade and similar character. However, to be joint tort-feasors within the rule barring indemnity, there must be joint participation in the tort, and the parties must be guilty in equal degrees. 42 C.J.S. Indemnity § 27, at 605.

There are numerous exceptions to the rule barring indemnity, as will be noted in 42 C.J.S. at 606, where it is said:

"It has been variously held that the rule does not apply, and that there may be a recovery of indemnity, where the person seeking indemnity and the person from whom indemnity is sought are not in pari delicto, as where the party who was compelled to pay damages was less culpable than the principal wrongdoer, although both are equally liable to the person injured; or where he was only technically or constructively at fault, as from a failure to perform some legal duty, and the negligent or wrongful act of the party from whom indemnity is sought

was the primary or proximate cause of the injury; or where both parties were at fault, but not in the same fault toward the person injured, and the fault of the party against whom indemnity is claimed was the primary and efficient cause of the injury; . . . ."

Alabama recognizes the exception to the rule. In Mallory S.S. Co. v. Druhan, 17 Ala.App. 365, 84 So. 874, the court made the following pronouncement:

"The exceptions to the rule that indemnity will not be allowed among joint wrongdoers are that a joint wrongdoer may claim indemnity where he has not been guilty of any fault, except technically or constructively, or where both parties are at fault, but the fault of the party from whom indemnity is claimed was the efficient cause of the injury. Where an injury results from a violation of a duty which one owes to another, the parties are not in pari delicto."

*Druhan* is cited as sustaining authority in City of Mobile v. George, 253 Ala. 591, 45 So.2d 778. There it was held that one guilty of active negligence in causing an injury was liable over to one guilty only of passive negligence. See also, Eureka Coal Co. v. Louisville & Nashville R. Co., 219 Ala. 286, 122 So. 169.

The Trustee Bank is not charged with conscious or intentional misfeasance, and its liability is found to originate in passive dereliction with respect to the administration of the trust consisting of no more than simple negligence, while the liability of Brady and W. E., Jr. is based upon affirmative representations of facts, and particularly of facts relating to values, all as heretofore found, inconsistent with facts known to them. Section 111 of Title 7 of the Alabama Code provides:

"One who wilfully deceives another with intent to induce him to alter his position to his injury, or risk, is liable for any damage which he thereby suffers."

While Section 112 provides:

"A deceit, within the meaning of the last section, is either: . . . the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact . . . ."

The acts of Brady and W. E., Jr. fall within the reach of Sections 111 and 112, entitling the Trustee to relief thereunder for the damages sustained by it in the sale of the thirty shares, notwithstanding the Trustee Bank's liability to the plaintiff. Brady and W. E., Jr., also, as previously held, violated Section 21(63) of Title 10 in that they concealed and failed to divulge information as to the value of the timber lands of the Corporation with the intent to depreciate the market value of the stock of the Corporation with the further intent of enabling the Corporation to buy the thirty shares.

In King v. Livingston Mfg. Co., 180 Ala. 118, 60 So. 143, it was held that contributory negligence was not a defense to an action for deceit. Consequently, the negligence of the Trustee Bank would not be a defense under Sections 111 and 112 or Section 21(63).

The Trustee Bank was not in *pari delicto* with Brady and W. E., Jr., and its acts were not equal but of a lesser degree of fault or culpability than those of Brady and W. E., Jr.

The Court deems it appropriate, considering the overall nature of this litigation and the desirability of preventing a multiplicity of actions, to declare and adjudge, and it does so declare and adjudge, that the Trustee Bank is entitled to indemnity against Brady and W. E., Jr. in the event it is compelled first to pay the judgment rendered against it resulting from the surcharge for its dereliction in the sale of the thirty shares belonging to Trust B.

A decree will be entered in conformity with the findings and conclusions made and entered herein.

By separate order to be entered herein, a Special Master will be appointed to make the accounting herein decreed. Said order will prescribe the scope and extent of such accounting.

Also by separate order, a Receiver will be appointed for the partnerships. Such order will likewise prescribe the duties of the Receiver.